ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON (*pro hac vice*)
CHRISTOPHER MARTINS (*pro hac vice*)
JASON H. ALPERSTEIN (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
cmartins@rgrdlaw.com
jalperstein@rgrdlaw.com

HOBSON, BERNARDINO + DAVIS LLP
RAFAEL BERNARDINO, JR. (118690)
JASON A. HOBSON (184134)
725 South Figueroa Street, Suite 3230
Los Angeles, CA  90017
Telephone:  213/235-9190
213/235-9190 (fax)
rbernardino@hbdlegal.com
jhobson@hbdlegal.com

Attorneys for Plaintiff and the Proposed Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FAITH BAUTISTA, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    v.<br><br>VALERO MARKETING AND SUPPLY COMPANY,<br><br>                Defendant. | Case No. 3:15-cv-05557-RS<br><br><u>CLASS ACTION</u><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Faith Bautista ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Second Amended Class Action Complaint against Defendant Valero Marketing and Supply Company ("Valero") and, in support thereof, makes the following allegations, which are based upon the investigation of counsel, facts garnered through discovery, Plaintiff's personal knowledge, and information and belief:

## SUMMARY OF THE ACTION

1. This is a class action brought on behalf of a class of consumers who purchased gasoline with a debit card and were unknowingly charged an undisclosed fee by Valero, in direct violation of California's consumer protection laws and California's Financial Code. This action seeks to end Valero's knowing, intentional, and deliberate debit card processing scheme through which it continues to collect substantial profits from consumers, many of whom are elderly or poor and cannot afford to take an additional financial hit from Valero.

2. Valero's gasoline is sold to consumers through its network of wholly owned, franchised, leased, and branded dealers across the country and the state of California. As such, Valero has a direct stake in the success of its Valero-branded dealers. To drive more sales and increase its own revenue, Valero created a two-tiered pricing program for its dealers, which offers gasoline for sale at a "credit" price and a slightly lower "cash" price; a practice referred to herein as "Split Pricing."

3. Split Pricing generates additional sales and revenue for Valero from consumers hoping to lessen the already heavy burden of gasoline costs by paying for gasoline with a form of payment other than credit. Split Pricing also results in additional sales and revenue for Valero from the holders of Valero's proprietary Valero-branded credit card (the "Valero Card"). One of the key benefits to the Valero Card is that, despite being a credit card, Valero charges cardholders the lower cash price. Without Valero's Split Pricing program, the Valero Card would lose much of its appeal.

4. In addition to increased gasoline sales, Split Pricing also gives Valero an additional revenue stream: fees for processing debit card payments. Valero-branded dealers are contractually required to use Valero's Credit Card Processing Network (the "Network") to process all debit card and credit card payments. Through its Network, Valero collects payments and processing fees

1  directly from consumers and, after skimming its share of the profits, pays the balance to the Valero-

2  branded dealer where the sale was made.

3      5.    The majority of gasoline purchases in this country are made with a debit card.

4  Consumers consider a debit card to be a form of cash, and unless they are notified otherwise,

5  consumers expect to pay the same price for goods purchased with a debit card that they would pay

6  using paper currency.  Recognizing this reality, debit card issuers like VISA and MasterCard have

7  established rules prohibiting undisclosed fees on debit card transactions in order to protect

8  unsuspecting debit card holders.  The California Legislature has also taken steps to protect

9  consumers from undisclosed debit card fees through the enactment of California Financial Code

10  Section 13081(b), which requires the "maximum feasible disclosure" of debit card fees and that

11  consumers be given the option to accept or reject the fee.

12      6.    Contrary to the expectations of reasonable consumers, as evidenced by the protective

13  actions taken by VISA, MasterCard, and the California Legislature, Valero's company policy is to

14  charge the higher credit price on debit card purchases.  And, despite the fact that Valero has sole

15  discretion and authority over the disclosures that consumers receive, Valero deliberately refuses to

16  disclose its company policy of charging consumers a higher price than they expect to pay.

17      7.    The reason for Valero's deliberate refusal to disclose its debit card processing fee, as

18  required by VISA, MasterCard, and the California Legislature, is clear: more money.  In addition to

19  increased revenue from gasoline sales to deceived consumers who would not have purchased

20  Valero's gasoline but for Valero's deceptive scheme, Valero also profits by collecting significantly

21  inflated debit card processing fees.  While both debit card and credit card transactions carry a

22  processing fee, that fee is significantly higher for credit cards.  By charging the same price for both

23  credit card and debit card purchases, Valero is able to collect the higher credit card processing fee on

24  debit card sales.

25      8.    Valero has actual knowledge that its policy of charging a credit price on debit card

26  transactions is deceptive, particularly in light of Valero's Split Pricing signage, which advertises

27  only a cash price and a credit price, and Valero's refusal to disclose its debit card processing policy,

28  which leads consumers to believe that they will pay the cash price when paying with a debit card.

1  Since 2011, Valero has received many complaints from irate customers who consider a debit card to
2  be a form of cash and, therefore, feel deceived by Valero's practices. Those complaints continue to
3  roll in, even after Plaintiff filed this lawsuit and served a written demand on Valero to cease its
4  deceptive practices. Despite having actual knowledge of the consumer deception that it is directly
5  causing, Valero refuses to correct its deceptive signage, disclose its debit card processing policy, or
6  change its policy to process debit cards like cash, as consumers reasonably expect.

7        9.     Valero's scheme harms not only the members of the consumer class who collectively
8  have been swindled out of millions of dollars, it also harms the countless competitors of Valero who
9  do the right thing by clearly disclosing any debit card fees and, therefore, lose customers who are
10  under the false impression that Valero charges no fees, and for that reason, choose Valero over its
11  competitors.

12        10.    In furtherance of its knowing and intentional scheme to deceive consumers, Valero
13  directly and deliberately engaged in at least four deceptive acts or practices that, both collectively
14  and independently, deceived and continue to deceive reasonable consumers, in violation of
15  California's Consumers Legal Remedies Act, California Civil Code Section 1750, *et seq.* (the
16  "CLRA"); False Advertising Law, California Business & Professions Code Section 17500, *et seq.*
17  (the "FAL"); and Unfair Competition Law, California Business & Professions Code Section 17200,
18  *et seq.* (the "UCL"). Valero's unlawful and deceptive acts and practices include:

19       •  Creating, designing, reviewing, and approving deceptive advertising with
20         actual knowledge that such advertising is deceptive;

21       •  Disseminating, displaying, and controlling deceptive advertising with actual
22         knowledge that such advertising is deceptive;

23       •  Processing debit cards at the credit price with actual knowledge that
       consumers expect to pay the cash price; and

24       •  Deliberately refusing to disclose or require disclosure of its debit card
25         processing policy with actual knowledge of the consumer deception that its
       policy causes.
26

27        11.    Valero's failure to make the "maximum feasible disclosure" of the fees that it
28  imposes directly on consumers through its debit card processing policy also violates Cal. Fin. Code

§13081(b), and Valero's violation of that statute operates as a predicate for liability under the UCL's "unlawful" prong.

12.   By this action, Plaintiff seeks injunctive relief to end Valero's knowing and intentional scheme to deceive consumers.  Specifically, Plaintiff seeks an Order requiring Valero to:

- Withdraw its deceptive signage from the market;

- Design future iterations of Split Pricing signage in a manner that puts consumers on notice that Valero charges the credit price on debit card purchases;

- Clearly disclose its debit card processing policy and the higher fee that it imposes on consumers; and

- Change its company policy so that Valero processes debit cards at the cash price, as consumers expect.

13.   Plaintiff also seeks, individually and on behalf of the consumer class, actual damages caused by Valero's deceptive scheme, as well as punitive damages for Valero's knowing and intentional violations of law.

## PARTIES

### *Plaintiff*

14.   Plaintiff Faith Bautista is a citizen of California residing in San Mateo County. Plaintiff purchased gasoline throughout the Class Period from a number of different Valero-branded dealers in California.  Based on the fundamental differences that exist between a debit card and a credit card, including the immediate deduction of cash from a bank account that results in a debit card transaction, Plaintiff considers a debit card to be a form of cash, not credit.  Plaintiff never received any prior notice of Valero's policy of charging the credit price on debit card purchases. Plaintiff would not have purchased gasoline from Valero-branded dealers with a debit card but for Valero's knowing and intentional scheme to deceive consumers for its own profit.

### *Defendant*

15.   Defendant Valero Marketing and Supply Company is a privately held company founded in 1981 that operates as a subsidiary of Valero Energy Corporation and maintains headquarters at One Valero Way, San Antonio, Texas 78249.  Valero is a major supplier of gasoline

1  and sells its gasoline through Valero-branded dealers located throughout the country and the state of

2  California.  Valero knowingly, intentionally, and directly engaged in the following acts or practices

3  that, both collectively and independently, deceive reasonable consumers, in violation of California's

4  consumer protection laws:

5          (a)      ***First, Valero – not its dealers – created, designed, reviewed, and approved***

6  ***the deceptive advertising with actual knowledge that its Split Pricing signage is deceptively***

7  ***designed.***  As demonstrated by Valero's "Wholesale Branding Manual," Valero has the sole ability,

8  discretion, and authority to design the appearance of the signage and all other elements of its Valero-

9  branded dealers.  Valero deliberately designed its Split Pricing signage in a manner that deceives

10  consumers with the specific intent of increasing its own profits through gasoline sales to deceived

11  consumers and inflated debit card processing fees.  Despite having actual knowledge that consumers

12  are being misled by its Split Pricing signage, Valero deliberately continues to create, design, review,

13  and approve new iterations of its signage that continue to cause consumer deception.

14          (b)      ***Second, Valero – not its dealers – disseminated, displayed, and controlled its***

15  ***deceptive signage with actual knowledge that its signage is deceptive.***  Under the terms of its

16  agreements with dealers, like the "Branded Distributor Marketing Agreement," for example, Valero

17  provides its deceptive Split Pricing signage to its dealers and retains the sole discretion to dictate and

18  change the ***number***, ***type***, and ***location*** of the signage installed at its dealers.  Under the terms of

19  those same agreements, Valero maintains ownership of its signage and requires its dealers to return

20  all signage upon the termination of their relationship with Valero.  Despite having actual knowledge

21  that its Split Pricing signage is deceptive to consumers, Valero deliberately continues to disseminate,

22  display, and control deceptive signage at Valero-branded dealers in order to continue profiting off

23  the consumer deception that its signage causes.

24          (c)      ***Third, Valero – not its dealers – processes debit cards at the higher credit***

25  ***price with actual knowledge that consumers expect to pay the cash price.***  Valero, directly and/or

26  through Valero's payment processing agent, processes debit card payments made at Valero-branded

27  dealers through its Network.  Despite having actual knowledge that consumers consider a debit card

28  to be a form of cash and expect to pay the cash price, Valero's company policy is to charge the

1   higher credit price on debit card payments.  Valero collects payments directly from consumers and,

2   after skimming its profits and processing fees, pays the remainder to the dealer where the sale was

3   made.  Despite having actual knowledge that consumers receive no disclosure of Valero's debit card

4   processing policy, Valero deliberately refuses to change its policy in order to continue profiting off

5   unsuspecting consumers.

6          (d)     ***Fourth, Valero – not its dealers – deliberately refuses to disclose, or require***

7   ***disclosure of, its debit card processing policy, despite having actual knowledge of consumer***

8   ***deception.***   Through contractual agreements with its dealers, Valero has the sole discretion and

9   authority over the disclosures that consumers receive.  Debit card fees are material to consumers, and

10   because Valero has superior knowledge of the fees it imposes on unsuspecting consumers, it has a

11   duty to disclose those fees.  Despite having actual knowledge that consumers find Valero's debit

12   card processing policy to be deceptive, Valero deliberately refuses to disclose its debit card

13   processing policy in order to continue profiting off the resulting consumer deception.

14       16.     In the alternative, Valero is directly liable for aiding and abetting unlawful and

15   deceptive acts and practices that violate the CLRA, FAL, and UCL.  Valero has actual knowledge

16   that consumers are being deceived into unknowingly paying undisclosed fees on debit card

17   transactions.  Despite having actual knowledge of the consumer deception, Valero continues to

18   provide substantial and necessary assistance to the deceptive scheme alleged herein, with the specific

19   intent of increasing its own profits.  Specifically, Valero knowingly and deliberately provided

20   substantial assistance, and continues to provide substantial assistance, to the deceptive scheme

21   alleged herein by:

-   Creating, designing, reviewing, and approving deceptive signage to be displayed at Valero-branded dealers;

-   Permitting Valero-branded dealers to use and display deceptive signage;

-   Processing debit cards like credit cards and imposing the higher processing fee on debit card holders; and

-   Refusing to disclose or require Valero-branded dealers to disclose Valero's deceptive debit card processing policy.

1     17.    The deceptive scheme alleged herein, which has caused millions of dollars in

2 damages to deceived consumers, would not be possible without Valero's substantial, knowing, and

3 intentional assistance, which therefore aided and abetted the deceptive scheme.

4                               **INTRADISTRICT ASSIGNMENT**

5     18.    A substantial part of the events or omissions which give rise to the claims in this

6 action occurred in the county of San Mateo, and, as such, this action is properly assigned to the San

7 Francisco division of this Court.

8                               **JURISDICTION AND VENUE**

9     19.    This Court has jurisdiction pursuant to 28 U.S.C. §1332(d)(2)(A) as modified by the

10 Class Action Fairness Act of 2005 because at least one member of the Class is a citizen of a different

11 state than Valero, there are more than 100 members of the Class, and the aggregate amount in

12 controversy exceeds $5 million exclusive of interest and costs.

13     20.    Venue is proper before this Court pursuant to 28 U.S.C. §1391 in that many of the

14 acts and transactions underlying this action occurred in this District and because: (a) Valero is

15 authorized to conduct business in this District and has intentionally availed itself of the laws and

16 markets within this District through the promotion, marketing, distribution, and sale of Valero-

17 branded gasoline; (b) Valero conducts substantial business in this District; and (c) Valero is subject

18 to personal jurisdiction in this District.

19                               **SUBSTANTIVE ALLEGATIONS**

20                       ***Valero Created Deceptive Signage to***

                        ***Display at Valero-branded Dealers***

21

22     21.    In the ultra-competitive gasoline market where up to four competing stations are often

23 found at a single intersection, a price difference of just a few cents can drive motorists from one

24 dealer to another.  In order to steer customers to its own Valero-branded dealers over competing

25 dealers, Valero made a corporate-level decision to offer Split Pricing at many of its locations.

26 Valero then "specifically designed" large signage, like the one seen below, that advertises a cash

27 price and a credit price but fails to disclose that, pursuant to Valero's internal company policy,

28

Valero charges the higher credit price on debit card purchases, rather than the cash price that consumers expect:[1]



22.     Split Pricing generates additional sales and revenue for Valero from consumers hoping to lessen the already heavy burden of gasoline costs by using a form of payment other than credit.  Split Pricing also results in additional sales and revenue from Valero Card purchases.  One of the key benefits to the Valero Card is that, despite being a credit card, Valero charges cardholders the lower cash price.  Without Valero's Split Pricing program, the Valero Card would lose much of its appeal.

### *Reasonable Consumers Expect to Pay the Cash Price When Using a Debit Card*

23.     The majority of consumers purchase gasoline with a debit card.  When those consumers drive by Valero's Split Pricing sign, they must make a determination as to which price will apply to a debit card.  A reasonable consumer would invariably conclude that the cash price applies because consumers consider a debit card to be a form of cash, not a credit card.

---

[1]     A larger version of this image is attached hereto as **Exhibit A**.

24.     Valero has actual knowledge that consumers expect to pay the cash price when paying with a debit card.  Over the years, Valero has received countless complaints from consumers who were deceived by Valero's deceptive scheme.  Those complaints include statements like this: "It's unfortunate that a company does not a[*sic*] appreciate its customers enough to give them the best price they can when using a form of payment ***that is the same as cash***." (Emphasis added).

25.     There are plenty of reasons why reasonable consumers consider a debit card to be a form of cash, not credit.  ***First***, whereas consumers must demonstrate positive credit history to obtain a credit card, virtually anyone with a checking account can obtain a debit card to spend the money in his or her checking account in a safe and convenient manner.  Many consumers also cannot obtain a credit card because they cannot afford the high interest rates or annual fees that credit card companies charge.  These consumers, which include students, the elderly, and other low income Americans, are very aware of the fact that a debit card is not a credit card.  And the very poorest Americans who desire the convenience and security of a debit card but cannot even open a checking account must rely on "prepaid" debit cards like the Gold VISA® Prepaid Card, which, like other debit card issuers, explicitly warns cardholders that "***This is not a credit card***."[2]

26.     ***Second***, consumer-oriented Internet content consistently draws a distinction between debit cards and credit cards.  For example, a July 2010 article in *Consumer Reports Magazine* entitled "Debit or credit: Which card to use?"[3] warns consumers that, unlike with credit card transactions:

> Some hotels, gas stations, restaurants, auto rental companies, and retailers put a hold on the money in your checking account until a debit transaction is processed, which might take up to several days for signature-based payments. What's more, the amount that's blocked can significantly exceed the amount of your purchase. These holds can prevent you from accessing the funds in your bank account and result in bounced checks, declined transactions, or overdraft charges.

---

[2]   Gold Visa Prepaid Card, https://goldvisa.accountnow.com (last visited Sept. 21, 2016).

[3]   *Debit or credit: which card to use?*, CONSUMER REPORTS MAGAZINE (July 2010), http://www.consumerreports.org/cro/magazine-archive/2010/july/money/-debit-or-credit/overview/index.htm.

27.     Likewise, *Investopedia*, an Internet site devoted to investing education, advises consumers that:

> Credit and debit cards typically look almost identical, with 16-digit card numbers, expiration dates and PIN codes. ***But that's where the similarity ends.*** Debit cards allow bank customers to spend money that they have by drawing on funds that they deposited with the card provider. Credit cards allow consumers to borrow money from the card issuer up to a certain limit in order to purchase items or withdraw cash.[4]

28.     ***Third***, there are clear and fundamental differences between debit cards and credit cards.  No cash is deducted from the cardholder's bank account.  Instead, the cardholder receives a bill at the end of each month.  Cardholders may wish to pay off their entire credit card balance, or they may wish to pay only a portion of the balance each month in order to retain some cash in their bank account.  Of course, unpaid credit card balances can accrue significant interest that the cardholder must eventually pay.  Moreover, credit card issuers typically charge cardholders an annual fee.  In stark contrast, a debit card payment results in an immediate deduction of cash from the cardholder's checking account, which is then immediately collected by Valero through its Network.  Cardholders do not receive a bill at the end of each month to settle accounts and they pay no interest on their purchases.  "Prepaid" debit cards, like the Gold VISA® Prepaid Card, for example, function in the same way except that the cash is withdrawn from a dedicated account into which the cardholder deposits cash for the sole purpose of later spending that cash through the prepaid debit card.  As Valero recognizes in its "Credit Card Sales Guide," which sets forth Valero's credit and debit card processing policies that Valero-branded dealers are obligated to follow, debit cards are also eligible to receive "cash back" on purchases, unlike credit cards.  Therefore, reasonable consumers consider a debit card to be a safer and more convenient way to carry and spend cash.

29.     Recognizing that consumers do not expect to pay anything over the cash price when using a debit card, issuers like VISA and MasterCard have taken steps to protect cardholders from

---

[4]   Mark P. Cussen, *Credit vs. Debit Cards: Which is Better?*, INVESTOPEDIA (May 20, 2016), http://www.investopedia.com/articles/personal-finance/050214/credit-vs-debit-cards-which-better.asp. (emphasis added).

1   undisclosed fees, like the fees Valero imposes.  For example, even where, unlike here, consumers are

2   given the option to process a debit card as "credit" or "debit," VISA requires that  "Visa debit Card

3   Transactions are **not** assessed a US Credit Card Surcharge[, and that] [i]t is made clear to the

4   Cardholder that surcharges are not permitted on debit Transactions[.]" (Emphasis added).[5]

5       30.  The California Legislature has also taken steps to protect consumers from undisclosed

6   debit card fees through the enactment of Cal. Fin. Code §13081(b), which requires the "maximum

7   feasible disclosure" of debit card fees and that consumers be given the option to accept or reject the

8   fee.

9       31.  Even Valero distinguishes between debit cards and credit cards throughout its Credit

10  Card Sales Guide, which provides for different processing procedures for credit cards and debit

11  cards.  This is an admission that Valero itself considers a debit card to be a form of cash that must be

12  collected immediately through Valero's Network at the time of sale

13  
14  
*Despite Having Actual Knowledge that Consumers*
*Expect to Pay the Cash Price, Valero Deliberately*
*Charges the Credit Price on Debit Card Purchases*

15      32.  Valero-branded dealers are contractually required to use Valero's Network to process

16  all debit card and credit card payments.  Valero's company policy is to charge the credit price on

17  debit card purchases processed through its Network.  Through this policy, Valero generates

18  increased revenue from both increased gasoline sales to deceived consumers who do not realize they

19  are being overcharged and from inflated debit card processing fees that it collects from unsuspecting

20  consumers.  While both debit card and credit card transactions carry a processing fee, that fee is

21  significantly higher for credit cards.  Credit card processing fees represent a percentage of the total

22  sale price, so they can quickly grow along with the value of the transaction.  By contrast, debit cards

23  carry a flat fee capped by federal law at $0.21 per transaction, plus five basis points multiplied by the

24  
25  
26  
27  
28  

[5]  *See* Visa International Operating Regulations, attached hereto as **Exhibit B**; *see also* MasterCard's policy prohibiting surcharges on debit card, attached hereto as **Exhibit C**; "Q&A" by Visa to its network of merchants informing them that they may not charge consumers any additional fee or surcharge on debit card purchases, attached hereto as **Exhibit D**; Visa infographic informing merchants that they may not charge any additional fee or surcharge on debit card purchases, attached hereto as **Exhibit E**; correspondence from Visa to its network of merchants informing them of the aforementioned settlement and instructing them not to charge additional fees or surcharges on debit card purchases, attached hereto as **Exhibit F**.

1   value of the entire transaction.  By charging the same price for credit card and debit card purchases,

2   Valero is able to collect the significantly higher credit card processing fee on debit card sales.

3

*Valero Deliberately Refuses to Disclose Its*
*Deceptive Debit Card Processing Policy*

4

5   33.     Valero has sole discretion and authority over the disclosures that consumers receive.

6   Yet, despite Valero's superior knowledge of its debit card processing policy, and its actual

7   knowledge that Valero's policy is deceptive to consumers, Valero deliberately refuses to disclose its

8   policy:[6]

9

10

11

12

13

14

15

16

17

18

19

20



21   34.     Consumers paying with a debit card and expecting to pay the cash price look first to

22   the card reader on the POS device, which instructs them to "Insert card and remove."   A screen

23   above the card reader labeled "Instructions" then guides the consumer through the steps to authorize

24   a payment.

25   35.     Because Valero's company policy is to processes debit cards like credit cards, the

26   POS device simply asks for a zip code without providing the cardholder with any options, such as to

27

[6]     A larger version of this image is attached hereto as **Exhibit G**.

28

1    enter a personal identification number ("PIN").  The digital screen then instructs the cardholder to

2    begin fueling.  At that point, reasonable consumers begin fueling their vehicle, as instructed,

3    completely unaware that they were charged a higher price.

4              36.    *After* the POS device instructs the cardholder to begin fueling, a small digital screen

5    to the right of the POS device displays a price labeled only as "price per gallon."  That price also

6    appears on small, dimly lit, digital screens sitting at waist level, which are also labeled only as "price

7    per gallon."  Those small and dimly lit screens do not cure the consumer deception for several

8    reasons.  First, a reasonable consumer does not expect the price at the dispenser to be different from

9    the price advertised on Valero's street sign, so there is no reason to pay close attention to the

10   dispenser in order to confirm Valero's advertised price.  Second, a reasonable consumer would not

11   recognize the "price per gallon" to be the credit price rather than the cash price that they expect

12   because Valero does not expressly label it as such.  Moreover, the difference between the cash price

13   and the credit price can be as little as $0.04 per gallon, so a reasonable consumer would not notice

14   the differential.  A reasonable consumer also would not recall the exact dollar amounts advertised on

15   Valero's street sign but, rather, would simply remember that Valero advertised a cash price that was

16   lower than the credit price.  Therefore, it is reasonable for a consumer to believe that the "price per

17   gallon" displayed on the fuel dispenser represents the cash price they expect.  And if there were any

18   doubts, they would be quickly dispelled by a large white decal appearing directly below the "price

19   per gallon" display that advises consumers in bold, black, uppercase letters that it "**INCLUDES**

20   **CASH DISCOUNT**."

21             37.    In the unlikely event that an extra-savvy consumer were to both notice the small

22   "price per gallon" displays and also suspect that the price appeared to be off by a few cents, the only

23   way to confirm that suspicion would be to walk away from the fuel dispenser island in order to see

24   the prices advertised on Valero's street sign, which is not always visible from where the consumer is

25   standing.  But the law does not require reasonable consumers to be suspicious, or to investigate their

26   suspicions.

27             38.    The first and only time that Valero discloses its higher charge is on the sales receipt,

28   after a sale is completed, and only if the cardholder requests one.  By that time, of course, it is too

1   late for the consumer who has been deceived because unlike with other retail products, consumers

2   cannot simply return the overpriced gasoline for a refund.

3          39.    Valero has actual knowledge that consumers receive no disclosure of Valero's debit

4   card processing policy.  First, Valero does not offer its dealers any such disclosures in the Wholesale

5   Banding Manual, and it does not require dealers to make any such disclosures.  Second, countless

6   customers have made complaints, like the following, directly to Valero: "I have *recently realized*

7   that the gas prices I thought I was paying at your stations wasnt [*sic*] accurate. . . .  These prices are

8   not even listed which in my opinion should be illiegal [*sic*]. . . . People have the right to know

9   exactly what they are paying and sneaky practices . . . lose all respect in my eyes." (Emphasis

10  added).

***Valero Is Knowingly and Intentionally***
***Engaging in Business Acts and Practices***
***that are Deceptive to Consumers***

13         40.    Valero has actual knowledge that its acts and practices alleged herein are deceptive to

14  consumers, but it refuses to correct its practices in order to continue profiting off deceived

15  consumers.  Valero has acquired this actual knowledge from not only this lawsuit and Plaintiff's

16  written demand that Valero cure its deceptive practices, but also from countless customer complaints

17  that it has received since at least 2011 to the present.  Those angry customers informed Valero that

18  they were deceived by Valero's deceptive acts and practices alleged herein.  For example, customers

19  made the following complaints during the Class period directly to Valero:

20      •   I just finished putting gas a [*sic*] one of your Valero Stations and *the price*
            *displayed on [the] pump was not the amount charged* when it began
21          pumping gas.  (Dec. 12, 2011).

22      •   I have purchased fuel at this station because it was usually the most
23          affordable price, and it was close to my home.  *I was very disappointed to*
            *see that Valero now charges my debit card as if it was a credit card instead*
24          *of the past practice of treating it like cash*.  Because of this policy change, I
            will *purchase gas and other items some where [sic] else*. (Jan. 19, 2012).
25

26      •   I used my Debit card to purchase 18.436 gallons of gas. I should have been
            charged $4.039/gal but *when I received the billing receipt* I found I was
27          charged $4.079/gal (which was Credit card price). *I felt I was overbilled*
            $.75 cents. . . . They need to upgrade their software *to inform the patrons*
28

*when entering a card as to what they will be billed*, so the patron can cancel before pumping gas. . . . *most other stations* display preferred option [*sic*] before inserting card, authorization and purchase.  (June 28, 2012).

- About 4 weeks ago at 6am I purchased gas at a Valero gas station in San Jose, CA with my debit card.  The gas attendaed[*sic*]/shift manager charged me the Credit Price for gas.  When I told him that I paid and selected debet [*sic*] he told me *it was Company Policy that the debit card users were given the Credit Price for gas*.  (Dec. 26, 2012).

- I have recently realized that *the gas prices I thought I was paying at your stations wasnt [sic] accurate*.  The stations put the cash prices but apparently there is a separate atm price.  *These prices are not even listed which in my opinion should be illiegal [sic]. . . . People have the right to know exactly what they are paying* and sneaky practices by a person or a co. lose all respect in my eyes.  Sorry but wont [*sic*] be going back to valero [*sic*]. (Jan. 13, 2013).

- I used my DEBIT card on 4/28/13 at the Snappy Food store at 1700 S Chester Ave, Bakersfield, CA 93304. The sign said $3.799 for unlead [*sic*]. The pump said $3.899. The very rude woman clerk said I chose [*sic*] the Credit Card feature. *It did not offer me a choice* and *I do not have a credit caard[sic], only a debit card. I feel I was overcharged.* It was only 80 cents, but *it is still misleading* and that store *must make a small fortune* every week, on the people it gouges. I will never buy another gallon from Valero, unless it is the only station within 300 miles and my car is on empty. (Apr. 30, 2013).

- I just filled up my vehicle, paying at the pump with my debit card. The cash price was posted at the street at 4.069.  I was charged 4.159/ gallon. When I asked inside, *I was told that debit or credit both paid the higher price*. . . . If this is a new company wide policy I will look to other suppliers for my fuel! (May 8, 2014).

- Cust called in the following: Customer states he filled up on 08/18/2014 in the morning and did not receive cash price posted. *Customer would like to confirm if he comes back to site he will get cash price when he pumps*. (Aug. 18, 2014).

- CC Center sent the following complaint – *site is not charging cash/credit price correctly*. (Oct. 21, 2014).

- Customer called in the following: Customer states this station is not giving the cash price when customer fills up. . . . Customer does not want to be contacted but would like the issue resolved. (Jan. 14, 2015).

- Customer called in the following: *[P]ay with debit card, doesn't give cash price*[.] (Jan. 16, 2015).

- The station . . . *is not charging the cash price*. The *customer. . . was upset*. (June 9, 2015).

- Donald called stated that he *didn't get cash price* on 09/07. (Sept. 11, 2015).

- . . . called – said station *refused to adjust to cash price* for fuel on 12/05/15. (Dec. 8, 2015).

- Received a call from Donny stating he went to this station and used his Debit card. . . . Donny then got gas and noticed he was charged the Credit price and not the cash price. He went in and spoke with the attendant. The attendant stated even when he used his debit card it is like Credit because he used a card. *Donny does not feel this is right. He states there is no sign up stating Debit is the same a [sic] Credit. He would like a sign put up about debit and credit being the same*. (Jan. 6, 2016).

- Christopher left msg, I returned his call.  He says the store had *false advertising on gas price*. The signed [*sic*] shows $2.13 but then they charged him $2.29 *for using he [sic] debit card[.]* (Feb. 16, 2016).

- I've been a long time customer of the Valero store in Reedley and other locations for a long time. I normally fill up 2-3 times a week. I always pay with a debit card and noticed about couple months ago that I was now paying the higher credit price when using my debit card. It didn't used to be that way. *I have since started purchasing my gas and diesel at a different brand station that does not charge extra to use a debit card*. It's unfortunate that a company does not a [*sic*] appreciate its customers enough to give them the best price they can when using a *form of payment that is the same as cash*.  (Mar. 30, 2016).

- Amanda called to advise she purchased fuel at this station *thinking she was getting the cash price* even though she used her debit card[.] (July 12, 2016).[7]

41.    The response from Valero's manager of territory sales to the Valero-branded dealers involved in these complaints was predictably curt and unapologetic: "Your cashier is correct…debit sales receive the credit price at all <u>cash/credit</u> sites (*Valero policy*). . . . Please contact the customer and resolve the problem, then advise us of the resolution."  (Emphasis added).

---

[7]    Emphasis added throughout.

42.     Despite having actual knowledge that its acts and practices alleged herein are deceptive to consumers, in direct violation of California's consumer protection laws, Valero has refused to correct the deceptive design of it Split Pricing signage, as seen in the latest 2016 edition of its Wholesale Branding Manual, which still promotes deceptively designed Split Pricing signage. Valero has also refused to disclose its policy of charging the credit price on debit card payments. And despite having actual knowledge that consumers expect to pay the cash price and receive no disclosure of Valero's policy, Valero continues to charge the higher credit price on debit card purchases.

43.     Valero's failure to cure its deceptive acts and practices is deliberate and calculated to increase its own profits at the expense of deceived consumers.  Therefore, Valero's violations of the CLRA, FAL, and UCL were committed knowingly and intentionally.

### *Valero Imposes an Undisclosed Fee for the Use of a POS Device in Violation of Cal. Fin. Code §13081(b)*

44.     The difference between Valero's advertised cash price and the higher credit price that it charges represents a fee that Valero imposes on debit card transactions.  Under California law, it is unlawful to impose any fee on a debit card transaction unless cardholders are provided with the "maximum feasible disclosure" of the fee before they are obligated to pay it.

45.     Cal. Fin. Code §13081(b) provides that "[n]o operator of a point-of-sale device in this state shall impose any fee upon a customer for the use of that device unless that fee is disclosed to the customer prior to the customer being obligated to pay for any goods or services."  Section 13081(a)(3) further provides that it was "the intent of the Legislature in enacting this section to require the **maximum feasible disclosure** of fees at point-of-sale devices." (Emphasis added). Valero does not make **any** timely disclosure regarding its fees at the POS device, let alone the "maximum feasible disclosure."  Therefore, consumers have no ability to choose whether to accept or reject Valero's fee.  Valero's failure to disclose its fee, therefore, violates Section 13081(b).

46.     To be sure, Valero is the operator of a POS device within the meaning of the statute. Section 13081(d) defines the term "operator of a point-of-sale device" as "the person who imposes the fee on a customer for using a point-of-sale device to pay for a good or service."  Through its

1    Network, Valero collects debit card payments, together with processing fees, directly from

2    cardholders and, therefore, Valero directly imposes a fee on debit card customers and is the

3    "operator" of the POS devices at Valero-branded dealers, within the meaning of the statute.

4           47.     The statute also applies to the POS devices at Valero-branded dealers.  Section

5    13081(c) provides that the term "'point-of-sale device' *includes* any device used for the purchase of

6    a good or service where a personal identification number (PIN) is required[.]" (Emphasis added).

7    Under the plain language of the statute, the term "includes" is a word of enlargement, not limitation.

8    Therefore, the statute does not *exclude* from its definition a device that, solely due to the deceptive

9    acts and practices alleged herein, does not ask for a PIN.  The POS device at Valero-branded dealers

10   *would* require a PIN for debit card transactions were it not for Valero's deceptive policy of

11   processing debit cards like credit cards.  To allow Valero to circumvent the protective statute by

12   deceptively processing a debit card as a credit card in order to impose undisclosed fees on

13   cardholders would subvert the California legislature's stated intent to "maximize consumer

14   awareness of fees at point-of-sale devices" by requiring the "maximum feasible disclosure."

15   §13081(a)(3).

16          48.     Valero's violation of Section 13081(b) serves as a predicate for Valero's liability

17   under the "unlawful" prong of the UCL.

18                                  ***Valero's Scheme Has Caused***
                              ***Millions of Dollars in Damages to***
19                            ***Unsuspecting Consumers and***
                                   ***Valero's Competitors***
20

21          49.     Debit cards have become increasingly popular over the last several years.  While only

22   300 million debit card transactions were completed in 1990, that number exploded to 37.6 ***billion*** by

23   2009, and approximately 40.8 ***billion*** debit card transactions were completed each year during the

24   Class Period.  Today, it has been reported that over 80% of consumers rely on debit cards for

25   everyday purchases like gasoline.  Therefore, Valero's deceptive scheme has caused California

26   consumers, including Plaintiff and the Class, millions of dollars in damages during the Class Period.

27          50.     But Valero's scheme does not harm only the members of the consumer class who

28   have collectively been swindled out of millions of dollars.  It also harms the countless competitors of

1    Valero who do the right thing by clearly disclosing any debit card fees and, therefore, lose customers

2    who are under the false impression that Valero charges no fees, and for that reason, choose Valero

3    over its competitors.

4                                  ***Plaintiff Was Deceived by Valero's Scheme***

5          51.    Plaintiff is a resident of South San Francisco, California.  At various times throughout

6    the Class Period, Plaintiff purchased gasoline from a number of Valero-branded dealers throughout

7    California where Valero advertised Split Pricing.

8          52.    Based on the fundamental differences between a debit card and a credit card,

9    including the immediate deduction of cash from a checking account that results in a debit card

10   transaction, Plaintiff considers a debit card to be a form of cash, not credit.

11         53.    Plaintiff never received any prior notice of Valero's debit card processing policy of

12   charging a higher credit price, or any amount in excess of the cash price, on debit card purchases.

13         54.    The Valero-branded dealer located at 6989 Mission Street, Daly City, California is

14   one example of the many Valero-branded dealers where Plaintiff purchased gasoline with a debit

15   card during the Class Period.  Plaintiff saw the cash and credit prices advertised on Valero's Split

16   Pricing sign and concluded that the cash price would apply to her debit card purchase.  Plaintiff

17   followed the instructions on the POS device to insert her debit card.  The digital screen above the

18   card reader labeled "Instructions" asked for a zip code and provided Plaintiff with no options, such

19   as to enter a PIN.

20         55.    Plaintiff either did not notice the "price per gallon" displayed on the fuel dispenser or

21   she did not recognize the price to be Valero's credit price.  After the sale was completed, Plaintiff

22   requested a receipt and was surprised to learn that she had been charged the credit price rather than

23   the advertised cash price that she expected to pay:

24

25

26

27

28

```
DALY CITY GAS          , L306047489001
6989 MISSION ST
DALY CITY  , CA
94014

10/26/2015 01:11:21 PM 827965298

XXXX XXXX XXXX 2360 Mastercard

INVOICE 081445
AUTH 266352

PUMP# 3
REGULAR CR                    10.875G
PRICE/GAL                      2.939

FUEL TOTAL                   $  31.96
                             --------
                  Subtotal = $  31.96
                       Tax = $   0.00
                             --------
                     Total = $  31.96

CREDIT                       $  31.96
*****************************************
APPROVED  266352
*****************************************
```

56.     Plaintiff would not have purchased gasoline from Valero-branded dealers with a debit card but for Valero's knowing and intentional scheme.

57.     As a result of Valero's false, deceptive, and misleading practices, Plaintiff suffered damages in an amount to be proved at trial, but no less than the jurisdictional minimum of this Court.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf the following proposed Class:

> *All persons who paid for Valero-branded gasoline with a debit card in the state of California between July 1, 2011 and the present and were charged a "credit" price that was higher than the "cash" price.*

59.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

60.     Specifically excluded from the Class is Valero, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers or entities controlled by Valero, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Valero and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

61.     *Numerosity*.  The members of the Class are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff alleges that the Class contains many hundreds

1    of thousands of members.  The precise number of Class members is unknown to Plaintiff.  The true

2    number of Class members is known by Valero, however, and thus may be notified of the pendency

3    of this action by first class mail, electronic mail, or published notice.

4        62.    ***Existence and predominance of common questions of law and fact***.   Common

5    questions of law and fact exist as to all members of the Class and predominate over any questions

6    affecting only individual Class members.  These common legal and factual questions include, but

7    are not limited to, the following:

8            (a)    whether Valero created, designed, reviewed, and/or approved deceptive

9    advertising;

10           (b)    whether Valero disseminated and controlled deceptive advertising;

11           (c)    whether Valero adequately disclosed its policy of charging a higher price on

12   debit cards;

13           (d)    whether Valero's acts and practices would deceive a reasonable consumer;

14           (e)    whether Valero aided and abetted deceptive acts and practices that would

15   deceive a reasonable consumer;

16           (f)    whether Valero is an operator of a POS device within the meaning of Cal. Fin.

17   Code §13081(b);

18           (g)    whether the POS devices at Valero-branded dealers meet the definition of a

19   "POS device" within the meaning of Cal. Fin. Code §13081(b);

20           (h)    whether Valero violated the CLRA;

21           (i)    whether Valero violated the FAL;

22           (j)    whether Valero violated the "unlawful" prong of the UCL;

23           (k)    whether Valero violated the "unfair" prong of the UCL;

24           (l)    whether Valero violated the "fraudulent" prong of the UCL;

25           (m)    whether Valero violated Cal. Fin. Code §13081(b);

26           (n)    whether Valero's violations of law were committed knowingly and/or

27   intentionally;

28

1    (o)    whether Plaintiff and the other Class members have sustained monetary loss

2  and the proper measure of that loss;

3    (p)    whether Plaintiff and the other Class members are entitled to punitive

4  damages; and

5    (q)    whether Plaintiff and the other Class members are entitled to declaratory and

6  injunctive relief.

7    63.    ***Typicality***.  Plaintiff's claims are typical of the claims of the other Class members in

8  that Valero deceived Plaintiff in the very same manner that it deceived each of the other Class

9  members.

10    64.    ***Adequacy of representation***.  Plaintiff will fairly and adequately protect the interests

11  of the Class.  Plaintiff has retained counsel highly experienced in complex consumer class action

12  litigation, and Plaintiff intends to vigorously prosecute this action.  Further, Plaintiff has no interests

13  that are antagonistic to those of the members of the Class.

14    65.    ***Superiority***.  A class action is superior to all other available means for the fair and

15  efficient adjudication of this controversy.  The damages or other financial detriment suffered by

16  individual Class members is relatively small compared to the burden and expense that would be

17  involved in individual litigation of their claims against Valero.  It would, thus, be virtually

18  impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed

19  against them.  Furthermore, even if Class members could afford such individualized litigation, the

20  court system could not.  Individualized litigation would create the danger of inconsistent or

21  contradictory judgments arising from the same set of facts.  Individualized litigation would also

22  increase the delay and expense to all parties and the court system from the issues raised by this

23  action.  By contrast, the class action device provides the benefits of adjudication of these issues in a

24  single proceeding, economies of scale, and comprehensive supervision by a single United States

25  District Court, and presents no unusual management difficulties under the circumstances here.

26    66.    In the alternative, the Class may also be certified because:

27

28

1        (a)    the prosecution of separate actions by individual Class members would create

2 a risk of inconsistent or varying adjudication with respect to individual Class members that would

3 establish incompatible standards of conduct for Valero;

4        (b)    the prosecution of separate actions by individual Class members would create

5 a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the

6 interests of other Class members not parties to the adjudications, or substantially impair or impede

7 their ability to protect their interests; and

8        (c)    Valero has acted or refused to act on grounds generally applicable to the Class

9 as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the

10 members of the Class as a whole.

11     67.    Alternatively, certain issues relating to Valero's liability may be certified pursuant to

12 Fed. R. Civ. P. 23(c)(4).

13 **COUNT I**

14 **Violation of the CLRA, Cal. Civ. Code §1750, *et seq.***

15     68.    Plaintiff realleges and incorporates by reference the allegations above as though fully

16 set forth herein.

17     69.    The CLRA "shall be liberally construed and applied to promote its underlying

18 purposes, which are to protect consumers against unfair and deceptive business practices and to

19 provide efficient and economical procedures to secure such protection." Cal. Civ. Code §1760.

20     70.    Plaintiff and the other Class members are consumers as defined by Cal. Civ. Code

21 §1761(d).

22     71.    Gasoline is a good as defined by Cal. Civ. Code §1761(a).

23     72.    Valero violated and continues to violate the CLRA by engaging in the following

24 practices proscribed by Cal. Civ. Code §1770(a) in transactions that were intended to result in, and

25 did result in, the sale of goods to consumers, including Plaintiff and other Class members:

26        (a)    Representing that goods or services have sponsorship, approval,

27 characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a

28 sponsorship, approval, status, affiliation, or connection which he or she does not have (§1770(a)(5));

1       (b)     Advertising goods or services with intent not to sell them as advertised

2  (§1770(a)(9)); and

3       (c)     Making false or misleading statements of fact concerning reasons for,

4  existence of, or amounts of price reductions (§1770(a)(13)).

5       73.     Specifically, as detailed herein, Valero violated the CLRA by creating and displaying

6  signage that advertised cash and credit prices for gasoline but, despite having actual knowledge that

7  consumers consider a debit card to be a form of cash, not credit, Valero deliberately refused to

8  disclose its policy of charging the higher credit price on debit card payments.  Valero had superior

9  knowledge of its debit card processing policy, which is difficult for consumers to discover on their

10 own, and, therefore, Valero had a duty to disclose its policy but refused to do so in order to continue

11 to profit off unsuspecting consumers.  In the alternative, as detailed herein, Valero is liable for

12 knowingly providing substantial assistance to a deceptive scheme that violates the CLRA.

13      74.     Valero's deceptive acts and practices alleged herein are likely to deceive, and in fact,

14 did deceive, reasonable members of the public, including Plaintiff and the other Class members, who

15 consider a debit card to be a form of cash, not credit, and, therefore, do not expect to pay the higher

16 credit price.

17      75.     Valero's deceptive acts and practices alleged herein deceived Plaintiff and the other

18 Class members who would not have purchased gasoline from Valero-branded dealers with a debit

19 card but for Valero's intentional and knowingly deceptive scheme.

20      76.     Pursuant to Cal. Civ. Code §1782(d), Plaintiff seeks an order enjoining the above-

21 described wrongful acts and practices of Valero and for restitution and disgorgement.

22      77.     Pursuant to Cal. Civ. Code §1780(d), Plaintiff has prepared and attached an affidavit

23 stating facts showing that this action has been commenced in a county described as a proper place

24 for the trial.  *See* **Exhibit H**.

25      78.     Pursuant to Cal. Civ. Code §1782, on December 3, 2015, Plaintiff's counsel sent a

26 notice and demand letter by certified mail to Valero, c/o its General Counsel, Jay Browning, One

27 Valero Way, San Antonio, Texas 78249, attached as **Exhibit I**.

28

79. Valero failed to rectify or agree to correct, repair, replace, or otherwise rectify their violations of the CLRA within 30 days. As such, Plaintiff also seeks actual, punitive, and statutory damages for Valero's knowing, intentional, and deliberate violation of the CLRA, as well as costs and attorneys' fees pursuant to Cal. Civ. Code §§1780(e) and 1021.5.

## COUNT II

**False and Misleading Advertising in Violation of the FAL,**
**Cal. Bus. & Prof. Code §17500, *et seq.***

80. Plaintiff realleges and incorporates by reference the allegations in ¶¶1-67, above, as though fully set forth herein.

81. The FAL makes it unlawful for:

[A]ny person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of . . . personal property . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, . . . any statement, concerning that . . . personal property . . . , or concerning any circumstance or matter of fact connected with the proposed . . . disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading," [or for] "any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that . . . property . . . so advertised at the price stated therein, or as so advertised.

82. As detailed herein, Valero violated the FAL by intentionally, knowingly, and deliberately creating and displaying deceptive signage that advertised cash and credit prices for gasoline with the intention of charging the higher credit price on debit card purchases, contrary to the expectations of a reasonable consumer, in order to profit of unsuspecting consumers. In the alternative, as detailed herein, Valero is liable for knowingly providing substantial assistance to deceptive advertising that violates the FAL.

83. Valero's false, deceptive, and misleading advertisements regarding the true price of gasoline are likely to deceive, and in fact, did deceive, members of the public, including Plaintiff and the other Class members, who reasonably and correctly believe that a debit card is a form of cash, not credit, and, therefore, were induced to purchase Valero-branded gasoline through Valero's false, deceptive, and misleading representations regarding the true price of gasoline.

84.     Pursuant to Cal. Bus. & Prof. Code §17203, Plaintiff seeks an order enjoining the above-described wrongful acts and practices of Valero and for restitution and disgorgement.

## COUNT III

### Violations of the UCL, Cal. Bus. & Prof. Code §17200, *et seq.*

85.     Plaintiff realleges and incorporates by reference the allegations above as though fully set forth herein.

86.     The UCL prohibits unfair competition, which the statute defines as any business act or practice that is either: (1) unlawful; (2) unfair; or (3) fraudulent.

87.     As detailed herein, Valero violated the "fraudulent" prong of the UCL by creating and displaying deceptive signage that advertised cash and credit prices for gasoline but, despite having actual knowledge that consumers consider a debit card to be a form of cash, not credit, Valero deliberately refused to disclose its policy of charging the higher credit price on debit card payments. Valero had superior knowledge of its debit card processing policy, which is difficult for consumers to discover on their own, and, therefore, Valero had a duty to disclose its policy but refused to do so in order to continue collecting higher fees from unsuspecting consumers.   In the alternative, as detailed herein, Valero is liable for knowingly providing substantial assistance to a deceptive scheme that violates the "fraudulent" prong of the UCL.

88.     Valero's intentional and knowingly deceptive scheme also violates the "unfair" prong of the UCL because the injury to consumers is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury that consumers themselves could reasonably have avoided.

89.     Valero's intentional and knowingly deceptive scheme, as detailed herein, also violates the "unlawful" prong of the UCL because Valero's scheme violates the following laws:

- Cal. Fin. Code §13081(b);
- the CLRA; and
- the FAL.

90.     Plaintiff reserves the right to allege other violations of law by Valero, which constitute additional fraudulent, unlawful, or unfair business acts or practices in violation of the UCL.

91.     Valero's unlawful, unfair, and fraudulent business acts and practices in violation of the UCL were likely to deceive, and in fact, did deceive, members of the consuming public, including Plaintiff and the other Class members.

92.     Pursuant to the UCL, Plaintiff seeks an order enjoining Valero's unlawful, unfair, and fraudulent business acts and practices in violation of the UCL, and for restitution and disgorgement of Valero's ill-gotten proceeds.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for a judgment as follows:

A.      Certifying the Class as requested herein, appointing Plaintiff as Class Representative, and appointing Robbins Geller Rudman & Dowd LLP and Hobson, Bernardino + Davis LLP as Class counsel;

B.      Awarding declaratory, injunctive, and other equitable relief as permitted by law or equity, including enjoining Valero from continuing the unlawful practices described herein, and directing Valero to identify, with this Court's supervision, victims of its conduct and to pay them restitution of all monies Valero acquired through any act or practice declared by this Court to be wrongful or unlawful;

C.      Awarding Plaintiff and the Class damages, including punitive damages and interest thereon;

D.      Awarding restitution and disgorgement of Valero's revenues to Plaintiff and the other Class members;

E.      Awarding Plaintiff attorneys' fees and costs; and

F.      Providing any and all further legal and equitable relief as this Court may deem just and proper.

1

**JURY DEMAND**

2          Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, and Local Rules of this

3    Court, Plaintiff respectfully demands trial by jury on all issues so triable.

4    DATED:  September 23, 2016                  ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
5                                                STUART A. DAVIDSON (*pro hac vice*)
                                                 CHRISTOPHER C. MARTINS (*pro hac vice*)
6                                                JASON H. ALPERSTEIN (*pro hac vice*)

7

8                                                    *s/ Christopher Martins*
9                                                   CHRISTOPHER MARTINS

10                                               120 East Palmetto Park Road, Suite 500
                                                 Boca Raton, FL  33432
11                                               Telephone:  561/750-3000
                                                 561/750-3364 (fax)
12

13                                               HOBSON, BERNARDINO + DAVIS LLP
                                                 RAFAEL BERNARDINO, JR.
14                                               JASON A. HOBSON
                                                 725 South Figueroa Street, Suite 3230
15                                               Los Angeles, CA  90017
                                                 Telephone:  213/235-9190
16                                               213/235-9190 (fax)

17                                               ROBBINS GELLER RUDMAN
18                                                 & DOWD LLP
                                                 PATRICK W. DANIELS
19                                               655 West Broadway, Suite 1900
                                                 San Diego, CA  92101
20                                               Telephone:  619/231-1058
                                                 619/231-7423 (fax)
21

22                                               ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
23                                               ROXANA PIERCE (*pro hac vice*)
                                                 1701 K Street NW, Suite 350
24                                               Washington, DC  20036
                                                 Telephone:  202/822-6762
25                                               202/828-8528 (fax)

26                                               **Attorneys for Plaintiff and the Proposed Class**

27

28