1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  STUART A. DAVIDSON (*pro hac vice*)
   CHRISTOPHER C. GOLD (*pro hac vice*)
3  JASON H. ALPERSTEIN (*pro hac vice*)
   ERIC S. DWOSKIN (*pro hac vice*)
4  120 East Palmetto Park Road, Suite 500
   Boca Raton, FL  33432
5  Telephone:  561/750-3000
   561/750-3364 (fax)
6  sdavidson@rgrdlaw.com
   cgold@rgrdlaw.com
7  jalperstein@rgrdlaw.com
   edwoskin@rgrdlaw.com
8
   HOBSON, BERNARDINO & DAVIS, LLP
9  RAFAEL BERNARDINO, JR. (118690)
   JASON A. HOBSON (184134)
10 725 South Figueroa Street, Suite 3230
   Los Angeles, CA  90017
11 Telephone:  213/235-9190
   213/235-9197 (fax)
12 rbernardino@hbdlegal.com
   jhobson@hbdlegal.com
13
   Attorneys for Plaintiff and the Class
14

15                 UNITED STATES DISTRICT COURT

16                NORTHERN DISTRICT OF CALIFORNIA

17                    SAN FRANCISCO DIVISION

18 FAITH BAUTISTA, Individually and on    )  Case No. 3:15-cv-05557-RS
   Behalf of All Others Similarly Situated, )
19                                          )  CLASS ACTION
                          Plaintiff,        )
20                                          )  DECLARATION OF CHRISTOPHER C.
         vs.                                )  GOLD IN SUPPORT OF PLAINTIFF'S
21                                          )  MOTION FOR LEAVE TO FILE A
   VALERO MARKETING AND SUPPLY             )  MOTION FOR RECONSIDERATION OF
22 COMPANY,                                 )  THE COURT'S DECERTIFICATION
                                            )  AND SUMMARY JUDGMENT ORDERS
23                        Defendant.        )
   _____ )
24

25

26

27

28

1      I, Christopher C. Gold, declare as follows:

2      1.      I am an attorney admitted to practice in the state of Florida and *pro hac vice* before this

3 Court.  I am a partner with the law firm Robbins Geller Rudman & Dowd LLP and counsel for

4 Plaintiff Faith Bautista in this action.  I submit this Declaration in support of Plaintiff's Motion for

5 Leave to File a Motion for Reconsideration of the Court's Decertification and Summary Judgment

6 Orders.  I have personal knowledge of the facts stated herein and, if called to testify, could and would

7 competently testify thereto.

8      2.      Attached hereto as Exhibit A is a true and correct copy of the October 25, 2018

9 Transcript of Proceedings.

10      3.      Attached hereto as Exhibit B is a true and correct copy of the Deposition of Faith

11 Bautista, taken on May 10, 2017.

12      I declare under penalty of perjury under the laws of the United States of America that the

13 foregoing is true and correct to the best of my knowledge and understanding.

14 Executed this 17th day of December, 2018.

15      By:          */s/ Christopher C. Gold*

16                        Christopher C. Gold

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Pages 1 - 76

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

| | |
|---|---|
| Faith Bautista, )<br>)<br>     Plaintiff, )<br>)<br>  VS. )<br>)<br>Valero Energy Corporation, et )<br>al, )<br>)<br>     Defendants. )<br>_____) | **NO. CV 15-5557 RS** |

San Francisco, California
Thursday, October 25, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          Robbins Geller Rudman Dowd, LLP
                        120 East Palmetto Park Road, Suite 500
                        Boca Raton, FL   33432
                   **BY: CHRISTOPHER GOLD, ESQ.**
                        **STUART A. DAVIDSON, ESQ.**

                        Hobson, Bernardino, Davis, LLP
                        725 South Figueroa Street, Suite 3230
                        Los Angeles, CA   90017
                   **BY: RAFAEL BERNARDINO, JR., ESQ.**

For Defendants:         Crone Hawxhurst, LLP
                        11111 Santa Monica Blvd., Suite 620
                        Los Angeles, CA   90025
                   **BY: DAVID S. HARRIS, ESQ.**
                        **GERALD E. HAWXHURST, ESQ.**

Reported By:            Vicki Eastvold, RMR, CRR
                        Official Reporter

1 | **<u>Thursday - October 25, 2018</u>**                              **<u>3:05 p.m.</u>**

2 |                         <u>P R O C E E D I N G S</u>

3 |                            ---000---

4 |      **THE CLERK:**  Calling case C-15-5557, Bautista versus

5 | Valero Energy Corp.

6 |    Counsel, please state your appearances.

7 |      **MR. GOLD:**  Good afternoon, Your Honor.  Christopher

8 | Gold on behalf of plaintiff and the class.

9 |      **THE COURT:**  Good afternoon.

10 |      **MR. DAVIDSON:**  Good afternoon, Your Honor.  Stuart

11 | Davidson, also on behalf of the class.

12 |      **THE COURT:**  Good afternoon.

13 |      **MR. BERNADINO:**  Good afternoon, Your Honor.  Rafael

14 | Bernadino, also on behalf of the class.

15 |      **THE COURT:**  Good afternoon.

16 |      **MR. HARRIS:**  Good afternoon, Your Honor.  David Harris

17 | on behalf of Valero.

18 |      **THE COURT:**  Good afternoon

19 |      **MR. HAWXHURST:**  Good afternoon, Your Honor.  Jerry

20 | Hawxhurst on behalf of Valero.

21 |      **THE COURT:**  Good afternoon.

22 |      **MR. HAWXHURST:**  And we wanted to thank the Court and

23 | apologize to the Court for accommodating our travel snafu this

24 | morning.

25 |      **THE COURT:**  No problem.  Okay.  So what we have in

1  front of us today are motions to decertify, motions for summary

2  judgment, and motions to exclude expert studies and testimony.

3       What I have to tell you is not so much a tentative ruling

4  on these, but some thoughts and some ground rules that I would

5  like you to follow.

6       First of all, I'd like counsel to focus on the motion to

7  decertify first.  And I think that the summary judgment motions

8  have considerable overlap, and I do request the parties not to

9  repeat the arguments that I heard that also happen to impact

10  the decertification motion.

11       And I also do not propose to hear argument on the *Daubert*

12  motions, the motions to exclude.  They're fully briefed and I'm

13  going to take those under submission.

14       Let me give you a little bit of further guidance on where

15  we're going.

16       As to the motion to decertify.  I'm not inclined at this

17  point to view the involuntary payment doctrine as an obstacle.

18  As you know, I let it go forward as an affirmative defense; and

19  I realize that there is a lack of any real Ninth Circuit or

20  Supreme Court precedent on the issue.  But at the end of the

21  day, to give you the benefit of my thoughts, I don't think it

22  applies as a matter of public policy where California consumer

23  statutes are involved.

24       And the other issues on certification -- reliance, for

25  example -- those I'm not really inclined to think I need to

1   hear much more.

2        But my focus today, or the focus I would like you to have,

3   is on the state of the evidence on the stations involved in the

4   dual pricing and how that record comports with the need for

5   common questions for a class case.  And I do have some

6   significant questions about that.

7        So that's where, for me, the rubber meets the road and I'd

8   like to have you focus.

9        With respect to the (b)(2) injunctive relief class, for

10  those of you who were here before, we had some discussion about

11  injunctive relief and who can be plaintiffs on those claims.  I

12  have to say -- and we were talking about the flushable wipes

13  case and other cases of that kind -- I do think that there are

14  distinctions in terms of the kind of case, and that, carried to

15  its logical extreme, the defense argued on that side you could

16  never bring an injunctive relief (b)(2) case.  And I don't

17  think that's correct.  Again, to some extent, as a matter of

18  public policy.

19       That said, I still would like -- the parties really didn't

20  brief the (b)(2) issue, 23(b)(2), and I think where we'll end

21  up rather than having a full discussion on that I'd like some

22  further briefing on that.  I'm not going to have further

23  argument, but I'd like to have further briefing.

24       Finally, just logistical, as to the use of PowerPoints and

25  the like -- again for those who were here before they heard

 1   this -- I'm not a big fan of PowerPoints in motions.  I don't

 2   preclude them.  I see them a lot in patent cases.  You can

 3   point to specific things if you want me to see some chart or

 4   some collection of points, but what I'm not going to do is have

 5   people run through a presentation to me, a lecture, about what

 6   they want to cover.

 7        I have some further thoughts I won't bore you with about

 8   how some of the PowerPoint approach has actually had a negative

 9   impact on oral argument.  Because I think people get wedded to

10   -- kind of like in the old days people got wedded to the speech

11   they wanted to make.  But be that as it may, I'm not precluding

12   you from using it, but I'm also not going to entertain the

13   answer, Well, we'll get there when we get to that part of the

14   PowerPoint.  That will not happen.  So those are the ground

15   rules.

16        Let's start, as I indicated, with the certification

17   motion.  And I'll go ahead and let the defense begin as the

18   moving party, and see where we go from there.

19        **MR. HAWXHURST:**  Your Honor, Jerry Hawxhurst.  As a

20   housekeeping matter, in light of your preference about

21   PowerPoint, first of all, we didn't have a tutorial, we had

22   evidence.  But what we do have in lieu of PowerPoint, if it

23   pleases the Court, are just copies that we can give to Your

24   Honor and give to defense and that way we're not distracted by

25   the PowerPoint.  You can have them in front of Your Honor.

 1          **THE COURT:**  That's fine.  As long as you don't propose

 2    to go through every page in sequential order like PowerPoints.

 3          **MR. HAWXHURST:**  I think it might be ten pages in one

 4    and eight in the other or something like that.

 5          **MR. HARRIS:**  I believe I have seven.

 6          **MR. HAWXHURST:**  Seven and -- maybe seven.

 7          **MR. HARRIS:**  It's very minimal.

 8        I think that the defendants agree with Your Honor that the

 9    most serious problem when it comes to class certification at

10    this point is the so-called station list.  I think, as we

11    pretty extensively documented in our papers -- and I'll try not

12    to be repetitive.  If I am, please stop me and tell me that you

13    know all of this.

14        But I think it's important to realize what has happened

15    over the course of this case, and it's why we spent a great

16    deal of time documenting the procedural history in our papers.

17    Because at class certification, this issue was raised and the

18    defense counsel at that time pointed out that there was a

19    problem that the plaintiffs were including in their station

20    list a whole bunch stations that either shouldn't be included,

21    that were included for time periods when they shouldn't be,

22    that modified their signs, even stations that were no longer

23    Valero or hadn't yet become Valero-branded stations.

24        And in response to those arguments, plaintiff came forward

25    and assured the Court that she would soon be receiving evidence

from Valero that would easily enable her to define -- I think during oral argument at that time she said -- counsel said they would be able to define "the precise universe." Those were the words that were used. The precise universe of the stations and time periods that were at issue in this case.

And I believe, if I read the Court's ruling correctly, the Court took that assurance, that promise, at face value and said, Okay, if you can prove that this may be workable as a class. And I think what's happened since then is that it's become clear that not only can Ms. Bautista and the class not identify the, quote/unquote, "precise universe of stations," they can't even really get close.

THE COURT: We're down now to 192 stations. And I know you have some arguments as to why those stations are not definitively the correct stations for us to look to.

But there is an overriding suggestion that the reason we can't get to that point, assuming -- and I know the plaintiffs will say, Well, maybe we have gotten to where we need to get. But to the extent we haven't, isn't that because Valero doesn't have the records? And why should that be something, in a sense, you get the benefit of? Because you don't apparently have the information that's going to nail this down for us.

MR. HARRIS: Yes, Your Honor. And I think the answer to that question is very straight forward. And that's that Ms. Bautista sued the wrong party. Or, at least did not

1 include the party she should have included with Valero.

2        **THE COURT:**  The party being 192 stations?

3        **MR. HARRIS:**  Yes, Your Honor.  At the very outset of

4 this case, in our initial Rule 26 disclosures, we informed

5 Ms. Bautista that we don't own the stations, we don't operate

6 the stations, we don't control their signage, we don't control

7 their point-of-sale systems.  And we listed as witnesses the

8 station owners.

9        Now, we obviously couldn't list every station owner

10 because we didn't at that time even know which stations were at

11 issue.  And in some ways we still don't.  I think Ms. Bautista

12 is still claiming she can continue to modify and change the

13 station list going forward.  And so at that point, we couldn't

14 name the stations, but we certainly said to Ms. Bautista, This

15 is a problem.

16        And then when Ms. Bautista served her first set of

17 discovery, she said, Give me a list of all the stations that

18 had allegedly misleading signs.  We said, We can't do that.  We

19 don't own and operate, we don't keep track of that information.

20 Ms. Bautista said, Give us information about the point-of-sale

21 devices.  We said, We can't do that.  We don't own and operate

22 the stations.  And the list goes on.

23        And so Ms. Bautista has known from the beginning --

24        **THE COURT:**  Let me stop you for a moment.  The whole

25 -- I forget the lingo.  It's the POD.  The pay on -- what's

1    that stand for?

2              MR. HARRIS:  The pump of discount.

3              THE COURT:  Pump of discount.  Valero -- Valero

4    launches this program which is, as I understand it -- put the

5    debit card aside for a moment -- is that the consumer may get a

6    discount if they pay in cash.  Is that fair aspect of what the

7    POD is?  Pump of discount?

8              MR. HARRIS:  Yeah.

9              THE COURT:  Aren't they the entity that is both

10   introducing the concept and deriving some of the benefit by

11   virtue of being the vendor of the gasoline products?

12             MR. HARRIS:  Well, I would note, first, that this is

13   not a pricing mechanism that Valero invented.  This is

14   something that's regularly done out there, I'm sure.  Everyone

15   in here has purchased gas and they see these types of

16   promotions all the time.

17        Second, I would point out that it's an optional program.

18   It's not something that Valero came down with and said to the

19   stations, You must implement this policy because it's going to

20   benefit us.  To the contrary, the testimony all showed that

21   Valero has a very strict policy of not giving any advice on

22   whether or not a station should adopt this program.

23        And what the testimony also shows is that it was put in

24   place more to assist the stations who at that time were

25   suffering from increased charges for credit processing, less so

1    than to help Valero.  In fact, as we put in our papers, there's

2    still no evidence to date adduced anywhere in the record to

3    show that Valero had any financial benefit from this at all.

4        Now, there's lawyer argument about, Well, why else would

5    you do it unless it's going to benefit you?  But there's no

6    evidence, nothing that could be pointed to.

7        I'll give you those two answers for that.  And then I

8    would point out again that this is not a situation where Valero

9    is running or in charge of these stations.  These truly are

10   independently owned and operated stations.  And they basically

11   contract with Valero to use Valero's trademarks and trade

12   dress.  And so the amount of control here, the amount of input

13   Valero has, is very minimal compared to I think what

14   Ms. Bautista is trying to paint for Your Honor.

15       **THE COURT:**  Isn't there, though, an argument -- let's

16   assume that the plaintiffs did something that they did not do.

17   And that is, to go to the 192 stations and get discovery from

18   the station owners.  And they then had a record that was air

19   tight that shows when the signage indicated -- you know,

20   credit, debit, cash.  If they had all that information, is it

21   still your position that Valero would not be a defendant?  The

22   proper -- a proper defendant in this case?

23       **MR. HARRIS:**  Well, I want to be careful because I want

24   to separate this out from the issue of the station list.

25       I would say generally speaking, yes, our position is that

1    Valero is not the right party to sue.  With regard to -- with

2    regard to direct liability, I don't believe that the plaintiff

3    can establish that.  I also don't believe they can establish

4    aiding and abetting.  But as far as decertification, the

5    station list, I don't think that really comes into play with

6    that issue, respectfully.

7         **THE COURT:**  I agree with you.  So we do know that the

8    sign company, if you will, SDI, we know they -- and that sign

9    is -- they sell the sign that facilitates the display in

10   dispute.  The disputed display, if one can characterize it in

11   that fashion.  And we do know which stations had the capability

12   of doing this, right?

13        **MR. HARRIS:**  I don't agree with that statement, Your

14   Honor, and I'll tell you why.

15        SDI's list, and we refer to it as a possible station list

16   in our briefs, and that's because that's an accurate

17   description of it.  Ms. Bautista subpoenaed SDI instead of

18   going to the individual stations.  And SDI came back and said,

19   We don't keep track of this information.  And there was a bunch

20   of lawyer correspondence back and forth.  And eventually what

21   they agreed upon is in exchange for not having to testify at

22   depo and all of this stuff, SDI would do its best to go through

23   its prior records and try to put together some sort of list of

24   stations that order signs -- and I quote -- "capable of

25   displaying two prices at once."

1      Now "capable" doesn't get you to that they did.  And

2  doesn't get you to whether or not they actually charged a lower

3  price for cash, whether they charge a lower price for debit or

4  didn't charge a lower price for debit.  And so SDI's list is

5  very problematic.  I think it's so problematic that it's not

6  admissible.  It's certainly not a business record because it

7  wasn't contemporaneously created.  That's undisputed.  Ms.

8  Bautista wanted to get it in under the exception for

9  compilations.

10      However, Ms. Bautista doesn't have -- and certainly hasn't

11 produced -- any of the underlying documents that SDI used to

12 create that list.  Their argument is, Well, you work with SDI,

13 you contract with them, so go demand that they give them to

14 you.  But that's not what the law says.  The law says that the

15 party who's the proponent of the evidence, of the compilation,

16 needs to go get the underlying records and turn them over.

17      And I believe the case law goes a little bit further and

18 says the proponent of the compilation should be able to stand

19 up and say why it's accurate.  And Ms. Bautista certainly can't

20 do that.  She has no idea how it was created.  She hasn't seen

21 the underlying documents.  She doesn't know what it's based on.

22      And more than that -- and, you know, we point this out in

23 our papers, and opposing counsel is not disputing it, but I

24 will note that during meet and confer efforts about the station

25 list after the Court denied the first motion for approval of

1    class notice, Ms. Bautista's counsel specifically represented

2    to Valero's counsel that the reason she had not relied on SDI

3    station list, the first time in creating the list of the 297

4    stations, was because she did not believe it was reliable.  And

5    they told us they were doing us a favor because of how

6    unreliable it was.

7         And so I do not believe that the SDI list is admissible.

8    And so -- and that's the only document to show when signs may

9    -- signs capable of displaying split pricing, two prices at

10   once, went up.  That's all there.

11        And I would note that it also doesn't provide -- as I

12   think I mentioned a little bit -- it doesn't provide any

13   details as to whether or not the stations were actually

14   charging two different prices.

15        And that leads to the second evidentiary problem that we

16   have here, and that's that there's only partial transaction

17   data available.  And why is that?  Well, that's because the

18   transaction data is -- is documenting third parties'

19   transactions, the gas stations, which again Valero does not

20   own, does not operate.  And Valero gets this transaction data

21   from another third-party, a processor, and they save it for I

22   think it's 25 months.  I hope I have that amount of time right.

23   But somewhere along those lines.

24        So their standard retention policy -- because it's not

25   their transaction data in fact -- for the stations, is to get

```
 1    rid of it after that amount of time.  So even if you have a
 2    station show up on SDI's list -- which is not admissible --
 3    saying they installed a sign in 2012, you have no data prior to
 4    January 2014 to show whether they ever charged split pricing.
 5    In fact, there's no evidence whatsoever.  And that goes back to
 6    the fact that Ms. Bautista didn't try to take any discovery
 7    from any station owners.
 8         THE COURT:  I take it, though, your argument is even
 9    if the SDI information were deemed to be admissible, you think
10    it's inadequate as a basis to determine the station's -- the
11    fact of what happened at those stations.
12         MR. HARRIS:  That's right, Your Honor.  That's
13    actually what one of our slides here shows -- it goes
14    through -- is that all of the evidence kind of conflicts with
15    each other that plaintiff has.  So if you look -- this is just
16    one example.  It's one page.  If you look at the first page of
17    this handout, this is one page from Bautista's third station
18    list.  And it's hard to read.  And I apologize for that.  But
19    this is the Sunnyvale Car Spa.
20         And according to Bautista's third station list, the sign
21    was installed in 2012.  And liability stopped, if you look at
22    the furthest to the right column, in January 2016.  But then if
23    you look at SDI station list, which is the next page, what
24    you'll see is there's no end date here.  There's nothing to
25    tell you whether or not a modified sign ever went up, right?
```

1    So if you were to base this on SDI's possible station

2  list, I think the conclusion would have to be the supposedly

3  misleading sign is still up to this day.  But according to

4  Bautista, that's not correct.

5    Now, you say, Well, why did Bautista change that day?

6  Well, you turn to the next page.  And that's because Bautista's

7  investigator spent time looking around Google Maps and managed

8  to find a sign, which is a little bit blurry, but it clearly

9  shows there's two prices with a debit/credit column.  It says

10  debit/credit.  You'll see it in other photos from later dates.

11    And this photo was taken, if you look at the top left

12  corner, in February 2016.  So what is Bautista doing for her

13  list is she's just simply going back to the month before, the

14  last day of the prior month, and guessing because this is the

15  first photo she could find that says "debit" on it, that that

16  must be the date.  January 30, 2016.  That must be the date

17  when they changed the sign.

18    Now, of course, maybe this is made up.  And this is also

19  problematic because if you turn the next page -- I personally

20  went online and looked around on Google Maps.  And I'm not

21  blaming Ms. Bautista's investigator for this.  It's hard to

22  find these pictures.  I spent a good 30 minutes to an hour

23  looking.

24    But I found this picture which shows that the debit/credit

25  price sign actually went up in March of 2015.  So Ms.

1    Bautista's saying a whole year of liability simply because her

2    investigator, clicking around, didn't reveal the right picture.

3        And I have another picture, the next page, shows the same

4    thing.  I was actually able to find this one -- I think it's a

5    little clearer -- showing debit/credit from March 2015.  But

6    the point is, she's expanding liability, and it's just

7    guesswork.

8        And then if you go to the next page, this is a picture

9    that Ms. Bautista said was -- is the immediately prior picture

10   available on Google Maps.  So in other words, you know, there's

11   a March 2015 picture.  What's the next picture before that?

12   Well, this one from July 2014.

13       Now, this shows that there's a credit.  No debit price.

14   But when in those six to eight months did the sign change?

15   It's just guesswork.  And the problem -- you know, I can't tell

16   you when that changed, and neither can Ms. Bautista.  And the

17   problem is that based on this evidence, neither can the jury.

18   And if you're going to have a trial on this, you're going to

19   have to go through all of this information for 192 stations.

20       And what I fear is that the only way to do this fairly at

21   the end of the day would be to call in the station owners as

22   witnesses.  Because none of them have been deposed.  They've

23   been disclosed, but they haven't been disclosed.  So what you

24   end up, then, is at least 192 witnesses.  Because I don't know

25   if the station owners, the person who owns it today in 2018, is

1    the same as the person who owned it in 2012.   Maybe, maybe not.

2    At least 192 witnesses to come in and testify about what their

3    pricing was prior to 2014, at least.   When they put their signs

4    up, when they took them down, when they stopped or started

5    charging split pricing.

6        Because what the transaction data shows, also, is that

7    this isn't a "yes" or "no" proposition.   Station sometimes has

8    split pricing, and then they'll just stop for six months or a

9    year.   And that's outlined in our expert report from Mr. Ugone.

10   Is that -- these stations are all over.   This is not a "yes" or

11   "no" proposition.   This is for these six months "yes," for

12   these eight months "no."   For these six months, "we don't

13   know."

14       And I think that that's the fundamental problem here, Your

15   Honor.   Is that the evidence, even if it's admissible -- and

16   this packet right here, this is saying all of this is

17   admissible, and we obviously dispute that.   But even if

18   everything Bautista intends to put forward is admissible,

19   there's still not enough evidence to get us there.

20           **THE COURT:**   You note that either could be, going back

21   to the class definition when I did certify the class, that

22   there under plaintiff's approach here they might be members of

23   the class that weren't negatively impacted by this for various

24   reasons.

25       That in and of itself doesn't defeat class certification.

There's a lot of law that says if somebody in the course of the
class proceedings there's a putative class member that, for
want of a better way to describe it, gets a windfall, that
doesn't mean you automatically decertify the class.

But there's certainly a point at which you then say it's
lacking in the common -- you know, commonality, and maybe
typicality, as well.

Where do you draw that line?  And why is this so clearly
on one side of the line that --

**MR. HARRIS:**  Sure.  And I think, first, what's
important to realize is I don't think this is a damages issue,
which is what plaintiff keeps trying to paint it as.

**THE COURT:**  The damages issue, usually damages is not
a basis not to certify.

**MR. HARRIS:**  Exactly.  But I think the language you
were just using in terms of windfall, that kind of speaks to
damages.  And I just want to be very clear that this is about
liability, and this is about establishing periods of liability;
not about adding up is it four cents or six cents?  Will this
person get a little extra?  Will this person not get quite
enough?  This is about lengthy periods of time for which there
is no competent evidence to show any liability across 192
stations.

**THE COURT:**  This is not intended to suggest -- I think
it's to the contrary.  I just actually don't know.  You think

1    if you're assessing the question of the propriety of a case

2    proceeding on a class basis, there isn't a concept that it

3    isn't disabling to the class simply because there's some class

4    members that were harmed?  I'm talking about injury, not

5    damages.  Were just not harmed at all.

6        And I thought there was some law that said even if

7    included within the class of putative members that just weren't

8    injured, that doesn't mean you automatically can't certify the

9    class.

10       But perhaps you're saying -- what I'm thinking of is

11   really just a concept of whether or not there are certain class

12   members that get a windfall in terms of damages.

13       **MR. HARRIS:**  I think that's right.  I would also point

14   out that, if memory serves right, I believe in one of

15   Ms. Bautista's filings she has a lengthy footnote that talks

16   about how measuring damages is at a low evidentiary -- is a low

17   evidentiary burden, but proving the fact of damages is very

18   high burden of proof.

19       And I think that's what we're dealing with here.  This is

20   not an issue about -- again, about whether someone should be

21   getting four cents for the ten gallons they bought per gallon

22   or six cents.  What we're talking about is potentially years

23   and years and millions of transactions for which there is no

24   proof of liability whatsoever.

25       **THE COURT:**  Okay.  So I indicated to you that, you

know, particular focused thing I wanted to hear the most about

and then I'll shortly hear from plaintiffs about, is this

identification of stations and how that relates to the common

questions analysis for class cert.

But you also do invoke some arguments with respect to

reliance and some arguments on the voluntary payment doctrine.

And while I've indicated to you that I'm -- those aren't the

ones that I think are particularly compelling for purposes of

this decertification analysis, I don't want to cut you off.  If

you want to tell me anything more on those, feel free.

**MR. HARRIS:**  I don't want to try to convince the Court

to be interested in arguments that it's not interested in.

You know, I think that the one thing I would point out is

the case law is pretty clear on the point that to certify a

class for a FAL claim, CLRA claim, UCL claim, you do need to

come forward and show that there is a common understanding

class wide.  You don't have to prove that every single person

has 100 percent agreement on that.  I don't think that's what

we're trying to say.  But you do have to show that it's

material class-wide and that there's not a great amount of

variety across the class.  You do also have to show it's likely

to mislead class-wide.

And I won't go into detail because I think it's documented

well in our papers, but I do think it's problematic that at

this stage in the case when fact discovery is closed, expert

```
 1    discovery is closed, that Ms. Bautista hasn't come forward with

 2    any sort of class-wide evidence whatsoever on materiality.  And

 3    I know they argue it's common sense.  But --

 4         THE COURT:  They were picking up from some comments I

 5    made at the prior -- one of the prior proceedings, I guess it

 6    was in the first certification, where I was suggesting that

 7    whenever we're talking about price it's going to be material.

 8         So they may be flying that flag, to some extent, because I

 9    made those comments.  Go ahead.

10         MR. HARRIS:  Well, and I agree that in the abstract

11    price is always material.  But I think if you look at the

12    cases, the real question to be asked is not whether the subject

13    matter in abstract of the price -- of the sign is material, but

14    whether the specific representation being challenged is

15    material.

16         And here the plaintiffs aren't alleging something that's

17    -- that we're making claims that are factually untrue, but

18    they're arguing there's an omission of a single word that's

19    causing confusion.  And the only evidence as to whether the

20    omission of the word "debit" from a price sign is confusing --

21    is material to consumers -- not confusing, is material to

22    consumers -- the only evidence of that in the record that I

23    think is applicable class-wide is Mr. Simonson's report.

24         And what he did -- and for the Court's convenience it's

25    the last page of the slide here -- is he showed survey
```

respondents two pictures of Valero as you would see it as
you're passing by in a car.  And one sign just says
cash/credit.  The other sign says cash/credit/debit.

     And what the respondents did is they answered virtually
the same in both groups.  Group A that saw the cash/credit
sign, Group B that saw the cash/credit/debit sign.  The two
groups' answer as to whether or not they would go to this
station are virtually identical.

     And now, Ms. Bautista says, Well, that doesn't make any
sense because obviously people care about price.  My answer to
that, and it's in our reply brief, is, well, it makes a lot of
common sense once you don't assume, as plaintiff does, that
people are actually misled by this.  If people aren't confused
by the inclusion of the word "debit," then you would expect the
result we got, which is that it doesn't change whether people
are likely to go to that station or not.  And that's why it's
very important that we're very specific --

          **THE COURT:**  Just as a matter, again, going back to
common sense.  Let's assume a consumer that has decided for
whatever reason that they want to use their debit card.  That's
how we're going to engage in the transaction, because that's
how they buy gas.  They use their debit card.  Don't you think
at that point it would be material to them if -- and, again,
this all assumes the plaintiff's theory holds up in all the
other ways it has to hold up.  But doesn't it make sense that

 1  if you're a debit card purchaser, and you've concluded by their

 2  sign that the price that you're going to get is a cash price,

 3  which is less than the credit card price, that's not going to

 4  be material to that consumer?

 5          MR. HARRIS:  Well, but that assumes that the sign is

 6  misleading in a way that Ms. Bautista says.

 7          THE COURT:  Correct.

 8          MR. HARRIS:  I think that the proper analysis --

 9  because I think if you start down that road of measuring

10  materiality based upon what the plaintiff says the sign means,

11  it becomes very tricky to actually measure materiality.

12  Because now you're measuring, based on common sense, whether

13  the supposedly misleading aspects are material.  And what our

14  point is --

15          THE COURT:  Isn't that the fight that the jury

16  decides?  I mean, if the question that you're positing is, Is

17  this sign misleading?  Does this lead you to believe that

18  you're getting a benefit in the sense that when you use your

19  debit card it's going to be cash?  And they decide whether or

20  not that's what the sign says or it doesn't say.  Your argument

21  is expecting that answer before you answer the materiality

22  question.

23      The issue is material if the subject is material.  And

24  you're saying, But that's not the -- that's not the impression

25  that someone would have.  That's a different proposition.

1    That, to me, isn't a materiality question.

2        So I guess I'm not following your suggestion that somehow

3    I'm analyzing -- or, they're analyzing materiality incorrectly

4    by saying we think it's misleading and consider it in that

5    context.

6            **MR. HARRIS:**  Well, I think that it becomes problematic

7    when the entire argument is based upon common sense, as opposed

8    to just at base what Ms. Bautista's argument is.  Common sense

9    says that if you were to read the sign this way it would be

10   material.  And what we have here is an objective study

11   (indicating) that separates out that issue.  Because it doesn't

12   take a position as to whether or not people are misled by this

13   sign.  It doesn't give them the answer to that.  It says,

14   Here's what you would see.  How likely are you to go here?

15           **THE COURT:**  I guess what I'm trying to get -- and I'll

16   give you an absurd example.

17       If a sign -- there was a battle about whether or not a

18   sign indicated that you were going to get a benefit if you

19   drive a blue car.  And there's a dispute about does the sign

20   suggest you get a benefit or you don't if you drive a blue car.

21   But the class of people are all red-car-color owners. That's

22   not material.  They couldn't care less whether or not the blue

23   car gets a benefit.  So we know that's not material for that

24   case.

25       This is a different proposition because this is a case

1    where the question is, if you believe their view, a debit card

2    consumer is going to get a benefit on price.  And common sense

3    or not, it doesn't seem to me to be much of a stretch to say

4    that's a material proposition.  You may be able to prove that

5    nobody would interpret the sign that way, but it's very

6    different than the blue car -- the inept and clumsy blue

7    car/red car analogy I just gave.

8         **MR. HARRIS:**  Understood, Your Honor.  I'll take one

9    last stab and then we'll pass.  But I do think -- I understand

10   Your Honor's point.  But I do think the question again isn't

11   whether or not people find the price that they're going to pay

12   material.  It's whether or not the omission of the word "debit"

13   is material.

14        And on that issue, Ms. Bautista has no evidence.  It's

15   just -- again, it's common sense arguments.  And arguments

16   about the presidential elections are driven by gas prices.  But

17   that's not evidence at the end of the day.

18        **THE COURT:**  Let me ask now, and we won't belabor this

19   point, but this will bring the class issue to a conclusion.

20        I will give the parties leave to provide, if they want,

21   some further briefing on the 23(b)(2) injunctive relief only

22   class concept.  Because, you know, the plaintiffs are saying,

23   Well, whatever happens, even if the defense gets everything

24   they want in the decertification motion, we still have a class

25   under 23(b)(2).  And you're saying, Oh, no, no, they wouldn't

have.  But it isn't really fleshed out.  It's kind of like the tail end of the discussion.

So if you want to summarize for me what your position is, and then I will let you elaborate upon it in a further briefing if you would like.

**MR. HARRIS:**  Sure, Your Honor.  And I will admit to the Court up front that my position is almost as short as what's in our paper.  I think our initial position was that obviously the case law holds that you can't seek -- if monetary relief is your principal concern in a case, you can't seek certification under 23(b)(2).  So our initial position was that's clearly the prime motivating factor here for Ms. Bautista.

**THE COURT:**  You can't have both a (b)(3) and a (b)(2) class.

**MR. HARRIS:**  I'm not sure if you can't have both.  But I do know that you can't go to court and say, Well, yes, we're seeking $12,000,000, but really it's just the injunction that we're after, Your Honor.  Therefore, certify under 23(b)(2).  The case law is pretty clear on that point.

As far as Ms. Bautista's subsequent offer to drop the damages and restitution claims and pursue only injunctive relief, that, Your Honor, I frankly have not researched and I would hate to say something that's inaccurate in front of you.

So as to that aspect of whether the case can properly be

1   certified under 23(b)(2) if all of the damages, restitution,

2   monetary relief claims are out for the class, that I would like

3   to save my remarks for written brief.

4        **THE COURT:**  Okay.  I did -- varying on this theme,

5   came up in a case of mine, so you can both pore over it and

6   look at it and see if it has some application.  It's called

7   *Premiere Nutrition*.  It was otherwise to its friends and foes

8   referred to as Joint Juice, which is the product.

9        But there was some issue there where they dropped claims

10  -- this is my recollection, I may be wrong when I really go

11  back and look at it -- they dropped the monetary claims and

12  wanted to proceed only on an injunctive relief claim.  And

13  there was some litigation about that.  So you may want to look

14  at that because it was my case.  It still is.  The case is

15  still pending, I have to say.

16       The analysis on the identification of the stations, does

17  that fall away if it's a (b)(2) class?  Maybe I should just let

18  you brief this question further and not try to have too much of

19  a discussion now.  But are those concerns still implicated or

20  not in (b)(2) class?

21       **MR. HARRIS:**  I would have to think it through.

22       **THE COURT:**  All right.  I won't get too far down the

23  path because we will have some further briefing.  We'll talk

24  about that at the end of the discussion.

25       Okay.  So we'll come back to the motions for summary

1  judgment.  But let me go to the plaintiffs on the

2  decertification.  And I'll come back to you, Mr. Harris.

3            **MR. GOLD:**  Thank you, Your Honor.  When you look at

4  the application of the class action rule in general to consumer

5  class actions, it does not get any more straight forward or

6  simpler than it does in this case.  In fact, this case, I view

7  it, if there ever was one, almost a cookie cutter of a consumer

8  class action.

9       The reason I say that is because I understand counsel's

10 talking about, you know, variations, materiality, and what

11 consumers think.  Respectfully, I feel that's hyperbole.  There

12 are no variations in this case.  Well, let's say has a minimal

13 amount of variations in this case.

14      Let's look at the question of whether their signage is

15 misleading.  This is not an implied message case, right?  Like

16 Joint Juice.

17           **THE COURT:**  Why don't you start with my fundamental

18 problem, which is --

19           **MR. GOLD:**  Oh, sure.

20           **THE COURT:**  -- the state of the record on the

21 identification of the stations.  Because, I'll be candid with

22 you, that's a big problem for you in my mind right now.  So you

23 need to tell me why I should lay my burden down on that.

24      The other issues I think we can discuss them.  But in

25 fairness to you, that's your big hurdle.  So why don't you talk

```
 1    about that.

 2           MR. GOLD:  Fair enough, Your Honor.  Respectfully, and

 3    I think you'll agree with me when I'm finished, it's not a

 4    hurdle at all.  Again, I think, as defendants are doing

 5    throughout their entire brief, it's all exaggeration and

 6    hyperbole.

 7           With respect to the dates at issue, there's no mystery

 8    about the dates on which these stations installed their

 9    signage.  Because SDI installs the signage.  Every sign that

10    goes up, whether it's a deceptive sign, or whether they change

11    it to a nondeceptive sign, a lot of documentary evidence gets

12    generated.  Emails between SDI and Valero, purchase orders,

13    drawings of the sign what it's going to look like, invoices.

14    These things cost a lot of money.  They're several thousand

15    dollars.  Everyone -- SDI and Valero -- know exactly when the

16    signs go up.

17           THE COURT:  Assuming the admissibility of the SDI

18    information, which is a question I want you to address, if it

19    does get admitted you think I can assume that every -- I can

20    make the chain, the link in the chain, that every sign that is

21    ordered and that goes to one of the stations, the deceptive

22    signage is displayed.

23           MR. GOLD:  Yes.  Yes, you can.

24           THE COURT:  Why?

25           MR. GOLD:  Okay.  Well, first of all, I'll just say
```

1   the SDI list is not the only evidence we have.  We also have

2   signs from Google Maps which fully corroborate the dates on the

3   list.  And to the extent the defendant has pointed out any

4   errors in the list -- which there are some errors, and that's

5   what they're pointing out to you -- it's essentially moot

6   because we are going to change our damages calculation so at

7   trial we will have a perfect calculation with no errors.

8         Getting to your question.  The only reasonable dispute

9   that they have with the station list -- and I'm mindful of what

10  Your Honor said about not liking PowerPoints, but in this

11  instance I think it would be helpful just to be able to show it

12  to you.

13              **THE COURT:**  Go ahead.

14          **MR. GOLD:**  I have one here for --

15        Can you please hand that up to the judge?  Thank you.

16        What we're talking about is the dates on which a station

17  changed their sign to disclose a debit price, right?  That's

18  the main issue that I think is in dispute.  All the others --

19  and I'll go back and explain why it's not subject to reasonable

20  dispute.

21        So they're saying, Yes, it's true.  We did take a sign

22  that we can find, because going back to all the issues we had

23  with them producing evidence to us, we would find on Google

24  Maps a sign, for example, on the right; that it says July --

25  or, August 2015.  There's a debit sign.  Right?  So that takes

1   it out of the class.

2       So we pulled the number back through July 2015.  And we

3   propose to calculate damages up to July 2015.  Because at trial

4   we are allowed to use circumstantial evidence and reasonable

5   inferences to prove our case.

6       If the jury doesn't buy that, that's fine.  You can take

7   it back to the last sign that we do have that shows that the

8   station showed a deceptive sign without the debit price, and

9   that's the sign on the left.  Which, for example, this is the

10  Redwood City.  This sign was up on September 2014.  So we know

11  for a fact, we can calculate damages for this station up to

12  2014.

13      **THE COURT:**  Isn't this sort of entirely anecdotal?  I

14  mean, it's -- you know, hunt and peck on a sign here and there

15  that you can find on Google Maps, and then from that you're

16  deriving all sorts of assumptions on what all these stations

17  did during this entire period of time.  Why can't I make that

18  assumption?

19      **MR. GOLD:**  Sure, Your Honor.  Respectfully, that's not

20  the case.  First, let me zoom out and show the scope of this

21  dispute.  Out of the 192 stations at issue, only 33 of them

22  have this issue where they changed the debit sign.  So if we

23  remove those -- lets remove those 33 stations completely from

24  the case.  This is not even an issue.  We have the other

25  stations that are conclusive.

1      **THE COURT:**  What is your evidence as to the other

2  stations?

3      **MR. GOLD:**  Okay.  So the other stations is the SDI

4  declaration, which I could talk about why it's admissible, and

5  images from Google Maps.  And I know they keep saying --

6      **THE COURT:**  How complete are they, assuming those are

7  admissible, how complete are the Google -- do they have every

8  day during the class period?

9      **MR. GOLD:**  Well, they don't have every day, but these

10  signs, like I said, are very expensive and they don't go up and

11  down.  There's no evidence that a station will change its sign.

12  Okay, today is January, we'll have cash/credit.

13      **THE COURT:**  How do I know that?

14      **MR. GOLD:**  Because that's what the evidence is in the

15  record.  There's no --

16      **THE COURT:**  What evidence?

17      **MR. GOLD:**  Well, the SDI list isn't saying, Okay,

18  well, we went back this day and we changed the sign again, and

19  we changed the sign back to --

20      **THE COURT:**  So the station owner can't change the

21  sign?  They have to have SDI do it?

22      **MR. GOLD:**  They have to have SDI do it.  It's not a

23  matter -- I mean, you don't just like pick it up and change it.

24  It's bolted to the ground.  It's a big expensive sign.  SDI has

25  to come and re-face the sign.  And on Google Maps, no, they

1  don't show every day, but they'll show one month, a few months

2  later, a few months later.  And you see through that period of

3  a year, two years, the sign is the same.  There's no reasonable

4  dispute -- or, no reasonable -- yeah, I guess, dispute that --

5  or, no evidence to suggest that they changed the signs.

6  There's just none.

7         **THE COURT:**  But why -- I'm not by this question

8  concluding that this isn't sufficient.  But why didn't you use

9  some discovery devices to go to the individual stations?

10        **MR. GOLD:**  Sure.  Because we could not know which

11  stations were even relevant in this case until Valero produced

12  the underlying data.  The sales data.  Because with that data

13  we're able to tell -- you know, they have 500 stations in

14  California.  So with that data, that's the only way we can

15  confirm whether the station is actually doing this split

16  pricing.

17        Like he said, how do we know the station is actually

18  discounting the price?  Well, we only can tell through the

19  data.  And we did not get that data until I think two or three

20  months before we filed our motion.  And the reason is because

21  Valero refused to produce that data because it took the

22  position that it was class discovery.  And despite the fact

23  that Your Honor refused their request to bifurcate discovery,

24  they refused to produce it.

25        So we had to file a motion to compel.  Judge Kim ordered

them to produce it by the last date of our class cert hearing
which was last year.  About this time last year.  And they did
not produce -- well, they produced it at that date.  We
analyzed it.  Realized it was corrupt.  It was wrong.  Valero
changed counsel.

A long time -- a long amount of time passed until they
finally completed their production, which is only a few months
ago.  So you'll notice the first list when we moved for class
notice included a lot more stations.  As we got more evidence,
which was belatedly disclosed to us, we started narrowing it
down.

We're still -- you know, expert discovery just closed.
We're still evaluating this evidence.  And, like I said, they
pointed out a few errors; because we were in a time crunch we
had to produce this.  But there's nothing that gets in the way
of class certification.

We have conclusive -- if you accept the signs, the photos
of Google Maps, which I think are conclusive.  They're photos,
which are supported by the SDI station list.  If you accept
that, and let's put aside the dispute that only relates to 33
stations, if you accept that, there's no dispute with the
dates.  It's conclusive.

And then their question:  Well, how do we know the
stations during that period discounted debit cards?  Well, like
I said, we know because of the station data.  And they say,

1    Well, the station data didn't exist for the whole period.   And
2    in their papers, it's very misleading, they do a big
3    exaggeration to say, Oh, well, the plaintiff is inventing
4    damages for half the class period.

5         That's not true at all.   The class -- we're only -- we
6    only have a period of one to two years, depending on what
7    statute of limitations apply.   They're arguing for a three-year
8    statute of limitations.   So if it's three-year statute of
9    limitations applies for the CLRA, the FAL, there's only one
10   year where we don't have data.   And you can infer reasonably,
11   which we're allowed to do with circumstantial evidence, that if
12   a station has a split pricing sign, which we know they do, and
13   they have one in January 2014 when we get the data and they're
14   discounting debit, we can reasonably infer they didn't change
15   their practices.

16        And we knew that because they scoured the 192 stations at
17   issue and they found evidence of 17 stations where there was a
18   little bit of variation in the price.   Every other station was
19   consistent.

20        So again, they're really, really exaggerating what's going
21   on here.   There's no dispute, no reasonable dispute, at least,
22   with respect to the majority of the stations at issue.   They
23   started at a certain date, they ended to the present.   So we
24   know through the data, for instance, some stations were
25   de-branding.   We know exactly when they were de-branding

because the transactions stopped being recorded.  So with the
majority of the stations, there's no issue at all.

   This issue is also not really an issue because -- you
know, if Your Honor doesn't like it, that's fine.  Let's just
set all the end dates to the date of the last picture.  Let's
do that.  That's fine.  But I think at trial we are allowed to
use this circumstantial evidence and tell the jury, like, Look,
we have this -- these conclusive dates.  This is where we're
calculating damages to.  Jury, it's up to you to decide whether
we can draw the line a little bit further based on this
reasonable inference.  If not, no problem.  We'll just cut the
damages back.  But it doesn't create any individualized issues.
It doesn't create problems with damages.  This evidence is, in
my opinion, pretty conclusive.

   So back to the SDI list.  Again, there's no mystery of
when these dates happened.  That's another point.  There's no
evidence.  And they say, Trust me, there must be evidence that
there are all these other errors.  Well, "trust me" is not
enough on summary judgment or decertification.  They need
actual evidence.  And it's telling that they didn't produce any
evidence, because they have access to it.  They control SDI.

   They say, Well, we don't control.  Well, during discovery
when we asked for them to identify the stations at issue, they
went to SDI and they got the information and produced it to us.
In connection with this motion, they went to SDI without a

```
1    subpoena and got our emails with SDI that we had to go directly

2    to them through third-party discovery because Valero refused to

3    cooperate.

4        It was very difficult.  So my point is they know the

5    dates.  If there were any dates that were off, materially off,

6    they would just present the evidence and say, Look, they're

7    completely wrong.  But they haven't done that because the

8    evidence doesn't exist it.  It can't exist because we have

9    photographs of the dates -- of the signs on the particular

10   dates.

11           THE COURT:  Why is the SDI evidence admissible?

12         MR. GOLD:  Well, the SDI evidence is admissible.  One,

13   SDI is its agent, so that's an admission by party opponent.

14   Number two --

15           THE COURT:  Well, how are they the agent?  They're a

16   vendor from whom the stations buy the sign.  Where is the

17   agency?

18         MR. GOLD:  They are controlled from top to bottom

19   throughout the entire process through Valero.  If you look at

20   the emails -- a lot of them are cited in our brief -- they

21   control every aspect of what SDI does.  They don't just order

22   the signs.  They go back and forth.  Okay, can I do the sign

23   this way?  No, I can't.  Okay.  I need to go back to this sign

24   on this date.  No, go back on this date.

25       Like, these are the type of discussions.  They're,
```

1  basically, like the right-hand man contractor of Valero.  It's

2  not like --

3          **THE COURT:**  I don't think that makes you an agent.

4          **MR. GOLD:**  Okay.

5          **THE COURT:**  That's like, you know, any -- you're

6  contracting for services from an architect.  You know,

7  whatever.  It doesn't mean they're your agent.

8          **MR. GOLD:**  Okay.  Fair enough.

9          **THE COURT:**  Well, I mean, I'm asking the question.  I

10  mean, so let's assume they're not agents for Valero.

11      So then what's the basis on which to admit this?

12          **MR. GOLD:**  The summary under Federal Rule of Evidence

13  1006.  And I note --

14          **THE COURT:**  That 1006 is that they're voluminous

15  documents.  And voluminous documents are all available, they're

16  all there, and somebody does a summary and that comes in.  How

17  is that this set of materials?

18          **MR. GOLD:**  Well, all of the underlying -- so SDI in

19  the declaration they explain how they put the list together.

20  They looked through their emails, they looked through their

21  invoices, and they looked through their records.  All of that

22  is in Valero's possession.  Because it was emailed to Valero

23  before each sign was installed.

24      So if they want to inspect the documents, all they have to

25  do is go to their own records, or go to SDI like they did when

1    they went to go get our emails without a subpoena.  They could

2    have just asked for the records at that time.  And if there was

3    anything unreliable, they have could have produced it as

4    evidence.  But they didn't do that because it doesn't exist.

5        And if that is really the hurdle here that they didn't get

6    this uncontroversial evidence on these things, if that's the

7    hurdle, then we would respectfully ask for leave to move to

8    compel them to disclose this date.  Because Judge Kim actually,

9    when she ordered them to disclose the sales data, she also

10   ordered them to disclose information related to our request for

11   productions related to these dates.

12       And they didn't, but we didn't push on the issue because

13   we had the SDI list at the time which we relied on.  We

14   produced it to them, they did not object at that time.  And

15   there's case law out there saying that defendants can't game

16   the system like that.  If we present it, they need to object.

17       **THE COURT:**  You make the calls as to what you're going

18   to pursue and what you're not going to pursue.  And under our

19   rules, if you think you've got an issue of inadequacy with

20   respect to discovery, it's very hard and fast rule that when

21   discovery closes you have seven days or ten days, I forget what

22   it is, to bring whatever motion.  Once that period passes, we

23   will hear no more about how, Oh, I should have gotten this

24   discovery, or I should have gotten that discovery.  It doesn't

25   work that way.  It can't.  Because, you know, we just can't

```
1   operate the system.  So that doesn't work.
2       Now, if they hid stuff and somehow you discovered and it,
3   and it was -- there was something nefarious of that kind,
4   that's one thing.  But if it's, you know, you made your call
5   that you weren't going to pursue certain discovery, you can't
6   now say, Well, if you rule X now we wanted to pursue the
7   discovery.  That's not available to you.
8           MR. GOLD:  Not at all, Your Honor.  And it actually
9   goes to the example that you gave about some improper conduct.
10  We produced, the second we got this list during fact discovery,
11  early on we produced it to Valero.  No objection about it.  So
12  to answer your question of when you know you have an issue that
13  you need some --
14          THE COURT:  Why do they have to object?
15          MR. GOLD:  Because they're objecting to it now and
16  it's after fact discovery.  And now it's way too late.
17          THE COURT:  Wait, wait, wait.  The discovery is being
18  exchanged.  And then you, at a certain point, think they're not
19  doing what they are obliged to do and you bring a motion and
20  Judge Kim decides it, or whoever else has got the case.  That's
21  all fine.  Then subsequently, if a party takes a particular
22  position about the discovery that's been exchanged, that
23  doesn't give you an opportunity to reopen discovery.
24          MR. GOLD:  Okay.  I think I'll refocus on the main
25  point, which I think is the dispositive issue here.
```

1          The rule states they need to have access to the underlying

2     documents.  They have access to the underlying documents.  They

3     can't deny that.  It was emailed by SDI directly to them.  But

4     I think a more important point, the SDI list is not our only

5     evidence.  We have the photos from Google Maps.

6          **THE COURT:**  Yes.  Let's talk about the Google Maps

7     photos.  Because I'm not entirely clear -- I think there are at

8     least some questions about the admissibility of those

9     materials.  But let's assume for purposes of my question that

10    they are otherwise admissible.

11         They, as you acknowledge, they don't cover every day of

12    the class period for every one of these 192 stations.  So what

13    you're asking me to do, and if I recall your argument

14    correctly, it's because effectively these signs are big and

15    they're expensive and so we can from that assume that if

16    they're in place at a station at a particular time I can make

17    inferences going forward about the fact that the sign remains

18    there.

19         I mean, what are you asking me to infer?  Because -- am I

20    correct that the Google Maps evidence is sporadic?  It's not

21    comprehensive?

22         **MR. GOLD:**  I mean, yeah.  I guess you could say that,

23    that it's not comprehensive.  I'm not asking Your Honor to make

24    an inference.  What I'm saying is -- first of all, the

25    defendants have never made the argument that a sign -- a

1    station will change its sign sporadically throughout the class

2    period.  There's no evidence of that.  They've never argued

3    that.  And it's not really a big inference if you are to make

4    one about how the sign looks throughout the class period.

5          **THE COURT:**  Let's go down to basics here.  It is your

6    burden to demonstrate for me the 23(a) factors.  And in so

7    doing, you have to show me that there are common questions.

8    And one aspect of that, in my mind, is to demonstrate for me

9    that there are -- there's a reason for me to conclude that

10   there's a common problem, if you will, across the stations

11   you've identified that during the class period this allegedly

12   misleading advertising was going on.  That's your burden.

13         **MR. GOLD:**  Yes.

14         **THE COURT:**  Right?  Okay.  So and you're saying to me

15   I look at the SDI information, and I look at the Google Maps.

16   And the Google Maps show me, at various snapshots in time, that

17   various of these stations had the signs during the class

18   period.  Is that right?

19         **MR. GOLD:**  Well, you look at station by station and

20   you can determine, yes, that the station had the sign.  You

21   know January 2014, July 2014, December 2014.  And the signs,

22   when they change, they change drastically, as you can see in

23   this picture.  These are permanent signs.  They're not easy to

24   change.  So the inference, the opposite inference, would be

25   illogical.  Okay.  They had this sign on January 2014, and they

1  had this sign on December 2014.  Let's draw an inference that

2  maybe they changed it to a sign like this and then changed it

3  back.

4      You can tell it's the exact same sign from the photo.

5  It's a reasonable inference.  And we're allowed, Judge, to use

6  circumstantial evidence and reasonable inferences to prove our

7  case.

8          **THE COURT:**  How far does that inference go?  Can I

9  infer that the sign is there for a year?  Two years?  Three

10 years?  What's the inference?

11         **MR. GOLD:**  Well, if you have a beginning date with a

12 picture that shows a sign, and you have an end date with a

13 picture that shows a sign, step one.  That is a reasonable

14 inference, especially when the sign is a permanent sign that

15 looks like this.  And you can tell from the photo it's the same

16 sign.

17         **THE COURT:**  So for every 192 stations, you have a

18 beginning and an end Google Map picture.

19         **MR. GOLD:**  The vast majority.  There may be a few

20 outliers.  Like I said, there are some errors.  We got the data

21 late.  We're going to correct it.  But if not, we can -- let's

22 put it this way:  Any concern Your Honor has or defendants

23 have, we have the capability, we do have the capability to

24 create certain end dates.  The question is in between those end

25 dates did the sign change?  I don't think it's a reasonable

1    inference that the sign changed when you can look at the

2    picture between the end dates, and oftentimes you have multiple

3    pictures in between the end dates, where the sign is obviously

4    the same sign.

5            THE COURT:  The pricing is changing all the time,

6    presumably.  You're just saying the structure of the sign does

7    not change.

8            MR. GOLD:  Yeah.  Whether the debit price exists.  And

9    again, the sign doesn't even really -- doesn't completely

10   matter unless it discloses the debit price.  The issue is

11   whether the station is charging two prices for cash and credit.

12   And you can tell that from the station data.  So it doesn't

13   matter what the sign looks like unless there's evidence that

14   they disclose the debit price.  And as I said, there are only

15   33 stations of the whole 192 that disclose the debit price.

16   Most of those we do have conclusive evidence of the date before

17   they change.  So there's no dispute there.

18       And then, ideally, we could have a little bit of a dispute

19   with the jury with these ten stations.  There's actually -- you

20   know, we did further investigation.  These four they

21   identified, we're actually going to remove those because the

22   evidence doesn't support it.

23       But for these ten stations -- or, nine, rather -- it would

24   be interesting to tell the jury, Hey, we have these conclusive

25   dates, but let's try to litigate whether we could draw the line

1   further.  If not, if Your Honor doesn't think that's competent

2   evidence, let's just throw it out.

3      But we do have conclusive evidence of the dates on which

4   damages should be calculated.  Again, the signage only matters

5   if they disclose a debit price.  And there's no evidence that

6   that's an issue except for 33 stations.  The evidence is

7   conclusive with the station data that these stations are

8   charging two prices for debit.  Or, for cash and credit.

9   That's conclusive.

10      **THE COURT:**  Let's -- let me move on so we can get

11   through all this.  On the 23(b)(2) injunctive relief class, as

12   I say, you can file a further brief on the subject.  You want

13   to say anything about it now?  Otherwise, I'll get your brief

14   and I'll read.

15      **MR. GOLD:**  Yes, I'd love to, Your Honor.  The whole

16   point of the UCL, it's not restitution, it's injunctive relief.

17   That's the whole point.  Even if plaintiff sued not as a class

18   action, she could get injunctive relief -- that's the point --

19   without proving any actual deception, without proving any

20   actual harm.

21      Now they're saying, Well, you know, if your damages fail

22   you shouldn't get 23(b)(2) certification because monetary

23   damages predominant.  Well, if the damages fail there's no

24   monetary damages.  If the damages fail and we don't have a

25   class action of 23(b)(3) class action, the plaintiff still has

1    her individual action.  Which, what are her actual damages?  A

2    couple dollars.  Maybe less .a few cents.  She's obviously not

3    going to pursue that and it wouldn't predominate over the main

4    form of relief, which is injunctive relief.

5        And that, at the end of the day, is the main relief we're

6    seeking.  Injunctive relief.  Because consumers are being

7    mislead; even though we're not required to show actual

8    deception, only a reasonable likelihood that they could be

9    deceived.  And the evidence is clear.  This case, it's not like

10   the food labeling cases that they're citing where it's an

11   implied message and you need evidence.  What does this mean?

12   What does the consumer take away from Joint Juice?

13       They don't need that.  This is binary.  What do consumers

14   think?  Cash or credit?  That's it.  This is a type of case --

15   you know, the Ninth Circuit in *Williams* said in the false

16   advertising-- I'm sorry.  I talk so fast.  In the *Williams*

17   case, the Ninth Circuit said that the primary evidence in a

18   false advertising case is the false advertising itself.

19       In this type of case where the question is binary, there's

20   no variations of what a consumer would understand, that makes

21   the most sense ever.

22       So that's the deception question.  I think it's pretty

23   conclusive.  But I'm getting away from your point.  23(b)(2).

24   I think that's -- if the 23(b)(3) doesn't work out, it's

25   completely appropriate and necessary for us to have a 23(b)(2).

```
 1  Or -- yeah.  I think it is.  You know, she's entitled to
 2  injunctive relief individually and as a class.
 3          THE COURT:  Let's just bring that small item to a
 4  closure.  I'll let each of you file a further 15-page brief and
 5  limit it to the 23(b)(2) injunctive relief class issue.  And
 6  how much time do you want to do that?  I'll just expect
 7  simultaneous filings.
 8          MR. HARRIS:  Two weeks, Your Honor?  14 days.
 9          THE COURT:  Okay.  In two weeks you'll each file a
10  15-page brief on the question.
11      Okay.  And I'm not contemplating, you know, further
12  responsive briefs.  I just want one more brief.  You all know
13  what the issue is.
14      Okay.  So there are other issues that we kind of talked
15  about a bit on the certification question, materiality and
16  reliance, and all of that.  If there's anything else you want
17  to highlight for me, go ahead.
18          MR. GOLD:  Yes.  I'll just run through quickly --
19  speaking slowly for the court reporter.
20          So just as an initial matter, they're talking about this
21  concept of fact of damage versus measure of damage.  Under the
22  UCL, the fact of damage occurs -- or, no, let me back it up.
23  Under the CLRA.  But under the CLRA, the fact of damage occurs
24  when the first -- when -- First of all, let me back up again.
25          The liability, the violation for the law, occurs the first
```

time that they create a deceptive sign and approve it and put
it out into the market.  Because if it's likely to deceive the
public, even if no one's yet been deceived, that's a violation.
And that's clear cut.

Now, the question is when does the first damage happen?
The fact of damage?  In a class action we're allowed to
calculate aggregate damages, right?  So the first damage is the
first consumer ever, when deceptive sign went up, who made
their purchase and was deceived.  That's the first damage.
Every other consumer who purchased after that fact only adds to
the measure of damages, which as he said is a lower burden of
proof.

So coming back to that concept, reliance is not required
at all for a UCL claim or FAL claim.  Just for the plaintiff,
if they show reliance, any restitution can be ordered for any
amount of money that may have been obtained through unfair
competition.  It's a very liberal standard.

With the CLRA for damages, reliance is required, but when
the representation is material, as it is here, reliance is
presumed.  So every single person who bought gasoline with a
falsely labeled station is entitled to damages.  That's
unquestionable.  So the question is, is this material?

Absolutely.  The Ninth Circuit has said price matters to
consumers.  And here it's an objective test from materiality,
and it applies with no variations.  You know, like in some of

```
 1    the cases they cite which was, Oh, do consumers care about all
 2    natural labeling?  I couldn't tell you.  Do they care about
 3    Monster energy drink, does it rehydrate you?  I don't know if
 4    that's material.
 5        But is price material?  Absolutely.  The Ninth Circuit
 6    said in the Hinojos case, price advertisements matter.  Price
 7    is the fundamental basis of a consumer transaction.  No matter
 8    what consumers consider when they make transaction, price is a
 9    fundamental concern.  Consumers want to know and need to know
10    the price that applies to the form of payment they're using for
11    gas.  That's why the state requires Valero, as they argued at
12    the class certification hearing last time.  They require these
13    signs to be displayed, and they regulate them.  That's why
14    Valero devotes a large part of its business to creating and
15    regulating the signs.  Because price advertisements matter.
16        So now -- so it's inherently and it's common sense, but
17    that's not the evidence we're relying on.  We have plenty of
18    evidence.  We have our expert, Dr. Kamins, conducted two
19    surveys.  The second survey was the one at the point-of-sale
20    that asked, you know, how consumers would use the
21    point-of-sale.  And the ones who -- 78 percent of the
22    respondents on the second half answered that they would change
23    their behavior at the point-of-sale if they had known it would
24    result in a lower price per gallon.
25        Which is not surprising.  But I think what's more
```

```
 1    compelling is that evidence from their own expert supports
 2    materiality.  In connection with class certification last time,
 3    Dr. Serwin submitted a declaration where he said it's
 4    economically reasonable to assume that a consumer would choose
 5    the lower price if they had the option.
 6         THE COURT:  Okay.  Let's move on.  Let me -- I'll give
 7    Mr. Harris two, three minutes to respond on the class cert
 8    issues, and then I want to just talk about the summary judgment
 9    issues.
10         MR. HARRIS:  Thank you, Your Honor.  Just briefly.  I
11    think it's important to take a step back for a second.  Because
12    the test in our 23(b)(3) is not whether there is admissible
13    evidence to prove your case.  The test really is whether
14    individual issues predominate -- I'm sorry -- common issues
15    predominate.
16         And I think what this is showing, and what my handout is
17    showing, is that even if you assume all of this is admissible
18    evidence, that what you're going to be left with is a trial of
19    a whole bunch of individualized issues.  You're going to have
20    issues over 192 separate stations, you're going to have
21    competing pictures from Google Maps, from Bing maps.  Our
22    papers show that we found an image on Bing maps, which is a
23    competing service, that shows something the Google Maps doesn't
24    show.  You're going to have a list of stations.  You're going
25    to have cross referencing of data.  You're going to have
```

1    missing data for two years.  And I think that putting aside the

2    issue of whether or not this is admissible, I think that that

3    alone that we're going to be showing jurors stuff like this on

4    192 stations starts to show why this is not properly certified

5    under 23(b)(3).

6        Now just to quickly address some of the points that

7    Mr. Gold made.  You know, I think at a certain point he said

8    that Ms. Bautista couldn't know which relevant stations to take

9    discovery from until recently.

10       You know, I would just remind the Court that in her

11   original class certification motion she was very vehement that

12   there were at least 350 stations at issue and said it over and

13   over again.  And yet up until that point through all the fact

14   discovery when she, according to her representation to the

15   Court, believed that all 350 stations at least were at issue,

16   she didn't take discovery from any of them.  And so this idea

17   that this is Valero's fault somehow, that we're sandbagging

18   them at the last minute after telling them over and over in our

19   discovery responses and our disclosures, Go talk to the station

20   owners, is just simply not true, Your Honor.

21       This repeated comment that there are only 33 stations that

22   ever changed their signs.  I frankly have no idea where that

23   number comes from.  I think Mr. Gold indicated that he was

24   basing that number on SDI's station list.  But as we discussed

25   earlier with regard to my handout, SDI station list doesn't

1   show the Sunnyvale station changing their sign.  It doesn't

2   show it.  So this idea that there are only 33 stations, it's

3   just not true.  We just don't know.  Why?  Because SDI's list

4   is not reliable.

5        I'd also just remind the Court that this idea that one or

6   two pictures is enough, it doesn't answer a whole host of

7   questions which go to whether or not the station actually ever

8   charged split pricing or did it during that period of time.

9   Certainly, there's a problem with pre-January 2014 where

10  there's absolutely no data whatsoever.

11       And then as far as the SDI station list, I just briefly

12  comment.  This idea that we have the data already that SDI

13  relied on in creating its list, I just don't know where that

14  comes from.  Even if you assume -- I don't know what the

15  assumption is based on -- if you assume, as Mr. Gold does, that

16  over the years SDI sent us everything in their files.  We still

17  as a company, as counsel for Valero, I have no idea what SDI

18  relied on in creating that list.  I don't think I'm expected,

19  or the client is expected, to go through all of their files to

20  try to guess at what SDI relied on when it was guessing to

21  create its own list of stations capable of displaying a split

22  pricing sign.

23            **THE COURT:**  Okay.

24            **MR. HARRIS:**  If I could just have one last comment.  I

25  would also note that there are -- this idea that the signs are

stationary and there's no way to change them without changing

the entire sign, that's not true.  First, I would go back to

our sign where they just put -- it looks like a sticker to me.

Something over the word "credit" to add the word "debit" to it

as well.

I would also point out there's also this issue which the

limited transaction data that we do have shows that stations

often price the cash and credit price the same.  And so that's

another way to change the sign.

**THE COURT:**  How do I know that?

**MR. HARRIS:**  The transaction data shows that there are

multiple instances -- and Dr. Ugone opines on it in his report.

But there are multiple instances in the transaction data we do

have where the cash price, which is the Valero card price, and

the credit price, there's zero difference between it.  And

sometime for lengthy periods of time.  And personally, I've

seen photos on Google images, as well.

**THE COURT:**  You're saying the credit and the

cash/debit prices are the same.

**MR. HARRIS:**  All the same.  And why I bring that up in

the context of the signs is that -- I've seen this in the

images.  I don't know if one has been submitted to Your Honor,

but we certainly can if the Court is interested.  But I've seen

images in Google Maps where -- obviously when a station does

that, they change the sign to have the same price listed for

1    both.  And that point, the sign is no longer misleading.  So

2    there are multiple ways a sign can change, not this -- there's

3    not just this radical one way where they come in and they rip

4    up the pavement and they put in a huge new sign, that's the

5    only way it gets changed.  These are multiple instances

6    throughout the record showing signs are changed in various

7    small easy ways by the stations.

8         THE COURT:  Is there anything in the record that talks

9    about who would change the sign -- I mean, if the scenario that

10   you've just suggested where credit price is the same as the

11   debit/cash price, is the station owner able to change that at

12   his or her election?  Or do you have to get the SDI people to

13   come and change what's reflected on the sign?

14        MR. HARRIS:  That can be changed by the station owner.

15   I would refer Your Honor to the declaration of -- and I'm

16   afraid I will butcher his name -- but it's a D-E-O-L is the

17   last name.  He is a station owner.  And he talks about in there

18   that he from time to time offers a discount, sometimes doesn't.

19   And they just go out.  Just as a station owner would when price

20   changes from $3.12 to $3.14.

21        THE COURT:  Okay.  Let me just go over my notes here

22   and tell you how I see it.

23        A lot -- as I say, I think a lot of the summary judgment

24   back and forth really dovetails with some of what we've already

25   discussed.  Valero argues that the signage is not misleading as

1   a matter of law.  I'm not sure I need to know more about that.

2   We've already discussed that.

3       The materiality point as a matter of law.  That's been

4   kind of hashed out.

5       You've got the voluntary payment doctrine discussion.  And

6   again, I've read it.  I'm not sure I really want any more

7   discussion about it.

8       Valero has a motion about there are no disputed issue of

9   fact as to the relevant stations and the time period that

10  overlaps, I think we've already talked about.  Bautista's

11  standing to seek injunctive relief.  That will be somewhat, I

12  think, picked up in the (b)(2) discussion.

13      Ability to seek restitution.  Ability to seek punitive

14  damages.  Insufficient evidence of class-wide damages.  All of

15  these I think are frankly covered in the briefing.

16      So let's see.

17      It appeared to me that the plaintiffs were not objecting

18  to the argument that Bautista cannot recover for

19  pre-December 4, 2012, damages.  It looks like you weren't

20  disputing that.

21          MR. GOLD:  I'm sorry.  I don't understand the

22  question.

23          THE COURT:  It was their motion to cut off -- we're on

24  the summary judgment motion now.  It was only the CLRA under

25  argument provides monetary relief.  And there's a three-year

statute of limitations.  And the argument being that you can
only get monetary damages for -- you can only recover for
damages that were incurred, the operative date being December 4
of 2012.

   **MR. GOLD:**  Only for the CLRA and FAL.  UCL restitution
is still available.

   **THE COURT:**  I understand.  I understand.  But I think
that aspect of their motion was going to the CLRA monetary
damages.

  And then they make the argument that Bautista cannot
recover statutory damages under the CLRA because statutory
damages are only available for senior citizens and disabled
citizens.  And you didn't seem to dispute that.

   **MR. GOLD:**  Not pursuing that, Your Honor.

   **THE COURT:**  Then we get to Bautista's motion for
partial summary judgment.  And that you have an argument about
the eighth affirmative defense.  The defense had argued that
Valero's not responsible for acts and omissions of third
parties.

  And then there's some back and forth in the papers.  It
wasn't clear to me if the argument is that the consumers are
third parties because they have purchased after they have been
advised through the POS system and the pump, or if it's --
we're talking about individual station owners and they're the
third parties.  So I wasn't quite clear on what Valero's

1    position was on that.

2         **MR. HAWXHURST:**  Your Honor, Jerry Hawxhurst.  I'm

3    going to argue the MSJ.

4         **THE COURT:**  Well, I'm not sure I'm going to let you

5    argue.

6         **MR. HAWXHURST:**  If permitted, I would argue the MSJ

7    and I would ask you to let me do a little bit on it because I

8    have something to add.

9         But who the third parties are, I think to answer your

10   question, they could be both.  But our point on the MSJ and

11   that issue I think is a very clear legal issue; which is by

12   asserting that affirmative defense, we have not arrogated to

13   plaintiff, or, from plaintiff, their obligations to still prove

14   that we were liable either as aider and abetters or as having

15   some control over the signs.

16        **THE COURT:**  So it is an argument about vis-à-vis the

17   individual stations.

18        **MR. HAWXHURST:**  That's how plaintiffs teed it up, Your

19   Honor.  Our point is simply -- two points on that.  One is

20   asserting an affirmative defense about these third parties

21   causing the interference.  Plaintiffs brought the motion, as

22   well.  We're going to prove that Valero is an aider and abettor

23   and that they've been involved sufficient enough with the

24   signage to be vicariously liable.

25        And our point on that is they didn't move for that on

1  their summary judgment.  It's their burden.  And that's not

2  what our defense is about in any event.

3       And then third, Your Honor, I think the papers are pretty

4  clear.  I'm not going to go through it.  Even if the Court

5  somehow let them flip -- you know, it's just gerrymandering,

6  sort of, the burden.  But if the Court were to side with them

7  on that, they're clearly issues of fact.

8            THE COURT:  Okay.

9            MR. HAWXHURST:  That's a long answer, Your Honor.  But

10  thank you.

11           MR. GOLD:  May I just be heard really quickly?

12           THE COURT:  Let me finish my list and then I'll give

13  you a chance.

14       And then there's Bautista's motion for partial summary

15  judgment on the voluntary payment defense.  I don't

16  particularly want to launch into that whole discussion.  But

17  let me just now finish my list.

18       It did not appear that there was any dispute by Valero on

19  Bautista's motion for partial summary judgment on -- and

20  there's a list of them.  Affirmative defenses 1, 2, 3, 4, 5, 10

21  and 12.  But Valero did dispute 6, 7 and 11.

22           MR. HAWXHURST:  I think that's correct, Your Honor.

23  And if it's not, we'll alert the Court.  But I think that's

24  correct.

25           THE COURT:  Now, let's go back and I'll give each of

1   you no more -- and I mean it, because the court reporter wants

2   to go home and my courtroom deputy already had to go home --

3   each of you can have no more than ten minutes and we're calling

4   this at quarter of 5.

5        So let me start.  And I know Bautista's made some motions

6   and Valero's made some motions, but I'm going to start with

7   Valero and cover them both, and then plaintiff can -- Bautista

8   can make their arguments.  Then we're going to call it a day.

9   So go ahead.

10       **MR. HAWXHURST:**  Thank you, Your Honor.  Jerry

11   Hawxhurst again for Valero.

12       Your Honor, I'd like to touch on two categories of issues

13   in our summary judgment motion.  One is the materiality and not

14   misleading as a matter of law.  And I know Your Honor's

15   preliminary thoughts on that.  But I think it's important, Your

16   Honor, to go through that especially if Your Honor is inclined

17   to deprive us of a rule that the voluntary payment defense

18   doesn't apply.  And I think it's important to do that, Your

19   Honor, because the law -- we're entitled to the protections and

20   the requirements of the law, especially if we don't have a

21   voluntary payment defense.

22       And, Your Honor, I had some slides, as well, that I'll --

23   if I may pass --

24       **THE COURT:**  You can just leave them with --

25       **MR. HAWXHURST:**  -- pass up, Your Honor.

1      So on the materiality issue, Your Honor, again the only

2  evidence on materiality in this case, the actual evidence, is

3  Dr. Simonson's survey.  And I won't rehash everything that

4  Mr. Harris said to Your Honor.

5      But this case is not a literal falsity case, and it's not

6  a case about the price.  It's a case about what does the word

7  "debit" mean to a consumer who drives by Valero?  That's what

8  the case means, Your Honor.

9      And this notion that price matters, and price sort of

10  shoves aside the debit issue, proves too much, Your Honor.

11  Because, for example, in all of the other consumer cases where

12  you have materiality, well, price is front and center on every

13  one of them.  The customers are all saying, I paid too much for

14  this product.  That's their gripe.  It is a price-centered

15  concern.  Everybody wants the best value, everyone wants to pay

16  the lowest price, Your Honor.  Those are the common sense

17  arguments.

18      But that's not what the law says.  The law says we have to

19  test the claim.  What is the claim here?  The claim here is

20  what does "debit" mean to someone who passes by Valero?

21      So again, Your Honor, if you look at what Dr. Simonson

22  did, noted Stanford consumer expert, he said, Let's test the

23  sign.  And he did.  He did.  A sign with "cash" and "credit"

24  and then he did a sign with "cash/debit/credit."  And it was --

25  the consumers were agnostic to the changes in the signs.

1          **THE COURT:**  Yes.  But don't you think the pool of

2    people that should have been tested are the people who planned

3    to transact their gas purchases with a debit card?

4          **MR. HAWXHURST:**  There was a screen at the beginning --

5    that's a great question.  Absolutely.  And one of his first

6    questions, several questions, were screeners to say, Do you use

7    debit cards for gas?  And, How do you use them for gas?

8    Absolutely.  I'm with you.  And so was Dr. Simonson, Your

9    Honor, when he did his survey.  He did that.  He made sure that

10   he qualified the group of consumers who were taking the survey.

11   I'm glad you asked that question.

12        So turning to the law.  You know, when we go buy gas -- we

13   talk about common sense.  When we go buy gas, we might look at

14   the sign, but where does the rubber hit the road when you buy

15   gas?  It happens at the pump.  And our position -- and we

16   briefed this.  And the case law is very strong on this, Your

17   Honor.  This is not a disclaimer case, by the way.  This isn't

18   something written on the back of baby food that a customer

19   might have to search for, like the *Gerber* case they rely on.

20        This is part and parcel of the transaction.  What happens

21   at the gas pump?  This is not a voluntary payment point, Your

22   Honor.  This is part of plaintiff's burden.  Case law is well

23   established that you have to look at everything that the

24   consumer is exposed to in connection with the transaction.

25        And we have exhibits in the summary judgment that I've

shown to the Court.  And, in fact, it's the law in California,
Your Honor.  That before you can consummate a transaction at a
gas station you have to choose what fuel do you want?  Do you
want regular?  Do you want ethyl?  Do you want -- no one says
ethyl anymore.  Do you want high test?  What do you want?  Do
you want these ingredients?  And that button is at the bottom
of every gas pump.  And what happens when you push that?  It
tells you how much you're going to pay.  By law it has to tell
you that.  And even more, Your Honor, in the Business and
Professions Code -- and we cited, I think in our papers -- by
California law each pump has to have a sign that says that the
price you're shown includes all cash discounts.

        So whatever a consumer may think about when they roll in
to a Valero or any of the other thousand of gas stations that
do the same thing that we do, they know before they consummate
the transaction what they're going to pay.  And again, that
sign on the gas pump says, This is the price for cash.  So if
you put in your debit card -- and, again, some of the pumps
have different prompts.  We have that evidence before the
Court.  But one thing that is certain about all the pumps is
the consumer knows before they consummate the transaction how
much they're paying.

        The survey evidence in this case, Your Honor, is that
somewhere between 42 percent and 78 percent of consumers
believe that a debit is a credit card.  They do.  That's

 1    uncontested.  95 percent of consumers who took the survey said

 2    that if a business says "cash only" --

 3         THE COURT:  Of course, there's two ways to look at

 4    that.  It's okay, then, that the remaining percentage were

 5    deceived.  I mean, there's something for both of you in that

 6    study.

 7         MR. HAWXHURST:  My dad would say it's the Bible.

 8    Right.  But the point is, Your Honor, though, is that that

 9    variability means that there is not a materiality -- uniform

10    materiality.  That's exactly what those numbers mean.

11         THE COURT:  Well, uniform materiality.  I'm not

12    familiar with that concept.  If it's -- your argument is it's

13    not material because half the people don't think it's -- they

14    think a debit card is the same as a credit card.  What do you

15    cite for that proposition?

16         MR. HAWXHURST:  Well, we cite several cases, Your

17    Honor.  We cite the *In Re: 5-Hour Energy* case.  It was an MDL

18    down before Judge Gutierrez.  We cite *Bobo*.  Several cases for

19    that point.  We cite the *Vizio* case.

20         THE COURT:  That has a miracle divide such as this

21    that says if only half of the population would find it

22    deceptive, it's -- or, finds it material, it's not material.

23         MR. HAWXHURST:  That's right, Your Honor.  And I'll

24    tell you, the way it was explained by a judge, another federal

25    judge, was it means that there's not really a reasonable

1    consumer as to this term.  And that happened in the context of

2    what does the word "energy" mean?

3         I will just note real quick that in this case there's no

4    allegation or no evidence that Valero did anything to engender

5    some person's concept of what "debit card" meant.  In fact,

6    Dr. Kamins, Ms. Bautista's expert, says he didn't even test it.

7    In fact, what he was opining on is 42 percent of the people

8    have some preconceived notion, and 58 percent have another.

9         Well, that's not chargeable to us.  I think that's very

10   exculpatory, Your Honor.

11        Let me switch to damages, Your Honor, unless you have

12   questions.

13             THE COURT:  I had just one passing thought.

14             MR. HAWXHURST:  Yes, Your Honor.

15             THE COURT:  If this is all true, why do they list a

16   debit price at all?  Why?

17             MR. HAWXHURST:  Why does who list a debit price?

18             THE COURT:  The sign.  If you are correct, why not

19   just list the credit price and the cash price?  Why bother?

20   Because most of the consumers equate a debit card with a credit

21   card.  Somebody must think that it's -- there's a message, or

22   else they wouldn't include the message.  So why is it there?

23             MR. HAWXHURST:  Well, I would say that some station

24   owners want to include it and some don't.

25             THE COURT:  All right.  So somebody thinks it's

1   sending some message to somebody.  Well -- okay.  All right.

2   Go ahead.

3          **MR. HAWXHURST:**  Yes, Your Honor.  Just -- so on

4   damages -- and Mr. Harris talked about this so I won't belabor

5   it.  But the issue with damages with Mr. Blum isn't that we

6   have a violation and there's some disagreement over whether

7   it's $100 damages or $200 damages.  What Mr. Blum has done is

8   he has calculated damages for transactions where we know for

9   sure that a minimum of 42 percent of the people were not

10  harmed.  And as much as 78 percent of the people were not

11  harmed.  And that's true for his entire period.  He says

12  because there was a transaction, and it was a debit signature

13  card, I'm going to count that as damages.

14        And again, Your Honor, that's not a damages issue as Your

15  Honor was talking about earlier with Mr. Harris.  What about

16  the case where a class member sneaks in and maybe didn't go to

17  the store.  Maybe didn't buy the gas.  The case law that I

18  think Your Honor had in mind says, Well, in some circumstances

19  we're not going to care about that because we know that this

20  pile of money, every single dollar of it, came from -- by

21  reason of, to use the language of the statute -- by reason of a

22  violation.  All right?  And so that's why in those cases they

23  say, Look, defendant, you have no reason to complain because we

24  know -- we can trace every one of those dollars that were in

25  this bucket of money back to a violation.

1      That's not the case here.  We know that the transaction

2  data includes transactions where the prices were the same.  We

3  also know that a huge part, 42 percent to 78 percent, of all

4  consumers could not have been fooled.

5      **THE COURT:**  I don't think that's how class actions

6  work.  If the case is certified and there is a determination

7  made by virtue of doing that, that you -- that -- and the

8  plaintiff were to prevail and the jury were to conclude that a

9  reasonable consumer would find that deceptive, and a class

10  member bought gas using a debit card during that period of

11  time, the fact that they may have been under the impression --

12  or, it didn't matter to them, and they didn't even think about

13  it that they were getting one price or the other by using that

14  debit card, there's still -- they're injured in the class

15  context because they have engaged in the conduct that has been

16  deemed to be deceptive and they were a member of the class.

17      So I don't think -- I'm not sure I follow your argument.

18  Because if you get that down the line, you don't then ask each

19  individual class member, Did you personally feel deceived?

20  That's not a question that need be answered anymore.  If the

21  determination is made that you get through all those steps,

22  you've certified it, the jury has found it is deceptive, a

23  reasonable consumer would be deceived, you then go to damages.

24  And the damages is a straight-forward analysis of whether or

25  not during the relevant class period you used the debit card.

1   It's not, Did you feel deceived when you used the debit card?

2   That's not the analysis, is it?

3        **MR. HAWXHURST:**  Your Honor, it's not the analysis.

4   And I think maybe I'm not being clear enough.

5        I am not saying that you have to go plaintiff by plaintiff

6   and say, When you bought -- let's use another product.  Like,

7   When you bought the Joint Juice stuff, what did you -- were you

8   fooled?  What did you think?  Did you think -- I've read those

9   opinions.  Did you think that it helped cure your arthritis?

10  All right?

11       In that case, what the evidence was -- and this is where

12  your point comes in -- the evidence was that the Joint Juice

13  company went out and got an endorsement from the Arthritis

14  Foundation.  They made all of these affirmative claims about

15  what -- not structure, function -- they made health claims

16  about this.  And the Court said every one of those -- this

17  Court, excuse me, Your Honor -- as I recall, said every one of

18  those was a violation.  In other words, this violated the law

19  affirmatively.

20       And so I think that that's the distinction, Your Honor.

21  And Prop 64, when Prop 64 changed the UCL -- and subsequent

22  case law, *Tobacco II* and all the other cases, made clear that

23  only the named plaintiff had to have standing; but causation as

24  to the other members of the class has to be proven and has to

25  be proven on a class-wide basis.

1        And my contention here, Your Honor, is that there's

2   affirmative evidence that automatically takes 42 to 78 percent

3   of those people off the table.

4        And I'm going to try to use my time-wisely.

5        We cite cases in our papers that say that the damages, all

6   damages, have to be tied back to a violation.  And if folks

7   didn't have the view about debit being cash, there could be no

8   violation.  By the way, Your Honor, I went and got water at the

9   Midway Place this morning here in the building, and it's cash

10  only.  And I tried to give the woman my debit card and she

11  wouldn't take it.

12       I'll move real quick to punitive damages, Your Honor, and

13  just say that the evidence of punitives here is sparse.  As the

14  Court knows, they have to come with clear and convincing

15  evidence and they have to show oppression and fraud.  They have

16  these complaints which are really infinitesimal in terms of the

17  number of transactions.  Depending on how you slice it, it's

18  either .000002 or .000003.  That's just for the transaction

19  data that we have.  It's likely even smaller.  So we do not

20  believe that they can get to a jury question on punitives.

21       And lastly, Your Honor, with Mr. Blum on his backcasting,

22  whatever that is, it's January 2015 back.  We cite all the case

23  law.  I think his deposition's pretty clear, all he did was

24  simple math.  There wasn't any analysis there.  Whatever that

25  damages period is is wholly speculative.  We cite a lot of

 1   cases, including one on the Ninth Circuit that I won that that

 2   part of his damages should not be allowed to go to the jury.

 3        And thank you for your time, Your Honor.

 4        **THE COURT:**  Okay.  Sorry to rush you, but the day is

 5   coming to an end.

 6        **MR. GOLD:**  I'll be brief, Your Honor.  Thank you.  And

 7   I'll take them in the reverse order because that will be

 8   easier.

 9        With respect to the Blum extrapolation, which really is

10   not half the class period, it's only one to two years depending

11   on how you slice it.  Your know, they're criticizing that he

12   used simple math.  That's a good thing.  He's not using a

13   conjoint analysis or regression analysis.  That means there's

14   fewer concerns with the damage analysis.

15        The fact that we use an extrapolation, the Supreme Court

16   in *Tyson Foods* made it very clear we're allowed to use an

17   extrapolation, especially when they don't retain records as

18   they didn't in this case.  So there's nothing radical or

19   controversial about the extrapolation.

20        With respect to punitive damages.  You know, Mr. Hawxhurst

21   mentioned we need to show oppression and fraud.  Well, he

22   missed the third one, malice.  And your Honor stated in the

23   *Alberts* case that does not require a subjective intent to harm,

24   only conduct that was intentional, willful, and done in a

25   reckless manner.

1   Here that's clearly the case.  They know -- whatever you

2   want to believe about the case, they know whether they control

3   it or not.  They know that stations in California are charging

4   cash and credit.  They know that consumers are being deceived.

5   He wants to talk about infinitesimal complaints.  Well, he's

6   missing the complaints from the distributors who said, You

7   know, sorry, I wouldn't raise this issue if it was only a few

8   complaints, but we're getting a lot of complaints.  How about

9   the other distributor who said, The general public seems to be

10  misled by this; and urged them to start shipping out with their

11  portable sign little inserts that said "Debit and Credit."

12      Well, you know, in their papers they argue, Well, we

13  didn't have knowledge.  Because when we have knowledge of a

14  consumer confusion, we clearly take action.  For example, when

15  there was a consumer confusion with respect to the gift card,

16  they created decals for the jumps to tell consumers gift cards

17  don't qualify for the cash price.

18      Well, they did the same thing with the debit/credit

19  inserts.  They took their distributor's advice and in 2016

20  purportedly started shipping those out.  So the question, did

21  they know?  I mean, there's at least a jury question there

22  whether these complaints put them on notice.  And judging by

23  their actions, it looks like they did.  So I think we at least

24  have a jury question here.

25      With respect to damages, there's not much to say here,

1    Your Honor.  The law is very clear.  You don't need to prove a

2    unanimous deception.  You know, especially with the UCL, the

3    restitution claim, there is no reliance element at all.  The

4    Proposition 64 -- *Tobacco II* made it very clear -- Proposition

5    64 did not change the UCL at all except for to add a reliance

6    requirement for the named plaintiff.  The Court was very clear.

7         To the extent there's a causation requirement, the

8    requirement is you have to prove that you used a debit card to

9    purchase gas at one of these stations.  And that's it.  You

10   have causation, you can calculate aggregate damages for the

11   whole class regardless of whether they think a debit card is

12   credit or they even care.

13        With the UCL -- with the CLRA, excuse me -- same thing.

14   Once we hit materiality, which I think is obvious in this case,

15   every single purchase is damages irrespective of what the

16   consumer thinks.

17        With respect to whether their conduct is misleading.

18   Mr. Hawxhurst points out that 42 percent of our survey members

19   didn't believe a debit card was cash.  Well, as Your Honor

20   pointed out, the majority did.  And we're only required to show

21   a reasonable probability that a significant portion of the

22   reasonable public could be misled.  Not even what could be

23   misled.  So any sense of the word, "significant portion," I

24   think 61 percent of the majority satisfies that standard.

25        You know, Mr. Hawxhurst points to the *5-Hour Energy* case,

1    which is an interesting case.  First of all, unlike in this

2    case, that case the plaintiffs presented no evidence.  The

3    record included no evidence from plaintiff.  Here we do.  Not

4    only the Kamins survey, we have plaintiff's testimony, we have

5    the consumer complaints, and we have the signage itself which

6    is, in this case especially, is the most important,

7    particularly considering the pump display issue.

8        You know, it's a jury question.  I'll get to that issue in

9    a minute.  I'll just wrap up here.

10       There's no requirement in these laws that the defendant

11   caused a consumer to believe a certain way.  These cases are

12   all about pre-existing notions.  What do consumers believe such

13   that your signage, or your advertisement, could possibly

14   mislead the public?  There's no requirement that they have to

15   deliberately, you know, put this idea in the minds of

16   consumers.

17       And, you know, he wants to paint this case --

18       Oh.  Your Honor asked why list the debit price at all on

19   the sign if it's not material to consumers, or deceptive.

20   That's a good question.  As I mentioned before, they actually

21   did start shipping out the debit inserts.  And there's an

22   admission cited in our papers by their director of east coast

23   sales, after talking about these complaints internally he said,

24   I think debit/credit signs are a good idea.

25       Obviously they are.  And, you know, the fact that they

1    actually allow these signs at some stations -- 33 at issue

2    here, and it's a minority of the stations out in the field -- I

3    mean, that shows that their conduct is so much more egregious

4    than anything.  We're not asking them to change their business

5    model.  They're already doing what they need to be doing at a

6    certain small subset of stations.  Why not expand that to all

7    of them?

8         Which, by the way, goes to our unfair claim which they

9    waived in their summary judgment papers.  Those claims do not

10   collapse.  They have different standards.  Reasonable consumer

11   standard, utility of the conduct versus harm, weighing --

12   they're different standards.  They cited case law by Judge Koh,

13   but she talks about other cases talking about the claims

14   conflating.  But she cites herself in a case that didn't cite

15   anything else.  And then she cites Judge Patel, who cited her

16   case.

17        So there's no real law saying -- supporting the notion

18   that those -- which are known to be independently actionable

19   prongs of the UCL, that they conflate.  So, again, the fact

20   that they're not putting this debit disclosure to standardizing

21   it is especially egregious.

22        And finally, materiality.  They keep saying this.  The

23   only evidence they have -- the only evidence in the record on

24   materiality is Simonson.  That's not true.  First of all --

25   well, it's not true.  We have our Dr. Kamins expert.  We're not

 1 | required to use only expert testimony to prove reliance.  The

 2 | Ninth Circuit has said that in the *Skydive Arizona* case in

 3 | 2012.  It's not cited in our papers, but if you'd like I can

 4 | give you the cite.

 5 | But we also have the plaintiff's testimony, and we have

 6 | all of these consumer complaints that show at least a jury

 7 | question.  You know, is this important to people?

 8 | Mr. Hawxhurst says this case is not about price, it's

 9 | about what "debit" means to a person driving by the sign.

10 | Well, the sign doesn't including the word "debit."  So how can

11 | a driver driving by having any notion?  That's the problem of

12 | the case.  The sign doesn't include "debit."  So how can the

13 | whole case be about what the word "debit" means?  The case is

14 | about -- we're in control of our case what it's about.  It's

15 | about the price that applies when you use the form of payment,

16 | a debit card.

17 | You know, Mr. Hawxhurst again talking about the pumps.

18 | He's suggesting that the pump is more -- the price on the pump

19 | is more critical than the sign.  Well, that's not the law.  You

20 | know, the Ninth Circuit in *Williams*, they said the front of the

21 | box.  You need to rely on the front of the box.  You shouldn't

22 | have to look behind the box.

23 | The whole point of these cases is that consumers need to

24 | be able to rely on advertisements on the front end.  You can't

25 | try to cure on the back end.  And even if you could, there's no

1    evidence at all in the record that any consumer noticed the

2    pricing sign, noticed the pump display price, and also

3    understood it to be an excessive price.  Which by the way,

4    precludes the voluntary payment doctrine, which doesn't apply

5    anyway.

6        In fact, the evidence is the opposite.  We have

7    plaintiff's testimony who didn't notice it.  We have all these

8    consumers who are complaining which shows, or at least raises a

9    jury question, that despite this pump display consumers are

10   still being misled.  So it's a jury question whether, you know,

11   that cures deception.  And Your Honor said in the *Mullins* case,

12   binding authority from the Ninth Circuit, strongly suggests

13   that can't be decided as a matter of law.  And I think that's

14   correct.

15       And then the only -- the only thing I'll end off with is I

16   started talking about the *5-Energy* case, and I left off on the

17   fact that there was no evidence submitted by the plaintiff in

18   that case.  But the other critical thing is I think what really

19   distinguishes this case from other consumer class actions, like

20   I started off in the beginning talking about this really is

21   like a cookie cutter of a consumer class action if one ever

22   existed.

23       There's no implied messaging claim.  Like the Joint Juice.

24   What does Joint Juice mean?  I don't know.  5-hour energy.

25   What does it mean when they say 5-hour energy?  Is that caloric

 1   energy?  Is that time?  There's so many variations of what a

 2   consumer could think, so you need to be a little bit more

 3   diligent and get some more evidence that explains to the jury

 4   what message consumers take away.

 5        That's not the case here.  The question about consumer

 6   deception is binary.  Do consumers expect A or B?  And in a

 7   case like this, it doesn't lend itself to a lot of variations

 8   that creates problems in the applications of the well-known

 9   objective test for deception and materiality.

10        So I know we're all running late on time, so I'll just

11   thank you for your time and end there.

12        **THE COURT:**  Thank you very much.  I know it was a lot

13   of material and you felt you had to go very fast at the end.

14   But I think we gave it a good day.

15        So thank you very much for the argument.  I appreciate it.

16   And I'll be looking for your supplemental briefing in two weeks

17   and then the matter will be under submission.  And I will give

18   you an order.  I know what your schedule is, so I will keep

19   that in mind.

20        **MR. HAWXHURST:**  I know Your Honor will do it, but as a

21   matter of form I think I'm supposed to ask the Court to rule on

22   the evidentiary objections in our briefs.

23        **THE COURT:**  Okay.  Thank you.  All right.  Very good.

24                          ---oOo---

25

1

2

3                     <u>**CERTIFICATE OF REPORTER**</u>

4            I certify that the foregoing is a correct transcript

5       from the record of proceedings in the above-entitled matter.

6

7       DATE:   Monday, October 29, 2018

8

9

10

11       _____/s/Vicki Eastvold_____

12                  Vicki Eastvold, RMR, CRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

FAITH BAUTISTA, Individually
and on Behalf of All Others
Similarly Situated,

      Plaintiff,               No. 3:15-cv-05557-RS

  vs.

VALERO MARKETING AND SUPPLY
COMPANY,

      Defendant.
_____/


DEPOSITION OF

FAITH BAUTISTA

Wednesday, May 10, 2017


BARLEY & ASSOCIATES
Certified Shorthand Reporters
2977 Ygnacio Valley Road, #123
Walnut Creek, California  94598
(925) 934-8884

Reported by:  ANN R. LEITZ, CSR NO. 9149

**Page 2**

1    BE IT REMEMBERED that, pursuant to Notice, and on
2  Wednesday, May 10, 2017, at the hour of 9:00 a.m. thereof,
3  at Robbins, Geller, Rudman & Dowd, One Montgomery Street,
4  Suite 1800, San Francisco, California, before me, ANN R.
5  LEITZ, Certified Shorthand Reporter in and for the County
6  of Contra Costa, State of California, there personally
7  appeared
8            FAITH BAUTISTA,
9  called as a witness by the Defendants; who, being by me
10  first duly sworn, was examined and testified as is
11  hereinafter set forth.
12            ---oOo---
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1         APPEARANCES OF COUNSEL
2
3  FOR THE PLAINTIFF:
4     ROBBINS, GELLER, RUDMAN & DOWN, LLP
        BY: CHRISTOPHER GOLD, Attorney at Law
5     120 East Palmetto Park Road, Suite 500
        Boca Raton, Florida 33432
6     T: 561-750-3000
        Email: cgold@rgrdlaw.com
7
        HOBSON, BERNARDINO & DAVIS, LLP
8     BY: RAFAEL BERNARDINO, JR., Attorney at Law
        725 South Figueroa Street, Suite 3230
9     Los Angeles, California 90017
        T: 213-235-9190
10     Email: rbernardino@hbdlegal.com
11
12  FOR THE DEFENDANT:
13     GLYNN & FINLEY, LLP
        BY: ROBERT C. PHELPS, Attorney at Law
14     100 Pringle Avenue, Suite 500
        Walnut Creek, California 94596
15     T: 925-210-8800
        Email: bphelps@glynnfinley.com
16
17            ---oOo---
18
19
20
21
22
23
24
25

**Page 4**

1               I N D E X
2                            Page
3  EXAMINATION BY MR. PHELPS           7, 151
4  EXAMINATION BY MR. GOLD              141
5            ---oOo---
6
7         E X H I B I T   I N D E X
8  Exhibit No.     Description          Page
9
10  1 - Faith Bautista - NAAC Staff Profile          9
11  2 - Second Amended Class Action Complaint        20
12  3 - Printout of NAAC Board of Directors          32
13  4 - Press Release from Donald J. Trump           42
14  5 - Photograph of Shell station; located
        at intersection of Hillside/East Market      44
15
    6 - Yelp reviews of National Asian American
16     Coalition                                     49
17  7 - Photo printouts Bates stamped
        BAUTISTA 89 - 93                             51
18
    8 - Photograph of Five Star service station;
19     located at 1216 Hillside Blvd., Daly City     59
20  9 - Photograph of Shell station with Food Mart   62
21  10 - Photograph of price sign at Arco station;
        located at 5898 Mission                      65
22
    11 - Photograph of Arco station at 5898 Mission  65
23
    12 - Google Earth image of Chevron station in
24     Kettleman City, CA                            73
25

**Page 5**

1  EXHIBITS (CONTINUED):
2  Exhibit No.     Description          Page
3  13 - Google Earth image of Shell station across
        street from Exhibit 12                       74
4
    14 - Google Earth image of Valero station in
5     Sand City, CA                                  75
6  15 - Gas receipts, Bates stamped
        BAUTISTA 87, 88, 99                          79
7
8  16 - Photograph of Valero gas price sign;
        located at 503 Whipple Ave.                  81
9  17 - Photograph of Valero gas price sign;
        located at 503 Whipple Avenue                82
10
    18 - Photograph of Valero gas station;
11     located at 2918 Riverside Drive,
        Los Angeles                                  84
12
    19 - Citigold Account statements for Faith
13     Bautista, Bates stamped BAUTISTA 67-84        85
14  20 - Photograph of Fuel 24:7 gas station         87
15  21 - Chase statement for Faith Bautista,
        Bates stamped BAUTISTA 100-103               94
16
    22 - Chase statement for Faith Bautista,
17     Bates stamped BAUTISTA 104-107               94
18  23 - Citibank Account statements               97
19  24 - Photograph of Valero gas dispenser;
        located 6989 Mission                        111
20
    25 - Photograph of gas dispenser Instructions
21     with words "LIFT HANDLE"                     112
22  26 - Photograph of gas dispenser Instructions
        with words "DEBIT CARD? YES/NO"             114
23
    27 - Photograph of gas dispenser Instructions
24     with words "CASH PRICE YES/NO"               115
25

6

1  EXHIBITS (CONTINUED):
2  Exhibit No.        Description              Page
3  28 - Client Manual Consumer Accounts
         Bates stamped BAUTISTA 38-66          118
4
    29 - Chase Deposit Account Agreement,
5       Bates stamped BAUTISTA 3-35           120
6  30 - Photograph of Valero gas station;
         located intersection of Bismark/Mission   123
7
    31 - Photograph of Valero price sign;
8       located at Mission/Bismark            123
9
10              ---oOo---
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7

1              FAITH BAUTISTA,
2          having first been duly sworn, was
3          examined and testified as follows:
4
5          EXAMINATION BY MR. PHELPS
6      MR. PHELPS:  Q.  Would you please state your
7  name for the record.
8      A.  Faith B. Bautista.
9      Q.  Ms. Bautista, you understand that you're
10 testifying under oath; correct?
11     A.  Yes.
12     Q.  And the oath that you've just taken a moment ago
13 is the same oath and has the same force and effect as if
14 we were in a courtroom.  Do you understand that?
15     A.  Yes.
16     Q.  We're here for your deposition today in the
17 lawsuit that has been filed in your name against Valero.
18 And I would like to start by going through some of the
19 ground rules, rules of the road, for the deposition so we
20 can, hopefully, move through this as expeditiously as
21 possible.
22         The format is a question-and-answer format.
23 I'll be asking the questions, and when you're able to,
24 you'll be supplying the answers.  And it's important for
25 our court reporter, who will be taking down the record

8

1  verbatim here, that only one of us speak at a time.  I
2  will do my best to let you finish your answer before I
3  start asking another question, and, similarly, I would ask
4  you to let me finish my question before you begin your
5  answer.  That's a little different from usual
6  conversation, but it's important for keeping our record
7  clear.
8      Do you understand that?
9      A.  Sure, yes.
10     Q.  It's also important that when you answer a
11 question that you answer it audibly.  The court reporter
12 is unable to take down a nod of the head, shrugs of the
13 shoulder, that sort of thing.  You're doing a fine job so
14 far.  If there's a point where you don't answer audibly
15 and I prompt you to give us an audible answer, that would
16 be why.
17     Do you understand that?
18     A.  Yes.
19     Q.  It's also important -- and, again, you've done a
20 fine job on this so far -- that if you're going to answer
21 a question with a "yes" or "no" type of answer that you do
22 so clearly.  "Yes" or "no" is best, and "uh-huh" or an
23 "huh-uh" or that sort of thing is virtually
24 incomprehensible on the transcript when we get it back.
25     Do you understand that?

9

1      A.  Yes.
2      Q.  Do you have any questions about the deposition
3  process before we get into the substance?
4      A.  I do not.
5      Q.  Is there any reason that you can think of, as
6  we're sitting here today -- your health, medication,
7  anything like that -- that would keep you from being able
8  to answer questions?
9      A.  I'm good.
10     Q.  Okay.  All right.  Let's mark this as Exhibit
11 No. 1.
12         (Exhibit 1 marked for identification.)
13     MR. PHELPS:  Q.  Showing you what we've marked
14 as Exhibit No. 1, Ms. Bautista, and this is a two-page
15 document that's printed from the website of naac.org.
16 That is your biography?
17     A.  Yes.
18     Q.  And NAAC, the National Asian American Coalition,
19 is the organization you're the president and CEO of?
20     A.  Yes.
21     Q.  I printed this biography out in the middle of
22 March of this year.  Do you know if it's been updated
23 since then?
24     A.  This is correct.
25     Q.  Now, could you tell us, in brief, what it is

10

1  that you do for your work with NAAC?
2      A.  So we're an advocacy organization.  We're
3  focused on home ownership and economic development.
4      Q.  How long has NAAC been in existence?
5      A.  Since 2004.
6      Q.  And since 2004, have you been the president and
7  CEO of NAAC?
8      A.  Yes.
9      Q.  Have you had any other job titles with NAAC
10  since 2004?
11      A.  No.
12      Q.  How big is the staff of NAAC in terms of
13  numbers?
14      A.  The full-time staff?
15      Q.  Yes, Ma'am.
16      A.  Hold on.  Fifteen.
17      Q.  And then, are there part-time people?
18      A.  Yes.
19      Q.  How many?
20      A.  Two.
21      Q.  Of the 15 people, does that include you?
22      A.  Yes.
23      Q.  So working as president and CEO of the National
24  Asian American Coalition is your full-time job?
25      A.  Yes.

11

1      Q.  How many hours a week do you think you spend in
2  doing work on behalf of NAAC?
3      A.  As CEO, 10 hours, 12 hours.
4      Q.  So it's 10 to 12 hours a week?
5      A.  Yes.  I mean, a day.
6      Q.  Pardon me; I'm sorry.  We now have an unclear
7  record.  Let me try and clarify that.
8          I asked you how much time you spent working on
9  matters for NAAC.  Do I understand correctly that your
10  answer was about 10 to 12 hours per day?
11      A.  Correct.
12      Q.  And is that a five-day-a-week or
13  seven-day-a-week job?
14      A.  Six days a week.
15      Q.  Six days a week, okay.
16          Now, prior to the formation of NAAC in 2004,
17  what employment, if any, did you have?
18      A.  I was a business owner.
19      Q.  What type of business?
20      A.  Advertising specialties.
21      Q.  Was that the name of the --
22      A.  San Diego Advertising Specialties.
23      Q.  And what type of work did San Diego Advertising
24  Specialties do?
25      A.  We sell promotional products.

12

1      Q.  We're getting close to talking at the same time
2  here, Ms. Bautista.  I'm going to ask you if you can just
3  take a second after the question before you start
4  answering.
5          Can you give us an example of the types of
6  advertising materials that San Diego Advertising
7  Specialties created?
8      A.  Pens, mugs, paperclips, folders, purses, bags.
9      Q.  And how long were you the owner of San Diego
10  Advertising Specialty?
11      A.  1987 to 2002.
12      Q.  Did the business close in 2002?
13      A.  I sold it.
14      Q.  Were you living in Southern California during
15  the '87 to 2002 time period?
16      A.  Yes.
17      Q.  When did you move to the Bay Area?
18      A.  Five years ago.
19      Q.  So about 2011, 2012?
20      A.  2011.
21      Q.  Do you have any formal education after high
22  school?
23      A.  Yes.
24      Q.  And what is your education after high school?
25      A.  Bachelor's of science in marketing.

13

1      Q.  Where did you get your marketing degree?
2      A.  Philippines.
3      Q.  Is there a name of the school?
4      A.  Philippines School of Business Administration.
5      Q.  What year did you get that degree?
6      A.  1981.
7      Q.  Anything further in terms of formal education
8  after you received your BS in marketing in 1981?
9      A.  I took leadership training as a nonprofit leader
10  at Harvard, Wharton.
11      Q.  At Harvard and Wharton?
12      A.  Uh-huh (affirmative).
13      Q.  Was your answer "yes"?
14      A.  Yes.
15      Q.  And when did you take the leadership training?
16      A.  I don't have the exact -- what year is now,
17  2017?  Seven years ago at Harvard and three years ago
18  Wharton.
19      Q.  Just, in general, what types of issues did you
20  study or -- that question is not going anywhere.
21          Let me focus for a moment on the studies that
22  led to your bachelor's degree in marketing.  Was there any
23  special area of focus in your studies?
24      A.  Marketing, selling.
25      Q.  But any particular type of marketing, type of

14

1 product, type of anything that you specialized in?
2   A.  Not really.
3   Q.  So it was just general marketing?
4   A.  Yes.
5   Q.  Did you study anything in connection with your
6 bachelor's degree in marketing about marketing at service
7 stations or convenience stores?
8   A.  No.
9   Q.  How about in the course of your leadership
10 training, are you able to summarize for us what types of
11 things you studied as a part of the leadership training?
12   A.  It's a nonprofit leader, how to become an
13 outstanding nonprofit leader, how to help people, how to
14 advocate for consumers, and how to work with government
15 and corporations.
16   Q.  Now, you say that one was at Harvard and one was
17 at Wharton.
18       Were these programs that were sponsored by
19 Harvard and Wharton or did they just take place at Harvard
20 and Wharton?
21   A.  It was sponsored by -- I was chosen from
22 Pricewaterhouse Coopers to take the scholarship, and so,
23 as the -- the Harvard, I was chosen from the faith-based
24 churches to attend the school as a nonprofit leader.
25   Q.  My question was a little bit different from

15

1 that, Ms. Bautista.  I apologize if I was unclear.
2       My question was -- let's take the Harvard
3 leadership training program that you mentioned.  That took
4 place at the Harvard campus in Massachusetts?
5   A.  Yes.
6   Q.  And was the program sponsored by the university
7 or were they just using the space at the university?
8   A.  We were using the space at the university.
9   Q.  Do you know who sponsored the program?
10   A.  Harvard was -- it's a divinity school; it's all
11 the faith-based organizations.  I was sponsored by Core
12 City First AME Church.
13   Q.  How about the program at Wharton, was that also
14 physically located at Wharton in Pennsylvania?
15   A.  That's correct.
16   Q.  Was it sponsored by Wharton itself or was it
17 just --
18   A.  It's Pricewaterhouse Coopers.
19   Q.  Have you ever had your deposition taken before,
20 Ms. Bautista?
21   A.  No.
22   Q.  You've been involved in litigation previously;
23 correct?
24   A.  Yes.
25   Q.  Can you tell us about the litigation that you've

16

1 personally been involved in?
2   A.  Personally, no, I do not.
3   Q.  So the litigation that you've been involved in
4 in the past has been in the context of your work as a
5 consumer advocate?
6   A.  Correct.
7   Q.  Is it correct for me as shorthand -- and I don't
8 mean to misstate things -- for me to refer to you as a
9 "consumer advocate"?
10   A.  Yes, I am a consumer advocate.
11   Q.  If you wanted to describe what you do in one or
12 two words, is "consumer advocate" a fair description of
13 it, in your mind?
14   A.  A fair description of it?
15   Q.  Of what you do, yes.
16   A.  I protect consumers.
17   Q.  So let's talk about the prior litigation that
18 you were involved in in the context of your work as a
19 consumer advocate or protecting consumers.
20       You were involved in one case involving alleged
21 housing discrimination; correct?
22   A.  That's correct.
23   Q.  And can you tell us about that case?
24   A.  Five banks were fined hundreds of billions of
25 dollars for defrauding consumers, homeowners in distress;

17

1 Bank of America, Citibank, U.S. Bank.  The nonprofit
2 National American Asian Coalition is a HUD-approved
3 counseling agency where we helped 9,000 homeowners in
4 distress.  So Neil Barofsky, his law firm, approached NAAC
5 if we can be the plaintiff; right?  We were the ones who
6 win; right?
7   Q.  The plaintiff is the one who starts the lawsuit.
8   A.  Okay, yeah.  So because we have the experience
9 and we help homeowners, so California received 420 million
10 to help HUD-approved counseling agencies -- to fund
11 HUD-approved counseling agency, where we can help
12 homeowners.  But Governor Brown used that money to balance
13 the budget, which rightfully so, because California needed
14 funds at that time.  But when California became positive,
15 we asked Governor Brown to return that money back to
16 HUD-approved counseling agency, back to attorney general.
17 He refused to, so we filed a lawsuit on him and we won.
18   Q.  And when was that, approximately?
19   A.  Approximately a year ago, that's when we won.
20 The lawsuit, it took like eight months.
21   Q.  Were you also involved, Ms. Bautista, in a
22 matter where you acted as a housing tester?
23   A.  What do you mean by "housing tester"?
24   A.  Somebody who goes in when there's been an
25 allegation of some sort of discrimination on the part of

18

1  somebody who is renting a home or a dwelling and somebody
2  goes in to see if they can get the person to rent the
3  property to them.
4     A.  I do not do that.  I'm the CEO, so I handle the
5  management.
6     Q.  Have you ever been involved in something where
7  you acted as a housing tester, as I've just described
8  that?
9     A.  No.
10    Q.  So the only litigation prior to this case that
11 we're here for today that you were involved in was this
12 matter that you've just described regarding the money that
13 the governor had diverted; correct?
14    A.  Correct.
15    Q.  Do you have any special training in legal
16 issues?
17    A.  No, I do not.
18    Q.  So it's fair to say that you're not a lawyer,
19 and I'm not going to be asking you questions that expect
20 that you are a lawyer.
21        With that as background, can you tell me what
22 your understanding is, your personal understanding as a
23 non-lawyer, of what a "class action" is?
24    A.  So "class action lawsuit" is, I will represent
25 with me and I have a fiduciary duty to the people that

19

1  were involved and that were damaged or affected.
2     Q.  You mentioned the term "fiduciary duty,"
3  Ms. Bautista.
4        Again, as a non-lawyer, what does it mean to you
5  to have a fiduciary duty towards other people?
6     A.  To me, that's protecting them, fighting for
7  them.
8     Q.  Advocating for them?
9     A.  Advocating for them.
10    Q.  Other than, in general, fighting for and
11 advocating for the other members of the class, what do you
12 understand your duties, if any, to be as class
13 representative?
14    A.  I will represent them in a deposition like this.
15 I will represent them if there's a trial.  I will
16 represent them for any questions that might arise on the
17 case.
18    Q.  Again, understanding that you're not an
19 attorney, who do you understand the proposed class to be
20 that you're representing, or do you have an understanding?
21    A.  I don't understand the question.
22    Q.  Okay.  And at any point, Ms. Bautista, as we go
23 forward in the deposition, if I ask a question that you
24 don't understand or you didn't hear it or you were
25 distracted or something like that, please let me know and

20

1  I can rephrase it, if necessary.  We can also always have
2  the court reporter read it back.
3        My question then was, do you have an
4  understanding of who the people are that are the class
5  that you're representing?
6     A.  Yes.
7     Q.  And what is your understanding of the class?
8     A.  The people that I'm representing are the people
9  who got gas from Valero and who used their debit card and
10 paid -- and was charged for credit rather than cash.
11    Q.  As you sit here today, do you have any estimate
12 of the number of people who you are representing?
13    A.  I have no idea.
14    Q.  Now -- off the record for a second.
15        (Off the record at 9:19 a.m.)
16        (Resumed at 9:20 a.m.)
17        (Exhibit 2 marked for identification.)
18    MR. PHELPS:  Q.  Ms. Bautista, I'm showing you
19 what we've marked as Exhibit 2, which I'll represent, for
20 the record, is a copy of the Second Amended Class Action
21 Complaint in this matter without the exhibits attached.
22        Have you seen this before?
23    A.  Yes.
24    Q.  And you recognize on the first page here that
25 there are names of lawyers who are representing the

21

1  plaintiffs.  There's the Hobson firm and the Robbins,
2  Geller firm listed there; correct?
3     A.  Yes.
4     Q.  And my question is, when did you first have any
5  contact in connection with this matter with anyone from
6  the Robbins, Geller firm?  And my question is when.
7     A.  Last year.
8     Q.  Do you know about when?
9     A.  I can't recall.
10    Q.  How did you first get into contact with anyone
11 from the Robbins, Geller firm within the last year?
12    A.  Last week from Robbins, Geller.
13    Q.  I'm sorry.  I was unclear on that.
14        With respect to your work as the plaintiff in
15 this case, who was the first lawyer that you contacted?
16    A.  Rafael, Attorney Rafael.
17    Q.  When was that?
18    A.  If you're asking me for the exact month --
19    Q.  Best recollection.
20    A.  I think in January.
21    Q.  So January, early part of 2016?
22    A.  Yes.
23    Q.  And did you know -- you knew Mr. Hobson prior to
24 this lawsuit; correct?
25    A.  Correct.

22

1    Q.  And Mr. Hobson, who is one of the lawyers listed
2  on the front page of the complaint here, he's on the board
3  of directors of NAAC; right?
4    A.  Correct.
5    Q.  And is he currently on the board?
6    A.  Yes.
7    Q.  And was Mr. Hobson the person who first
8  introduced you to this matter?
9    A.  No.  It was Ralph (sic).
10    Q.  How did it come back that -- I'm trying to ask
11  this in a way that doesn't require you to disclose
12  attorney-client privileged information.
13       I'm trying to determine how it came about that
14  you got in contact with the lawyers for the plaintiffs
15  here on this case.  Can you explain that for us?
16    A.  When I'm noticing that the pricing is different
17  than what it was on the board, I actually ask Ralph why --
18  you know, because -- why do you think this is, why is the
19  price different?  If I'm being charged more than what I
20  thought I would have been charged and I didn't even notice
21  this for the longest time -- because, you know, I've been
22  driving since I was 19 -- I can't imagine how others are
23  being taken advantage of this.
24    Q.  There was a point then -- I'm sorry, you
25  finished your answer?

23

1    A.  Yes.
2    Q.  So there was a point where you noticed there was
3  a pricing difference; correct?
4    A.  Yes.
5    Q.  Was that at Valero that you noticed that?
6    A.  I notice it in others, but more in Valero.
7    Q.  What others did you notice?
8    A.  Shell.
9    Q.  Anybody else?
10    A.  That's all.
11    Q.  Now, approximately when was it that you noticed
12  this pricing difference?
13    A.  Yeah, around like December -- November,
14  December, and that's when I talk to Attorney Rafael.
15    Q.  November, December of 2016?
16    A.  2015.
17    Q.  2015, okay.  All right.  I'm sorry; I
18  interrupted you.  Please continue your answer.
19    A.  So when I spoke to him about this casually, you
20  know, and I guess he also check it out that, right, I'm
21  being charged also differently than what's on the board,
22  so ...
23    Q.  When you're saying "on the board," are you
24  referring to the large price signs at the service
25  stations?

24

1    A.  Yes.
2    Q.  And you indicated that you spoke with
3  Mr. Bernardino about this issue; correct?
4    A.  Yes.
5    Q.  At the time that you had that discussion with
6  Mr. Bernardino, was he your lawyer?
7    A.  No.
8    Q.  Okay.  What did he tell you in response to your
9  question you asked him why the price was different?
10       MR. GOLD:  I'm going to object to that question.
11  I would say in that instance she was seeking legal advice
12  from Mr. Bernardino, so I would say that that
13  communication is privileged.
14       MR. PHELPS:  Are you instructing her not to
15  answer?
16       MR. GOLD:  I'm instructing the witness not to
17  answer.
18       MR. PHELPS:  To not clutter up the record, but
19  to make my point, she did testify it was at a point when
20  he was not her lawyer, so I don't think that there was an
21  attorney-client relationship at that point.
22       MR. GOLD:  Just for the record, she's not sure
23  when it attaches, when he becomes lawyer, but if she is
24  seeking counsel on an issue that she is considered about,
25  I would say that is attorney-client privilege.  But the

25

1  objection is on the record.
2       MR. PHELPS:  As is the instruction.
3       MR. GOLD:  As well, I'll add for the record,
4  that Mr. Bernardino's firm did represent the NAAC prior to
5  this litigation.
6       MR. PHELPS:  Q.  During the time that Mr. Hobson
7  has been on the board of directors of NAAC, has he also
8  been providing legal service to NAAC separate and apart
9  from this lawsuit?
10    A.  Yes.
11    Q.  And NAAC also has Mr. Genazda (phonetic) on its
12  staff as well; correct?
13    A.  He's not a staff, he's our general counsel, he's
14  independent contractor.
15    Q.  But he's a lawyer and his function is to provide
16  legal advice to NAAC; correct?
17    A.  Yes.
18    Q.  Now, in the course of being the plaintiff in
19  this lawsuit, Ms. Bautista, do you believe that you have
20  an obligation to supervise plaintiff's counsel as part of
21  the fiduciary duty that you described?
22    A.  They're the experts, so I don't think I can
23  supervise them.
24    Q.  How frequently do you meet with plaintiff's
25  counsel?

26

1    A.  We've been talking a lot.
2    Q.  Is it something that -- do you meet on a regular
3 basis?
4    A.  When needed.
5    Q.  Again, Ms. Bautista, to be very clear, I'm not
6 asking you to tell us the substance of what you may have
7 discussed with the lawyers, I just want to know the
8 frequency of the meetings that you have.  And as I
9 understand it, it's as needed; correct?
10    A.  Right.
11    Q.  In the period that you've been the plaintiff in
12 this lawsuit, how many times do you think you've met in
13 person with the lawyer?
14    A.  Oh, a lot.
15    Q.  More than a dozen?
16    A.  Yes.
17    Q.  More than two dozen?
18    A.  No.
19    Q.  And have those been meetings where other people
20 besides yourself and the lawyers were present?
21    A.  No.  Was just me.
22    Q.  And do the meetings that you have with legal
23 counsel typically happen in person or are they sometimes
24 in -- on the phone?
25    A.  Both.  In person and by the phone.

27

1    Q.  When you were giving the numbers of meetings
2 previously, more than a dozen, less than two dozen, were
3 all of those meetings in person?
4    A.  No.
5    Q.  Out of that universe of meetings, what fraction,
6 percentage, however you can best estimate it, are phone
7 meetings versus in-person?
8    A.  I would say 60/40; 60 in person, 40 via phone.
9    Q.  Without going into the substance of anything
10 that plaintiff's counsel may have told you, do you receive
11 regular reports from them about events going on in the
12 case?
13    A.  Yes.
14    Q.  And in what form do you receive those regular
15 reports?
16    A.  Via phone and in person.
17    Q.  And do you receive information from counsel
18 about the costs and expenses that are being incurred in
19 this case?
20    A.  No.
21    Q.  Do you receive any copies of correspondence, for
22 example, letters, that are exchanged between the lawyers
23 for the plaintiffs and the lawyers for Valero?
24    A.  No.
25    Q.  Without describing any of their substance, have

28

1 you had any disagreements with the class counsel regarding
2 how the case should be prosecuted?
3    A.  None.
4    Q.  If you had a disagreement with the lawyers about
5 how the case was being handled, what would you do?
6    A.  I will advise them, I will give my opinion, but
7 because he's the expert, I will rely on him.
8    Q.  What efforts, if any, do you take to be
9 knowledgeable about the decisions that the lawyers make in
10 pursuing this case?
11    A.  What's the question, again?
12    Q.  Sure.  Are you making any efforts to stay
13 knowledgeable about the decisions, strategic decisions,
14 tactical decisions, legal decisions, that the lawyers are
15 making in pursuing this case?
16    A.  Yes.
17    Q.  What are you doing?
18    A.  When they tell me what they're doing, I agree
19 with them and I ask some question and then they explain it
20 to me.  So I want to make sure that I understand most of
21 it, my end, and that they explain it to me properly.
22    Q.  How much time in terms of hours do you think
23 you've spent on this matter?
24    A.  A lot of hours now.  Yes.
25    Q.  Does the time that you spend on this matter take

29

1 away from your time to do your consumer advocacy work for
2 NAAC?
3    A.  I would say yes and no, but because I'm in
4 advocacy, so this is -- this will help all our
5 constituents.
6    Q.  Is your role as plaintiff in this case being in
7 any way sponsored or supported by NAAC?
8    A.  Yes.
9    Q.  In what way?
10    A.  For advocacy, for making sure that the consumers
11 are protected.
12    Q.  The fact that you're the plaintiff in this
13 lawsuit, has that been discussed with board members of
14 NAAC?
15    A.  Yes.
16    Q.  Has it been discussed at a time when counsel
17 were not present?
18    A.  See, the board of directors are only policy,
19 i.e., they do not get involved with our day to day.  So
20 all the things that I do for NAAC, the board of directors
21 usually would not know it until I make my report, my
22 president's report, when I meet with them.
23    Q.  Is the -- let me ask it this way.
24    The board of directors has the ultimate
25 authority, as you understand it, over NAAC; correct?

30

1      A.   Only on policy.
2      Q.   On policy.  What do you mean by "policy"?
3      A.   Policy, we're following the bylaws, we're
4  approving the budget.  But the day-to-day operation,
5  management, I'm the CEO of the organization, I run the
6  show on that.
7      Q.   What about your position as CEO?  In your
8  understanding, does the board of directors of NAAC have
9  the authority to fire or dismiss you?
10     A.   Yes.
11     Q.   So, in a sense, you report, as the CEO, to the
12 board of directors; correct?
13     A.   Correct.
14     Q.   So to get back to the question that I had some
15 moments ago, you referred to president's reports to the
16 board of directors; is that --
17     A.   That's right.
18     Q.   And is this just at regular board meetings, the
19 president has something to say and that's called your
20 president's report?
21     A.   That's correct.
22     Q.   And so, in the course of the president's report,
23 you would talk about all sorts of policy issues that would
24 be relevant and germane to the board; correct?
25     A.   Correct.

31

1      Q.   Is this lawsuit one of things that you have
2  reported on to the board?
3      A.   I did not, because our board meeting will not be
4  -- for the actual thing, not until June.
5      Q.   How often does the board meet?
6      A.   Quarterly.
7      Q.   So when was the last meeting?
8      A.   Our last meeting was last year, because we
9  postponed the quart -- the first quarter meeting.
10     Q.   Have you had board meetings since the lawsuit
11 was filed?
12     A.   Over the phone, executive board, yes.
13     Q.   And is Mr. Hobson on the executive board?
14     A.   He's not.
15     Q.   And during the phone meetings that you've had
16 with the board or some subset of the board since this
17 lawsuit was filed, have you discussed the lawsuit with
18 him?
19     A.   I did not.  I'm sorry.  I discuss it with
20 executive board, but not the entire board.
21     Q.   Thank you for that clarification.
22          When you spoke to the executive board about the
23 lawsuit, who was on that executive board?
24     A.   The chairman and the vice chairman.
25     Q.   And who are they, by name?

32

1      A.   Jeff Lim.
2      Q.   Could you spell that, please?
3      A.   Jeff, J-e-f-f; Lim, L-i-m.  They're both
4  cochairs.  Cora, C-o-r-a; Oriel, O-r-i-e-l.
5          MR. PHELPS:  I did this backwards, but -- here,
6  let me try this.  Let's mark this as No. 3.
7          (Exhibit 3 marked for identification.)
8          MR. PHELPS:  Q.  I'm showing you what we've
9  marked as Exhibit No. 3, Ms. Bautista.  Again, printed
10 from the website.
11         NAAC has a website; right?
12     A.   Yes.
13     Q.   You're familiar with the contents of the
14 website?
15     A.   Yes.
16     Q.   Are you responsible in any way for the content
17 of the website?
18     A.   I check on it -- I tell them what to put in, but
19 I don't check it very often.
20     Q.   If you take a look at what we've marked as
21 Exhibit 3, the board -- a printout of the Board of
22 Directors pages of the website, does this look to be an
23 accurate listing of the board members?
24     A.   Leon Cook is no longer on the board.
25     Q.   I'm sorry, where is he?

33

1      A.   Leon Cook, at page four.
2      Q.   I see, okay.
3          Is there anybody new that's not listed?
4      A.   Del Hintz.
5      Q.   D-e-l?
6      A.   Uh-huh (affirmative).
7      Q.   Yes?
8      A.   Yes.
9      Q.   H-i-n-e-s?
10     A.   H-i-n-t-z.
11     Q.   H-i-n-t-z?
12     A.   Yes, H-i-n-t-z, yes.
13     Q.   So then, using Exhibit 3 as a little bit of a
14 roadmap here, the members of the executive board, then,
15 are Mr. Lim, who's on the second page; correct?
16     A.   Yes.
17     Q.   And then, Ms. Oriel, who is on the next page,
18 just above your photograph; right?
19     A.   Yes.
20     Q.   So, in the course of your conversations with
21 Mr. Lim and Ms. Oriel in their capacity as members of the
22 board, what, if anything, have you told them about this
23 lawsuit?
24     A.   I just told them that I'm representing -- I'm in
25 the class action lawsuit, trying to protect the consumers

34

1  on the Valero case.  I did not discuss with them the
2  details.
3      Q.  Did they have any response, any comments that
4  you recall?
5      A.  They said good for me, that I'm continuing doing
6  representing the people.
7      Q.  Now, getting back to the day-to-day operation of
8  the lawsuit here, do you read any of the legal filings?
9      A.  This (indicating).  This is what I read.
10     Q.  Now, you're referring to what we've marked as
11 Exhibit No. 2, the complaint?
12     A.  Yes.
13     Q.  And did you read the complaint -- now, this is
14 -- this document, Exhibit 2, is titled the Second Amended
15 Class Action Complaint.
16         Do you understand that there was a version
17 before that?
18     A.  Yes.
19     Q.  And did you review that before it was filed?
20     A.  Yes.
21     Q.  And did you also review the Second Amended
22 Complaint before it was filed?
23     A.  Yes.
24     Q.  And were you aware that there were claims that
25 were dismissed by the Court?

36

1      A.  No, I did not.
2      Q.  What's your opinion about oil companies,
3  Ms. Bautista, as a consumer advocate?
4      A.  Say that again.
5      Q.  What's your opinion about oil companies, as a
6  consumer advocate?
7          MR. GOLD:  I'm going to object to that question
8  as vague, but she can answer.
9          MR. PHELPS:  Q.  Do you have a general opinion
10 about oil companies?
11     A.  Yes.
12     Q.  And what is your general opinion?
13     A.  Not so concerned of the environment.  Oil
14 companies makes a lot of money.
15     Q.  So fair to say that your opinion about oil
16 companies, in general, is not a positive one?
17     A.  Not really.
18         MR. GOLD:  I'm going to object to that one.
19         THE WITNESS:  No.
20         MR. PHELPS:  Q.  Now, you mentioned your opinion
21 about oil companies in general.  Do you have any
22 particular opinions about Valero separate and apart from
23 this lawsuit?
24         MR. GOLD:  Object to the question as vague.
25         MR. PHELPS:  Q.  You can answer.

35

1      A.  I do not.
2      Q.  You were not informed by class counsel that the
3  Court had partially dismissed some of your claims?
4      A.  I do not.
5      Q.  Have you signed any written statements about
6  this lawsuit?
7      A.  Yes.
8      Q.  What written statements have you signed?
9      A.  That I'm representing the class action lawsuit.
10 What else did I sign?  There's so many pages that I read
11 in there.  Can I ask them?
12         MR. GOLD:  I can't help you.
13         MR. PHELPS:  Q.  Well, let me try and clarify
14 the question and see if this will help.
15         Have you spoken to any reporters about this
16 case?
17     A.  No.
18     Q.  Have you been interviewed by anyone other than
19 the lawyers about this case?
20     A.  No.
21     Q.  Have you made any written statements -- and I
22 mean to set aside things like the complaint that we've
23 marked as Exhibit No. 2.
24         Have you given any written statements to anyone
25 about the matters here?

37

1          MR. GOLD:  I'll object, and then just give me a
2  moment, and then you can answer.  Go ahead.
3          MR. PHELPS:  Q.  Ms. Bautista -- and I should
4  have mentioned this as part of my rules of the road --
5  there are points -- we don't have a judge here, of course.
6  There are points when counsel may object to the form of
7  one of my questions, as he's entitled to do.  We don't
8  have somebody here ruling on the objections.
9          The way it works, unless he tells you not to
10 answer the question, like the attorney-client privileged
11 one from earlier, you should answer the question if you're
12 able to do so.
13         Do you understand that?
14     A.  Yes, I do.
15     Q.  So my question was -- getting back to what you
16 think about oil companies.  You told us in general.  And
17 my question was whether you had a particular opinion about
18 Valero.
19         MR. GOLD:  Same objection.
20         MR. PHELPS:  Q.  And you can answer, if you are
21 able.
22     A.  I will not answer that, then.
23     Q.  Actually, he's not telling you you shouldn't
24 answer the question.  If you have an opinion about Valero,
25 you need to tell us.

38

1     MR. GOLD:  You can answer if you have an
2 opinion.
3     THE WITNESS:  I don't have an opinion.
4     MR. PHELPS:  Q.  So, as far as you are
5 concerned, Valero was no better, no worse than the other
6 oil companies and would fit within your general view of
7 oil companies, that they don't care about the environment
8 so much and they make a lot of money; right?
9     MR. GOLD:  I'm going to object to the form of
10 the question.  You can answer.
11     THE WITNESS:  Yeah, no, I'm not saying that at
12 all.  I object to that question, because it's not --
13 there's a lot of answers to that, so I would rather not
14 answer.
15     MR. PHELPS:  Q.  Let me try it a different way,
16 Ms. Bautista.
17     What do you think of Valero?
18     MR. GOLD:  Object to the form of the question.
19     MR. PHELPS:  Q.  You can answer.
20     A.  I don't like them.
21     Q.  Why not?
22     A.  They defrauded consumers.
23     Q.  Is there any other reason, anything else about
24 Valero that you don't like?
25     A.  I do not have any other reason.

39

1     Q.  So the only -- are there some oil companies that
2 you dislike more than others, that you think are worse
3 than others?
4     A.  No, I don't.
5     Q.  They're all about the same, as far as you're
6 concerned?
7     A.  Yes.
8     Q.  Has NAAC ever advocated a boycott of producers
9 of goods or services?
10     A.  No.
11     Q.  Has NAAC ever advocated a boycott of any
12 individual retailer?
13     A.  No.
14     Q.  Do you think that all of the members of the
15 class that you're representing share your view about oil
16 companies?
17     MR. GOLD:  Object to the form of the question.
18     THE WITNESS:  I will not know that.
19     MR. PHELPS:  Q.  Do you think that your view on
20 oil companies will impact any of the decisions that you
21 think need to be made in this case?
22     A.  No.
23     Q.  Is part of what you want to do here to teach
24 Valero a lesson?
25     A.  Yes.

40

1     Q.  What's the lesson you want to teach Valero?
2     A.  Do what's right.  Be transparent.
3     Q.  And let me ask the question this way,
4 Ms. Bautista.  Just, again, understanding that you're not
5 a lawyer, but you are the plaintiff in this case.  Tell me
6 what you believe Valero did wrong here.
7     A.  Valero charged me and others an incorrect price.
8 The board -- the sign says "credit" and "cash."  So
9 anybody that's paying outside credit should be charged
10 cash pricing.
11     Q.  So, I'm sorry, when you say "outside credit," am
12 I correct in understanding that you're saying that if
13 you're not using a credit card, you should get the cash
14 price?
15     A.  Absolutely.
16     Q.  Is there anything else, as you sit here today --
17 again, understanding that you're not a lawyer -- that you
18 believe that Valero did that was wrong?
19     A.  Yes.
20     Q.  What else?
21     A.  Oh, my understanding of your question is if they
22 did this wrong.  So my answer is yes.
23     Q.  And my question was, is there anything else
24 other than what you've just told us that you think Valero
25 has done wrong?

41

1     A.  Yes.
2     Q.  And then, what else?
3     A.  Okay, you know, they should tell whoever is
4 managing there that they cannot have that sign, that they
5 have to be clear on what they're charging to consumers.
6 They should tell their people.
7     Q.  By "their people," who do you mean?
8     A.  Whoever is managing that store.
9     Q.  You're talking about people who are running the
10 individual gas stations; right?
11     A.  Correct.
12     Q.  Is there anything else that you can think of, as
13 you sit here, that you haven't already told us about that
14 you think that Valero is doing wrong?
15     A.  That's all.
16     Q.  We talked a moment ago about your interest in
17 teaching Valero a lesson.
18     Would you be satisfied with a resolution of this
19 case that does not involve an admission of wrongdoing by
20 Valero?
21     A.  I think that's something that I'm going to defer
22 to my lawyer.
23     Q.  That's not something you have an opinion on one
24 way or the other?
25     A.  I'm going to refer to my lawyer.  I'm going to

42

1 discuss what's best.
2     Q.  If we could resolve the case and the resolution
3 of the case did not involve Valero admitting that it did
4 something wrong, would that be okay with you?
5     MR. GOLD:  I'm going to object to the question
6 as asked and answered, but you can answer.
7     THE WITNESS:  No, they need to admit.
8     (Exhibit 4 marked for identification.)
9     MR. PHELPS:  Q.  Showing you what we've marked
10 as Exhibit No. 4, Ms. Bautista, which is a printout from
11 the Donald Trump transition committee that is referring to
12 your endorsement of Steven Mnuchin to be the treasury
13 secretary; do you see that?
14     A.  Yes.
15     Q.  Were you aware of this press release from the
16 president?
17     A.  No.
18     Q.  Have you not seen this before?
19     A.  No.
20     Q.  Regardless of personal political views, do you
21 think that there might be some people in California in the
22 class who would object to having the class representative
23 who was praised by the president?
24     MR. GOLD:  I'm going to object to that question.
25     THE WITNESS:  I don't know what to answer, no.

43

1 I'm famous.
2     MR. PHELPS:  Q.  You mentioned in your testimony
3 a few moments ago, Ms. Bautista, that you noticed that
4 there were pricing issues at Shell stations as well as at
5 Valero; correct?
6     A.  Yes.
7     Q.  And do you have an understanding as a non-lawyer
8 as to why you're not suing Shell?
9     A.  Because I only saw it once.
10    Q.  And you only saw -- you say you only saw it
11 once.  What is the "it" that you saw?
12    A.  I did not say "it."  I only saw the sign once.
13    Q.  You saw a sign at a Shell station that had a
14 split between cash and credit?
15    A.  Right.
16    Q.  Is Shell and Valero -- or are Shell and Valero
17 the only brands that you've seen in the Bay Area or
18 anywhere in California that have a cash/credit split?
19    A.  Yes.
20    Q.  Nobody else?
21    A.  That's all I notice.
22    Q.  Where was the Shell station where you saw the
23 split price line?
24    A.  It's in South San Francisco.
25    Q.  Is it the one on --

44

1     A.  Hillside, Hillside Boulevard.
2     (Exhibit 5 marked for identification.)
3     MR. PHELPS:  Q.  Showing you what we've marked
4 as Exhibit 5, Ms. Bautista, this is a photograph of a
5 Shell station located at the intersection of Hillside at
6 East Market Street.
7     Is that the station that you were referring to?
8     A.  This looks like the one in Daly City.
9     Q.  Okay.  So this is not the one you were referring
10 to?
11    A.  No.
12    Q.  Have you seen this station before?
13    A.  Yes.  This is Daly City; right?
14    Q.  Well, I'm not sure if -- it's Hillside at East
15 Market Street.  I'm not sure if that's Daly City or South
16 City, myself.
17    But you've seen this location before; right?
18    A.  Yes.
19    Q.  You live on Hillside; right?
20    A.  Yes.
21    Q.  And so, this station would be on the street you
22 live on, couple miles away from your house?
23    A.  Yes.
24    Q.  So the station -- to get back to my earlier
25 question, the Shell station where you saw the

45

1 split-pricing sign, where was that?
2     A.  It's in, I think, Spruce.
3     Q.  Spruce?
4     A.  Yes.
5     Q.  When did you see this Shell station that had the
6 split-pricing sign?
7     A.  When did I see it?  It's near my house, so I
8 always see it.
9     Q.  It's something that's going on now?
10    A.  I don't -- no, not anymore.  They -- yeah, no, I
11 think -- I know they have debit card, it's not just cash,
12 but they also have debit.
13    Q.  So you saw the Shell station that you believe is
14 on Spruce that had the split-pricing sign, but you only
15 saw it one time and that's why you're -- you weren't
16 concerned about suing Shell?
17    A.  Right, yeah.
18    Q.  And that's the only reason why you're only suing
19 Valero here and nobody else?
20    A.  Yes.
21    Q.  Is it your belief personally, Ms. Bautista, that
22 companies should be regulated based on their service or
23 lack of service to minority communities?
24    A.  Yes.
25    Q.  Have you made any assessment of Valero in this

46

1 regard as to whether you believe that they are sufficient
2 in their service towards minority communities?
3     A.  I don't think so.
4     Q.  Why do you think that Valero has failed the
5 minority communities?
6     A.  Their pricing.
7     Q.  Is it the split pricing or is it just the level
8 of pricing in general?
9     A.  When you call "split pricing," you mean the
10 credit and the cash?
11     Q.  Yes, Ma'am.
12     A.  Yeah, yeah, that's the one.
13     Q.  Is there any other reason that you think that
14 Valero has been not up to par as far as serving minority
15 communities?
16     A.  Yes.  As community leader, I have not seen them
17 do a lot of work in the underserved communities.
18     Q.  You don't see them in your outreaches?
19     A.  I don't, no.
20     Q.  Is that something that concerns you?
21     A.  Yes.
22     Q.  Do you see people from other oil companies like
23 Chevron or Shell or ARCO in your community outreach?
24     A.  Yes.
25     Q.  In what ways do you see other oil companies

47

1 where you don't see Valero?
2     A.  Some trade organizations where EXXON sponsor.
3 Shell sponsor community gatherings like Hispanic heritage,
4 African-American, Asian heritage.  But Valero, no.
5     Q.  Is your desire to pursue this action against
6 Valero in any way motivated, even by the smallest amount,
7 by a view that Valero has failed an obligation toward the
8 Asian American community or minorities?
9     A.  I'm answering from deceiving the price, so they
10 did not serve the minority group in not disclosing the
11 correct price.
12     Q.  Anything else about your views on Valero that is
13 motivating you to sue Valero in this case?
14     A.  No.
15     MR. PHELPS:  Let's take a quick break.
16     (Off the record at 9:56 a.m.)
17     (Resumed at 10:06 a.m.)
18     MR. PHELPS:  Q.  Back on the record.  Before the
19 break, Ms. Bautista, I had asked you a question about what
20 you thought Valero had done wrong, and you testified that
21 Valero had charged the incorrect price.
22     And I'd like to ask you, as the representative
23 plaintiff in this case, in your understanding, what would
24 Valero have to do to resolve this problem?
25     A.  They need to remove -- they need to correct the

48

1 pricing immediately.
2     Q.  And by correcting the pricing, what does that
3 mean?
4     A.  They have to put in there that credit, debit,
5 cash.
6     Q.  So your understanding of what would be necessary
7 to resolve this problem would be to change the big price
8 signs so there was a column for "cash," a column for
9 "debit" and a column for "credit"; correct?
10     A.  Yes.
11     Q.  Is there anything else that you can think of
12 that Valero would have to do to resolve this problem?
13     A.  On the gas pump, they have to be specific in
14 there and make it clearer that if you're charging -- if
15 you're using your debit, that it will be a different
16 price.  Just be clear.
17     Q.  What would it take, let's say, at the gas pump
18 for it to be clear, as you said, that the price needs to
19 be clear?  If the price came up on the little video
20 screen, would that make it clear?
21     A.  Yes.
22     Q.  Now, do you ever get complaints about --
23     MR. GOLD:  I'm sorry to interrupt.  Just to the
24 last question, I think it was vague with regards to the
25 "little video screens."  I just want to enter that

49

1 objection.
2     MR. PHELPS:  Q.  Do you ever get complaints from
3 people you have worked with or worked for at NAAC like
4 your customers?  That was a horrible question.  Let me
5 start that all over again.
6     A.  Every day.
7     Q.  Who are your customers?
8     A.  Consumers.
9     Q.  And you're familiar with the web page Yelp?
10     A.  Web page?
11     Q.  Yelp.
12     A.  Yes.
13     Q.  When you get complaints -- when NAAC gets
14 complaints from its customers, what do you try to do?
15     A.  Fix it right away.
16     Q.  So you make an effort to respond --
17     A.  Yes.
18     Q.  -- to the complaint and try to make it right;
19 yes?
20     A.  Yes.
21     MR. PHELPS:  Let's mark this as the next in
22 order.
23     (Exhibit 6 marked for identification.)
24     MR. PHELPS:  Q.  Showing you what we've marked
25 as Exhibit 6, Ms. Bautista, it's a four-page printout from

50

1 the Yelp page for the National Asian American Coalition.
2 Do you generally take a look at the Yelp reviews
3 for NAAC?
4 A. No.
5 Q. Have you ever done that?
6 A. Once.
7 Q. So you see on the second page of Exhibit 6 that
8 there are a couple of reviews that are five-star reviews,
9 and then there's one that says, "these guys are crooks!"
10 and we go to the next page and there's a couple more
11 five-star reviews and then there's a one-star review that
12 says "The housing counselors make things up," and then
13 there's another five-star review.
14 Do you see that?
15 A. Yes.
16 Q. Is it possible sometimes, Ms. Bautista, that you
17 just get complaints that are crackpot complaints?
18 A. No. We've served over 9,000, and if you look at
19 this, I only see two.
20 Q. My question is about the two.
21 So your point is that out of the many thousands
22 of customers that NAAC has served, there are only a couple
23 of them that have said bad things on Yelp?
24 A. Yes.
25 Q. So what do you do about the ones where people

51

1 say things like "these guys are crooks"?
2 A. So we look at the file and then we investigate
3 what happened and we figure that this is the homeowner
4 that we really cannot help.
5 Q. Is it sometimes your experience that people make
6 complaints about what NAAC does and you're just not able
7 to resolve them?
8 A. We usually resolve almost everything.
9 Q. But sometimes you just can't; right?
10 A. Sometimes you cannot.
11 (Exhibit 7 marked for identification.)
12 MR. PHELPS: Q. I'm showing you what we've
13 marked as Exhibit 7 to your deposition, Ms. Bautista, and
14 it is a collection five-pages long of photographs that
15 were produced to us by your counsel.
16 If you see in the lower right-hand corner of the
17 pages, there is the name "Bautista" and then a series of
18 sequential numbers going from "Bautista 89" to "Bautista
19 93." Do you see that?
20 A. Yes.
21 Q. Do you recognize these photographs?
22 A. Yes.
23 Q. Are these photographs that you took?
24 A. Yes.
25 Q. Did you take all of them?

52

1 A. Yes.
2 Q. Now, the first page of Exhibit No. 7 appears to
3 show a Valero service station you can see part of a car by
4 one of the dispensers. Is this the station at 6989
5 Mission Street?
6 A. Yes.
7 Q. And when you talked earlier about the boards and
8 signs on the board, were you referring to the type of sign
9 that we see part of on the first page here?
10 A. Yes.
11 Q. And if we look at other photographs in this
12 exhibit, in particular, at pages 91 and 92, are those
13 pictures that you took?
14 A. Yes.
15 Q. I'm sorry; I already asked that. The second
16 one, the second page -- third page, I'm sorry, with
17 "Bautista 91," and there's a Valero sign; do you see that?
18 A. Yes.
19 Q. What service station was that taken at?
20 A. I don't recall.
21 Q. Is that the 6989 Mission Street station?
22 A. I don't think so.
23 Q. Do you recall when that picture was taken?
24 A. I don't recall.
25 Q. So you don't recall when it was taken and you

53

1 don't recall which Valero service station this is;
2 correct?
3 A. Yes.
4 Q. Is it possible this was the station on Sullivan?
5 A. I don't know.
6 Q. And then the next one on the page that's got the
7 number "Bautista 92," where was that taken? Is that the
8 6989 Mission Street station?
9 A. This one I know is the Mission.
10 Q. You're referring to the first page of Exhibit 7?
11 A. Yes. So this one I don't know.
12 Q. So you're uncertain of where the stations are
13 that have the signs depicted in pages 91 and 92; right?
14 A. Yes.
15 Q. And then, let's take a look at -- you know,
16 while we've got this here -- 90, page 90, same exhibit,
17 Exhibit 7; it's a picture of a dispenser, a pump; correct?
18 A. Yes.
19 Q. Did you take this picture?
20 A. Yes.
21 Q. And what station was this taken at?
22 A. This should be the Mission.
23 Q. And then, the last page of Exhibit 7 at page 93
24 is also a picture of a dispenser. Where was that taken?
25 A. Oh, I would not remember.

54

1    Q.  Do you know whether it's the -- is it a Valero
2  station, for one thing?
3    A.  Yes.
4    Q.  Do you know whether it was at the 6989 Mission
5  Street station or not?
6    A.  Probably.
7    Q.  Probably, but you're not sure?  I'm sorry.
8      Your answer is probably, but you're not sure?
9    A.  Yes.
10    Q.  Let's take a look at the first page again of
11  Exhibit No. 7, the picture that you took at the 6989
12  Mission Street station.  Forgive me, I may have asked this
13  already, but I didn't write it down.
14      Do you recall when this picture, the first page,
15  was taken?
16    A.  Either December of 2015 or -- yeah, before --
17  no, when I was starting to talk to Attorney Ralph about
18  it, so said I should take pictures, so I did.
19    Q.  Let's talk about this station and focus on the
20  6989 Mission Street station and your understanding of how
21  things operate there.
22      If I refer to the prices that are listed on the
23  big sign there as the retail prices, does that make sense
24  to you?
25    A.  Yes.

55

1    Q.  In your understanding for the 6989 Mission
2  Street station, who sets the street price -- or the retail
3  prices?
4      MR. GOLD:  I'm going to object to that question
5  as foundation.
6      MR. PHELPS:  Q.  If you know.
7    A.  I don't know.
8    Q.  Do you have any reason to believe that it's
9  Valero that sets those retail prices?
10    A.  Yes.
11    Q.  And what is your reason for believing that it is
12  Valero and not someone else that sets those retail prices?
13    A.  It's their company.
14    Q.  Is it possible, Ms. Bautista -- well, let me ask
15  you this.
16      As a former small business owner, you're
17  familiar with the concept of franchising; correct?
18    A.  That's correct.
19    Q.  And you understand that in a franchise business
20  you can have an individual or some entity that operates a
21  McDonald's or a gas station or 7-Eleven or something like
22  that and it says "McDonald's" on it, but there's some
23  third party that's running it; do you understand that?
24    A.  Yes.
25    Q.  And do you have any understanding as to the 6989

56

1  Mission Street station whether it's run by Valero
2  employees or by an independent franchisee?
3    A.  See, I'm not familiar with oil industry and how
4  they operate.  I'm familiar with other franchisee, but not
5  gas stations.
6    Q.  So your conclusion that Valero set the retail
7  prices at the 6989 Mission Street station is based on the
8  fact that it says "Valero" there; right?
9    A.  That's correct.
10    Q.  Is there anything else?
11    A.  No.
12    Q.  Do you know whether any of the Valero stations
13  in California are run by people other than Valero
14  employees?
15      MR. GOLD:  I'm going to object to on the basis
16  of foundation.
17      MR. PHELPS:  Q.  Do you know?
18    A.  I do not know.
19    Q.  Have you ever heard the term "petroleum jobber"?
20    A.  No.
21    Q.  So you have no understanding of what that means?
22    A.  No.
23      COURT REPORTER:  Did you say "jobber"?
24      MR. PHELPS:  J-o-b-b-e-r.
25    Q.  Have you heard the term "petroleum distributor"

57

1  before?
2    A.  No.
3    Q.  As you sit here today, you have no understanding
4  as to what the function is of a petroleum jobber or
5  distributor is in California; correct?
6    A.  No, I don't.
7    Q.  How long have you lived in California?
8    A.  Since 1981.
9    Q.  Do you remember when Valero first started having
10  retail service stations in California?
11    A.  I do not know.
12    Q.  You do or don't?
13    A.  I do not know.
14    Q.  How many times over the years do you think
15  you've bought gas at the 6989 Mission Street station when
16  it was branded Valero?
17    A.  I do not remember how many.  Many times.
18    Q.  More than 20?
19    A.  No.
20    Q.  Was that a regular place for you to stop for
21  gas?
22    A.  Yes.
23    Q.  Did you have other regular places that you
24  stopped for gas?
25    A.  Now I do.

58

1    Q.  Well, tell me where you go now.
2    A.  Texaco.
3    Q.  Where is that located?
4    A.  That's near Westgate in Daly City.
5    Q.  Is that near where the NAAC office is?
6    A.  Yes.
7    Q.  When did you start patronizing the Texaco near
8    the office?
9    A.  After -- when I started this lawsuit, I do not
10   use Valero anymore, so I started going to Texaco.
11   Q.  The fact is that you have been back to the
12   Valero station since the lawsuit was filed; haven't you?
13   A.  Yes.  Not me, my assistant, that I ask her to
14   get me gas, so I asked her to get me gas and that's where
15   she went.
16   Q.  Did you give her your debit or credit card to do
17   that?
18   A.  Yes.
19   Q.  It's your testimony that she went there without
20   any direction or anything from you, it just was a
21   coincidence that that's where she went to?
22   A.  No, that's because that's where they also go.
23   Q.  So your assistant -- this chair is gonna kill
24   me --
25       (Off the record momentarily.)

59

1        MR. PHELPS:  Q.  So your assistant was a regular
2    customer at the Mission Street station?
3    A.  No, not really.  She just -- when I ask her to
4    get me gas, and that's when she went for gas.
5    Q.  Do you recall when that was?
6    A.  I do not recall.
7        (Exhibit 8 marked for identification.)
8        MR. PHELPS:  Q.  Showing you what we've marked
9    as Exhibit 8; this is a photograph of a service station
10   located at 1216 Hillside Boulevard in Daly City.
11       This would be a couple of miles down the road
12   from your house?
13   A.  Yes.
14   Q.  Do you recognize this service station,
15   Ms. Bautista?
16   A.  Yes, I saw it, yes.
17   Q.  Do you ever shop at this station?
18   A.  No.
19   Q.  Why not?
20   A.  I just don't go there.
21   Q.  Is it the fact that it's a non-branded station?
22   Does that have a bearing on your decision?
23   A.  No.
24   Q.  When you decide where you're going to stop for
25   gas, Ms. Bautista, what are the factors that you consider?

60

1    A.  Oh, I always go by the lowest price.
2    Q.  Always?
3    A.  And convenience.
4    Q.  So price --
5    A.  And convenience.
6    Q.  -- and convenience.
7        Anything else?
8    A.  That's all.
9    Q.  So this service station, Exhibit No. 8, at the
10   Five Star Gas, from where your house is located, is this
11   closer to your house or farther away than the Valero at
12   6989 Mission?
13   A.  I think it's pretty much the same.  All depends
14   where you go.
15   Q.  When you would go shop at 6989 Mission, how
16   would you get there?
17   A.  I take the -- what's the -- it's not Daly --
18   Mission.  I'm sorry; I'm not good in directions.  I can't
19   remember the street.  I take Hillside, I make a left, I
20   think that's Mission, and then --
21   Q.  Where do you turn left on Hillside, before or
22   after you get to the Five Star gas station?
23   A.  Oh, it's after.
24   Q.  So you would -- on your regular route, you would
25   have to pass the Five Star gas station to get to the

61

1    Valero; right?
2    A.  I don't know exactly where this is.  Is this by
3    Hillside?
4    Q.  It is.  It's 1216 Hillside.  I'm sorry, I guess
5    we can't see the cross street.
6        But this is not a place that you go to?
7    A.  Huh-uh, no.
8    Q.  I'm sorry?
9    A.  No.
10   Q.  Do you have a sense of whether their prices at
11   this location are typically higher or lower than branded
12   locations?
13       MR. GOLD:  I'm going to object to that question.
14       THE WITNESS:  I do not know.
15       MR. PHELPS:  Q.  As a consumer, Ms. Bautista, do
16   you typically buy brand-name products?
17   A.  Not really.  To me, gas is gas.
18   Q.  Gas is gas, okay.
19       So if gas is gas, then why would you not go to
20   the unbranded station close to your house?
21   A.  I guess because -- I don't know.
22   Q.  Do you have a sense, Ms. Bautista, as a consumer
23   advocate, whether -- you have an understanding of what
24   generic products are; correct?
25   A.  Correct.

62

1    Q.   So let's take aspirin, for instance.  If you go
2  into a Walgreen's or a CVS and you want to buy aspirin,
3  you can get brand-name aspirin and you can get generic
4  aspirin; right?
5    A.   Yes.
6    Q.   Aspirin is aspirin; right?
7    A.   That's right.
8    Q.   Gas is gas; right?
9    A.   Right.
10   Q.   So, in your experience as a consumer advocate,
11 consumer educator, are the generic products typically more
12 expensive or less expensive than the brand-name products?
13   A.   Less expensive.
14   Q.   If price is your principal concern for gas, why
15 would you ever go to a brand-name service station?
16       MR. GOLD:  I'm going to object to that question.
17 Misstates the witness's testimony.  You can answer.
18       THE WITNESS:  I don't know.
19       (Exhibit 9 marked for identification.)
20       MR. PHELPS:  Q.  Showing you what we've marked
21 as Exhibit No. 9, Ms. Bautista, this is a photograph of a
22 Shell station located at 899 Airport Boulevard at Linden
23 Avenue in South San Francisco.
24       Do you recognize this station?
25   A.   Yes.

63

1    Q.   This is very close to your house; isn't it?
2    A.   Yes.
3    Q.   Less than a mile away from your house?
4    A.   Yes.
5    Q.   Do you ever shop at this Shell station?
6    A.   Yes.
7    Q.   Under what circumstances do you decide to go to
8  that Shell station?
9    A.   When I'm out of gas.
10   Q.   It's a last resort?
11   A.   Last resort.
12   Q.   So another factor, I guess, that would go into
13 your decision on where to buy gas is how badly you need
14 it; right?
15   A.   Yes.
16   Q.   Do you tend to be somebody who plans ahead on
17 buying gas or --
18   A.   Yes.  Sorry.
19   Q.   What do you do -- what is your process for
20 planning ahead when you're buying gas?
21   A.   What's the process for me buying gas?
22   Q.   Let me ask the question a different way.  That
23 was very vague, and counsel didn't even object to it.
24 I'll object to my own question.
25   A.   I don't know how my process is.

64

1    Q.   Sure.  Do you consider, for example, the time of
2  day?
3    A.   No.
4    Q.   Do you do research with things like Google or
5  GasBuddy or any of the other services that tell people
6  what gas prices are?
7    A.   No.
8    Q.   Do you ever advise consumers that that's
9  something that's smart to do?
10   A.   Not on gas.
11   Q.   Why not?
12   A.   I teach people how to save money but not where
13 to go gas.  I teach them on their budget.
14   Q.   Would you ever drive five minutes to find a
15 station that sells gas for five cents less?
16   A.   Yes.
17   Q.   You would do that?
18   A.   Yes.
19   Q.   Have you done that before?
20   A.   Yes.
21   Q.   Where have you gone when you've driven out of
22 your way to save money on gas?
23   A.   Well, because I plan when I already have like
24 one-fourth, and this is the cheapest gas, and that's where
25 I will go.  So it's not really out of the way.

65

1    Q.   Are you familiar with an ARCO station at 5898
2  Mission?
3    A.   I don't know.
4    Q.   Let me show you some pictures.  Maybe that will
5  jog your memory.
6        (Exhibit 10 marked for identification.)
7        MR. PHELPS:  Q.  Showing you what we've marked
8  as Exhibit 10, Ms. Bautista, it's a photograph of a price
9  sign for an ARCO station at the intersection of Mission
10 and at Sickles -- S-i-c-k-l-e-s -- and Acton -- A-c-t-o-n
11 -- Streets.  Do you see that?
12   A.   Yes.
13   Q.   Do you recognize this location?
14   A.   No.
15   Q.   You've never been there before?
16   A.   No.
17   Q.   Do you ever go to ARCO stations?
18   A.   Yes.
19   Q.   Is that one of the places you might go to save
20 some money?
21   A.   No.
22       (Exhibit 11 marked for identification.)
23       MR. PHELPS:  Q.  Why would you go to ARCO, if
24 not to save money?
25   A.   Why would I go to ARCO not -- because they

BARLEY & ASSOCIATES   (925) 934-8884

66

1 charge me more if I use my debit card.
2    Q.  So that's a reason why you don't like going to
3 ARCO?
4    A.  Yes.
5    Q.  Let me show you what's been marked as Exhibit
6 No. 11, which is another photograph of that same ARCO
7 station.
8       Do you see how this ARCO station, it's got a lot
9 of cars in it; doesn't it?
10    A.  This is where?
11    Q.  This is the ARCO station we just showed you the
12 price sign for.  It's at 5898 Mission at Acton and
13 Sickles.
14       So you see that?
15    A.  Yes.
16    Q.  When you drive by a gas station, when you
17 personally drive by a gas station, and it's -- looks like
18 this, would you consider it crowded?
19    A.  Yes.
20    Q.  Is the fact that the station is crowded
21 something that you might consider in deciding whether to
22 go buy gas or not?
23    A.  No.
24    Q.  Are you a Costco member?
25    A.  No.

67

1    Q.  But you're familiar that there is Costco near
2 where you reside; right?
3    A.  Yes.
4    Q.  And that Costco sells gasoline; correct?
5    A.  Yes.
6    Q.  Do you have any sense as to whether the prices
7 for the gas at Costco near your home are cheaper or more
8 expensive than Valero prices?
9    A.  I do not know.
10    Q.  Have you ever advised the people that you are
11 educating that they should be Costco members to save
12 money?
13    A.  No.
14    Q.  Is there some reason that you have a dislike for
15 Costco?
16       MR. GOLD:  I'm going to object to that question.
17 You can answer.
18       THE WITNESS:  We're a HUD-approved counseling
19 agency; we cannot tell people where to go.
20       MR. PHELPS:  Q.  You do not advise people one
21 way or the other where they should shop for gas?
22    A.  That's right.
23    Q.  Do you tell them the sorts of things they should
24 look for -- and by "they," I mean consumers -- in buying
25 gas?

68

1       MR. GOLD:  I'm going to object to that question.
2       THE WITNESS:  I don't know.
3       MR. PHELPS:  Q.  Within NAAC, there's a program
4 called The FAITH Project; correct?
5    A.  Uh-huh (affirmative).
6    Q.  Your answer is "yes"?
7    A.  Yes.
8    Q.  And can you tell us what The FAITH Project is?
9    A.  "FAITH" is an acronym of Financial Assistance
10 for Individual Towards Homeownership.
11    Q.  Is it just a coincidence that it's the same as
12 your name?
13    A.  Yes, yes.
14    Q.  And one of the things that you do for people via
15 The FAITH Project is education on financial literacy;
16 correct?
17    A.  Yes.
18    Q.  What does that mean, "financial literacy"?
19    A.  "Financial literacy" is you don't spend more
20 than what you can afford.  It's budgeting.
21    Q.  Is there any discussion in the financial
22 literacy education about purchasing consumer products?
23    A.  Not specifically on that.  It's really how much
24 do you make, you should spend this much in your household
25 and your mortgage and you save money.

69

1    Q.  Is there ever any discussion about credit cards?
2    A.  Yes.
3    Q.  What about debit cards, is there a discussion
4 about debit cards?
5    A.  Yes.
6    Q.  And so, counseling or educating people on using
7 their debit cards is something that's part of The FAITH
8 Project?
9    A.  Yes.
10    Q.  And in general, what sort of counseling via The
11 FAITH Project do you give to people regarding use of debit
12 cards?
13    A.  So our goal is to increase homeownership in the
14 minority groups.  So, on The FAITH Project, that financial
15 assistance for individuals towards homeownership, it's
16 really about how to buy a home, what fits your needs, and
17 providing them down payment assistance.
18    Q.  You understand that among the issues in this
19 case are issues relating to credit cards and debit cards
20 and how they operate in the consumer world; correct?
21    A.  Not really.
22    Q.  That's not something that you see as part of
23 this case?
24    A.  No.
25    Q.  Is credit cards and debit cards and how they

70

1  operate in the consumer world something that is part of
2  the financial literacy training that The FAITH Project
3  does?
4      A.  Kind of.
5      Q.  In what way?
6      A.  That if you cannot afford, do not charge your
7  credit card.  That if you really need to budget, use a
8  debit card.
9      Q.  Why?
10     A.  Because you know exactly how much money you have
11 and you are -- you're controlled on your expenses.
12     Q.  One difference between a debit card and a credit
13 card being that with a credit card you're charging
14 something for the future and with a debit card it's being
15 deducted from your account now; correct?
16     A.  Yes.
17     Q.  And that's one of the facts -- or one of the
18 issues that you use to educate people through The FAITH
19 Project; correct?
20     A.  Yes.
21     Q.  We were talking about factors that you would
22 consider in deciding where to buy gas.
23         Looking back at Exhibit No. 7, which is the
24 collection of photographs that you took, and in particular
25 the photos at pages 91 and 92 -- do you have those in

71

1  front of you?
2      A.  Yes.
3      Q.  Those were taken at night; right?
4      A.  I guess.
5      Q.  Well, at least --
6      A.  There's a light.
7      Q.  Let me put it this way; it was dark out when you
8  took these pictures?
9      A.  Yes.
10     Q.  Is the lighting at a service station a factor
11 that you consider if you're buying gas at night?
12     A.  No.
13     Q.  You would be okay going into a poorly-lit
14 station just as well as one that was well lit?
15     A.  No, I will not go if it's poorly lit.
16     Q.  As a consumer educator, consumer advocate, do
17 you have an understanding of what the term "brand loyalty"
18 means?  And, also, as somebody with a bachelor's degree in
19 marketing?
20     A.  Yes.
21     Q.  What does the term "brand loyalty" mean to you?
22     A.  You like the brand and you're loyal to them by
23 supporting, by going to their services or their products.
24     Q.  Does "brand loyalty" influence your personal
25 gasoline purchasing decisions?

72

1      A.  Not really.
2      Q.  Is there a gas station that you think is
3  perfect?
4      A.  No.
5          MR. GOLD:  Object to that question.  Sorry.
6          MR. PHELPS:  Q.  Besides the Daly City Valero
7  station, which gas station do you like the most?
8      A.  I don't have a favorite.
9      Q.  Aside from gas, what else, if anything, did you
10 buy at the Valero station at Daly City -- in Daly City,
11 the 6989 Mission Street station?
12     A.  Just gas.
13     Q.  Are you personally somebody who shops at
14 convenience stores?
15     A.  Not really.
16     Q.  Why not?
17     A.  I'm not a junky food eater.
18     Q.  A lot of people like to go to convenience
19 stores, though; don't they?
20     A.  Yes.
21         MR. GOLD:  Object.  Not at issue.
22         MR. PHELPS:  Q.  Certainly, as somebody with a
23 background in marketing, business owner, and the like, you
24 understand that people have different preferences and
25 different reasons for going into a store; right?

73

1      A.  Yes.
2      Q.  So, for example, have you ever made the drive,
3  Ms. Bautista, down I-5 from the Bay Area to Los Angeles?
4      A.  Yes.
5      Q.  You know how along the way there are places that
6  people stop and get gas, you can stretch your legs, that
7  sort of thing; right?
8      A.  Yes.
9      Q.  Have you ever noticed that at some of those
10 locations you'll find a business that's a combination of
11 things, it's like a gas station and a restaurant or a food
12 place together?
13     A.  Yes.
14     Q.  Let's take a look at that.
15         (Exhibit 12 marked for identification.)
16         MR. PHELPS:  Q.  Ms. Bautista I'm showing you
17 what we've marked as Exhibit No. 12, and this is a
18 printout from Google Earth of a location in Kettleman City
19 right off of I-5.
20         Have you ever stopped there on your drive down
21 I-5?
22     A.  I hardly drive the 5; it's been a long time.
23     Q.  Let's take a look at this facility that's
24 depicted in Exhibit No. 12.
25         This would be an example of the type of location

74

1  where there's a co-branding between the gas station, and
2  here it's a McDonald's; right?
3      A.  Yes.
4      Q.  You've seen this sort of place before; right?
5      A.  Yes.
6      Q.  And so, if you're a customer, you can go into
7  this location, you can get gas if you want to get gas, you
8  can go to McDonald's if you want to go to McDonald's, or
9  you can do both if you want; right?
10     A.  Yes.
11     Q.  And let's take a look at this as Exhibit 13.
12         (Exhibit 13 marked for identification.)
13         MR. PHELPS:  Q.  Showing you what we've marked
14  as Exhibit 13, Ms. Bautista, this is another Google Earth
15  capture, and it's -- I'll represent to you it's a facility
16  that's across the street from the Chevron station in the
17  prior exhibit.
18         But can you see how this is a Shell station
19  that, in addition to the fueling positions, has a Food
20  Mart, a Baja Fresh and a Quiznos associated with it?
21     A.  Yes.
22     Q.  So if you were a customer and you were going in
23  here, you can get gas or you can go to one of the food
24  places; right?
25     A.  That's right.

75

1          (Exhibit 14 marked for identification.)
2          MR. PHELPS:  Q.  This one I would like to show
3  you, Exhibit 14, Ms. Bautista, is a Google Earth image of
4  a location in Sand City, California where you see that we
5  have a combination of a Valero and a Subway restaurant;
6  right?
7      A.  Yes.
8      Q.  So many brands in California, you'll agree with
9  me, have locations where you can do more than just buy
10  gas; right?
11     A.  That's right.
12     Q.  When consumers go into the Valero that also has
13  a Subway, the Chevron that also has a McDonald's, or the
14  Shell that also has a Quiznos, what are they looking for?
15         MR. GOLD:  Object to form.  Foundation.
16         MR. PHELPS:  Q.  Are they looking for the
17  cheapest gas?
18         MR. GOLD:  Object to foundation.
19         THE WITNESS:  I do not know.
20         MR. PHELPS:  Q.  Would you agree with me,
21  Ms. Bautista, that sometimes when people go to service
22  stations they're making a compromised decision because
23  they can do more than one thing at a time?
24         MR. GOLD:  Object; foundation, speculation.
25         THE WITNESS:  I do not know.

76

1          MR. PHELPS:  Q.  Have you ever yourself, in
2  looking to purchase gas, gone to one of these type of
3  co-branded facilities?
4      A.  Yes.
5      Q.  And when you personally did that, were you still
6  looking for the lowest price or were you looking for gas
7  and some food at the same time?
8          MR. GOLD:  I'm going to object to the form of
9  the question.
10         THE WITNESS:  I do not know what to answer you.
11         MR. PHELPS:  Q.  Well, let me put it to you this
12  way; is your decision to go to a particular service
13  station ever influenced by your need to buy something
14  other than gas at a convenience store or a restaurant?
15     A.  No.
16     Q.  So that's not a factor for you?
17     A.  No.
18     Q.  Do you think it's a factor for other people?
19         MR. GOLD:  Object to foundation.  Speculation.
20         THE WITNESS:  I cannot answer.
21         MR. PHELPS:  Q.  Do consumers pay for
22  convenience?
23         MR. GOLD:  Object to foundation.  Speculation.
24         THE WITNESS:  I don't know.
25         MR. PHELPS:  Q.  In your experience, is

77

1  convenience a factor in where you go to buy gas?
2      A.  Yes.
3      Q.  And is your decision to buy gas affected by
4  whether there's a car wash affiliated with the business?
5      A.  No.
6      Q.  Do you ever use car washes?
7      A.  Barely.
8      Q.  But you've seen service stations that have car
9  washes?
10     A.  Yes.
11     Q.  So sometimes you can go in and get gas and get
12  your car washed, too?
13     A.  Yes.
14     Q.  Sometimes you'll even get a discount on gas if
15  you buy the car wash; right?
16         MR. GOLD:  Object to foundation.
17         THE WITNESS:  I don't know.
18         MR. PHELPS:  Q.  You haven't noticed that?
19     A.  No.
20     Q.  What about automobile service, where do you get
21  your car fixed?
22     A.  The dealer.
23     Q.  Do you go exclusively to the dealer?
24     A.  No.
25     Q.  Where else do you go?

78

1    A.  My friend sometimes fix it.  I really don't have
2  car problems.
3    Q.  Do you ever go to gas stations that have
4  automotive service bays?
5    A.  No.
6    Q.  That's not a factor for you in deciding whether
7  to shop at a particular location?
8    A.  No.
9    Q.  Do you think it's a factor for other people?
10    MR. GOLD:  Object to foundation.  Calls for
11  speculation.
12    THE WITNESS:  Yeah, I would not know that.
13    MR. PHELPS:  Q.  Does the fact -- well, you had
14  a bad experience with the Valero at 6989 Mission Street;
15  correct?
16    A.  Yes.
17    Q.  Does the fact that you had a bad experience at
18  that one location color your view of other Valero
19  locations and make you less likely to want to go there?
20    A.  Yes.
21    Q.  So if you've had a bad experience with one
22  location of a brand, that's a factor that you would
23  consider in future shopping decisions; right?
24    A.  That's right.
25    Q.  You indicated earlier that your opinion about

79

1  oil companies is not a high one.  And I don't mean to put
2  words in your mouth.  You said you didn't think they were
3  sufficiently concerned with the environment and they made
4  a lot of money.
5    Is that fact something that influences your
6  purchasing decisions for gasoline?
7    A.  No.
8    Q.  Is that because you think that all the oil
9  companies are basically the same?
10    A.  Yes.
11    (Exhibit 15 marked for identification.)
12    MR. PHELPS:  Q.  I'm showing you what we've
13  marked as Exhibit 15 to your deposition, Ms. Bautista, and
14  it's three pages from the documents that were produced to
15  us by your counsel, and they have the production numbers
16  Bautista 87, 88 and 99; they're nonsequential.
17    A.  (Witness mumbled.)
18    Q.  Pardon me?
19    A.  Yes.
20    Q.  These are copies of receipts relating to gas
21  purchases that you made; correct?
22    A.  Yes.
23    Q.  All right.  As a general matter, when you
24  purchase something with your debit or credit card, do you
25  generally get a receipt?

80

1    A.  Yes.
2    Q.  And what do you do with your credit or debit
3  card receipts when you receive them?
4    A.  I put them away.
5    Q.  Do you save all of them?
6    A.  Oh, sometimes I miss them.
7    Q.  How long do you keep the receipts for?
8    A.  Until taxes time.
9    Q.  So maybe for a year?
10    A.  Uh-huh (affirmative).
11    Q.  Your answer is "yes"?
12    A.  Yes.
13    Q.  After the tax season is over, do you just
14  dispose of them?
15    A.  No, I still keep them.
16    Q.  And for how long do you keep them?
17    A.  Three to five years.
18    Q.  Let's take a look on the first page here of
19  Exhibit 15.  There's a receipt -- well, there's three
20  receipts on the first page, and I would like to direct
21  your attention to the one on the far right.  Do you see
22  that?
23    A.  Yes.
24    Q.  And that indicates that you shopped at a station
25  located in Redwood City at 503 Whipple Avenue; correct?

81

1    A.  Yes.
2    Q.  And you purchased -- you made your purchase
3  there on August 14th of 2015; right?
4    A.  Yes.
5    Q.  And how much gas did you buy?
6    A.  $3.44.
7    Q.  In fact, it looks like you bought a gallon;
8  right?
9    A.  Yes.
10    Q.  1.050 gallons?
11    A.  Yes.
12    Q.  Why did you buy only one gallon?
13    MR. GOLD:  I'm going to object to this question
14  to the extent it calls for communication she had with her
15  counsel, and on that basis I will instruct the witness not
16  to answer.
17    (Exhibit 16 marked for identification.)
18    MR. PHELPS:  Q.  Showing you what we've marked
19  as Exhibit 16, Ms. Bautista, do you recognize this as the
20  sign, the price sign, for the Valero station at 503
21  Whipple?
22    A.  Where's Whipple?
23    Q.  In Redwood City.
24    A.  Well, now that I'm seeing it...
25    Q.  I'm sorry, pardon me?

82

1    A.  Yes.
2    Q.  And so, this is the station where you bought the
3  one gallon of gas in August of 2015; right?
4    A.  Yes.
5    Q.  Do you recall if there were any other service
6  stations in the general neighborhood there of this Valero
7  station on Whipple at 503 Whipple?
8    A.  Yeah, I think there's some.
9    Q.  In fact, let's mark this as Exhibit 17.
10       (Exhibit 17 marked for identification.)
11       MR. PHELPS:  Q.  Showing you what we've marked
12  as Exhibit 17, Ms. Bautista, it's another picture of the
13  503 Whipple Avenue Valero station, and from here you can
14  see that right across the street there was an ARCO; right?
15    A.  Yes.
16    Q.  And at the time that you went to buy a gallon of
17  gas at the Valero station on Whipple, did you also check
18  out the prices at the ARCO station across the street?
19    A.  I did not.
20    Q.  Did you buy gas there?
21    A.  No.
22    Q.  Why not?
23    A.  Like I said --
24       MR. GOLD:  I'm going to object to the extent it
25  calls for communications with counsel, and on that basis

83

1  I'll instruct the witness not to answer, but she can
2  answer to the extent she can do so without revealing
3  communications with counsel.
4       THE WITNESS:  No, like I said, I just don't go
5  to ARCO because I don't like their debit card charges.
6       MR. PHELPS:  Q.  Did you notice that there were
7  any other brands in that general area there?
8    A.  No.
9    Q.  How about a Chevron or a Shell down the block,
10  did you notice that?
11    A.  No.
12    Q.  Fair to say that you didn't try to go buy gas at
13  a Chevron or a Shell down the street?
14    A.  No.
15    Q.  I'm sorry; that was an unambiguous answer to an
16  ambiguous question.
17       Did you go to the Shell or Chevron down the
18  street?
19    A.  I did not.
20    Q.  Thank you.  Let's go back to take a look at
21  Exhibit 16, which is the price sign for the 503 Whipple
22  Avenue station.
23    Q.  Do you notice how the prices here are split as
24  "cash" and "credit/debit"?
25    A.  Yes.

84

1    Q.  In your view of what Valero has done wrong in
2  this case, would that be wrong?
3    A.  No.
4    Q.  In fact, is this what you want Valero to do at
5  all of the stations?
6    A.  Yes.
7    Q.  So, in your view, anybody who went to this
8  Valero station where the prices are advertised as they are
9  indicated in Exhibit 16 and used a debit card were not
10  harmed; correct?
11    A.  Correct.
12       (Exhibit 18 marked for identification.)
13       MR. PHELPS:  Q.  Showing you what we've marked
14  as Exhibit 18, Ms. Bautista, and I'll represent to you
15  that this is a photograph of the Valero station that's
16  located at 2918 Riverside Drive in Los Angeles; the cross
17  street is Glendale Boulevard.
18       MR. GOLD:  Excuse me, Counsel; do you have one
19  for me?
20       MR. PHELPS:  I'm sorry.
21       MR. GOLD:  No worries.  Thank you.
22       MR. PHELPS:  Q.  So you have that exhibit before
23  you, Ms. Bautista?
24    A.  Yes.
25    Q.  And you see here that this is a price sign for a

85

1  Valero station where there's a split, there's cash listed,
2  a cash price listed, and a credit price listed?
3    A.  Yes.
4    Q.  Do you notice, however, that at this location,
5  the cash price and the credit price for each grade were
6  identical?
7    A.  Yes.
8    Q.  So, in your view, would a shopper who went into
9  this station when the prices were as advertised in
10  Exhibit 18 and used a debit card, would they have been
11  harmed?
12    A.  No.
13       MR. PHELPS:  Let's take a break.
14       (Off the record at  11:00 a.m.)
15       (Resumed at 11:13 a.m.)
16       (Exhibit 19 marked for identification.)
17       MR. PHELPS:  Q.  Ms. Bautista, I'd like you to
18  turn back to be Exhibit 15, which is the collection, the
19  three-page collection of the receipts.  We talked a bit
20  about the Whipple Avenue station.  I just want to go
21  quickly through the other receipts here.
22       The one on the far left on the first page, that
23  would indicate that on September 22nd of 2015 you bought
24  $35 worth of gas at the 6989 Mission Street station;
25  correct?

86

1     A.  Yes.
2     Q.  Then the one immediately to the right there
3  indicates that on October 11 of 2015 you bought $31.67
4  worth of gas at the same station; correct?
5     A.  Yes.
6     Q.  Now, let's flip to the second page.  This has
7  the production number "Bautista 88"; correct?
8     A.  Yes.
9     Q.  This would be your receipt for a purchase on
10  October 26, 2015 at the 6989 Mission Street station,
11  again, $31.96 this time; correct?
12     A.  Yes.
13     Q.  The third page on the exhibit, with the
14  production number 99, is a receipt for a purchase on
15  December 2nd of 2015, $33.31 at Sullivan Valero located at
16  1690 Sullivan Avenue in Daly City; right?
17     A.  Yes.
18     Q.  I notice on the receipt they spelled "Daily"
19  wrong in "Daly City."  Shame on them.
20         Sullivan Valero, was that a location that you
21  shopped at fairly regularly?
22     A.  Not really.
23     Q.  Do you know whether it's still a Valero station?
24     A.  I don't know.
25     Q.  Do you have in your mind where 1690 Sullivan

87

1  Avenue is in Daly City?
2     A.  Yes.
3         (Exhibit 20 marked for identification.)
4     MR. PHELPS:  Q.  Showing you what we've marked
5  as Exhibit 20, Ms. Bautista.
6     MR. BERNARDINO:  We're skipping 19, Counsel?
7     MR. PHELPS:  For now.  We're coming back to it.
8     Q.  Do you recognize Exhibit 20?
9     A.  Yes.
10     Q.  Is that the Sullivan Valero -- what was the
11  Sullivan Valero station?
12     A.  I don't know.  I guess.
13     Q.  Across the street from, I guess, 7-Eleven maybe.
14         Do you recall that it was rebranded, or
15  debranded, from Valero to an unbranded location?
16     MR. GOLD:  I'm going to object to foundation.
17     MR. PHELPS:  Q.  Have you shopped there
18  recently, Ms. Bautista?
19     A.  No.
20     Q.  You can set that aside.
21         I've also placed before you Exhibit 19.  And I
22  spoke with counsel on the break on this, Ms. Bautista.
23  What I would like to do here is, I have a series of
24  documents that were produced from your records by counsel,
25  bank statements and the like.  And as we did with the

88

1  receipts marked as Exhibit 15, I just want to go through
2  here, and where we find the purchases at the gas stations,
3  just have you confirm for us that that's what that is in
4  the document.
5         So you have number 19 in front of you?
6     A.  Yes.
7     Q.  This is a copy of your Citibank bank statement
8  for the period that's indicated on the page there?
9     A.  Yes.
10     Q.  And when you receive your bank statements, what
11  do you do with them?
12     A.  I really don't look at it anymore because I go
13  online banking.
14     Q.  The document, as we move forward -- and it has a
15  number of places that are blocked out, redacted.  And we
16  can stipulate for the record that that redaction was done
17  by plaintiff's counsel; right?
18     MR. GOLD:  Yes, sir.
19     MR. PHELPS:  Q.  So if we go to the page of
20  Exhibit 19 that has the production number Bautista 70,
21  7-0, in the lower right-hand corner -- do you have that in
22  front of you?
23     A.  Yes.
24     Q.  -- you see that there are two entries on that
25  day.  The first one says "Debit Card Purchase 8/14

89

1  12:32a," and then it says "Daly City Clairmont" for
2  $36.50.  Do you see that?
3     A.  Yes.
4     Q.  That was a purchase at the 6989 Mission Street
5  station; correct?
6     A.  Yes.
7     Q.  And it appears that the purchase was on
8  August 14; correct?
9     A.  Yes.
10     Q.  But it wasn't reflected on your bank statement,
11  it didn't hit your bank statement until August 18th, four
12  days later; correct?
13     A.  You said --
14     Q.  So this would be an instance --
15     A.  I see, okay.
16     Q.  This would be an instance where you used a debit
17  card for your purchase but the money wasn't deducted
18  immediately from your account, it didn't happen until four
19  days later?
20     MR. GOLD:  I'm going to object to the question;
21  foundation, speculation.
22     THE WITNESS:  I don't know.
23     MR. PHELPS:  Q.  The next item on page 70 says
24  "Debit PIN Purchase 3:01 p.m. Sullivan Valero."
25         That would have been a 30-dollar purchase with

90

1  your debit card at that Sullivan Valero; correct?
2      A.  Yes.
3      Q.  Do you understand what it means to be a PIN
4  purchase, P-I-N?
5      A.  Yes.
6      Q.  What does that mean to you?
7      A.  To verify it's your credit card, so you -- to
8  verify your credit card, so they ask for your PIN number.
9      Q.  Personal Identification Number?
10     A.  Correct.
11     Q.  Let's continue on through the documents that
12  we've collected as Exhibit 19.  If you move forward to the
13  page that's got "Bautista 75" on it and let me know when
14  you're there.
15     A.  Okay.
16     Q.  This is part of your Citibank statement for the
17  period October 1st through November 1st, 2015; correct?
18     A.  Yes.
19     Q.  We have here at the top something that's
20  indicated as a debit card purchase on 10/12, October 12,
21  at 12:15 a.m. at Daly City Clairmont for $31.67.  Do you
22  see that?
23     A.  Yes.
24     Q.  If you look back on Exhibit 15, the receipts,
25  look at the first page, the one in the middle, there's a

91

1  $31.67 purchase at the 6989 Mission Street station.  Do
2  you see that?
3      A.  Yes.
4      Q.  Is that the same transaction, do you think?
5      A.  October 11?  Yes.
6      Q.  Now, let's go back to 19 and move down the
7  page --
8      A.  I'm not sure --
9      MR. GOLD:  I'm sorry; she has a clarification.
10     THE WITNESS:  -- because -- okay.  It's okay.
11     MR. PHELPS:  Q.  Ms. Bautista, let's make the
12  record clear here, because I'm not trying to ask a trick
13  question.
14         You see that the date on the receipt --
15     A.  Right, I see.
16     Q.  -- on Exhibit 15 is October 11 and it has a time
17  of 9:10 p.m.; right?  Do you see that?
18     A.  Yes.
19     Q.  That's the receipt you got at the gas station
20  when you used your debit card and bought $31.67 of gas;
21  correct?
22     A.  Yes.
23     Q.  In your bank record at 75, page 75, we see a
24  transaction amount for a debit card purchase for $31.67.
25  That number matches; right?

92

1      A.  Yes.
2      Q.  But the bank statement says that there was a
3  date of 10/12, which doesn't match with the receipt;
4  right?
5      A.  Yes.
6      Q.  And then, it also shows that the date that this
7  transaction, this $31.67 was posted to your account, was
8  October 14; do you see that?
9      A.  Yes.
10     Q.  Do you have any way to reconcile those
11  differences?
12     MR. GOLD:  I'm just going to object, for the
13  record, foundation.
14     THE WITNESS:  Yeah, I don't know.
15     MR. PHELPS:  Q.  Was there ever a time that you
16  can think of where on consecutive days you went to the
17  Daly City station and bought exactly $31.67 worth of gas
18  both times?
19     A.  Was there what?
20     Q.  Was there ever a time on consecutive days where
21  you went to the Daly City Valero station and bought
22  exactly $31.67 of gas each time?
23     A.  I don't know.
24     Q.  Let's go down the page on Exhibit 19, still at
25  page 75.  There's an entry for October 29, 2015, Debit

93

1  Card Purchase 10/26 at 4:12 for $31.96.  Do you see that?
2      A.  Yes.
3      Q.  If you go back to Exhibit 15, the collection of
4  the receipts, and you go to the second page, page 88,
5  that's the matching receipt; isn't it?
6      A.  Yes.
7      Q.  So back on No. 19 -- we're just going to grind
8  through this as quickly as we can -- if you would go to
9  page 80, 8-0, there is a reference to -- for 9/11/15,
10  September 11, 2015, a debit PIN purchase for $35 at
11  Sullivan Valero; right?
12     A.  Yes.
13     Q.  So that would have been a transaction where you
14  bought something at Sullivan Valero?
15     A.  Yes.
16     Q.  Do you ever buy anything at Sullivan Valero
17  other than gas?
18     A.  No.
19     Q.  So it's fair to say this was a gas purchase,
20  then; right?
21     A.  Yes.
22     Q.  Going onto the next page, page 81, about a third
23  of the way down, there's an entry for September 22nd,
24  2015, Debit Purchase, 7:46 p.m. Daly City Gas, another
25  $35; right?

94

1    A.  Yes.
2    Q.  That would have been a purchase at a Valero
3  station using your debit card; right?
4    A.  Yes.
5    Q.  It would have been a gas purchase; right?
6    A.  Yes.
7    Q.  And then, I think -- that's the last one for
8  Exhibit 19.
9        (Exhibits 21 and 22 marked for identification.)
10       MR. PHELPS:  Q.  Showing you what we've marked
11  as Exhibit 21.  Bear with me here.  I'm getting buried
12  under paper.
13       Exhibit 21 you have before you, Ms. Bautista.
14  You have Exhibit 21 in front of you?
15   A.  Yes.
16   Q.  Again, this is part of one of your bank
17  statements; correct?
18   A.  Yes.
19   Q.  And this would have been for a Chase account
20  that you had in July of 2013; right?
21   A.  Uh-huh, yes.
22   Q.  Your answer is "yes"?
23   A.  Yes.
24   Q.  Again, it's been partially redacted.  And we can
25  stipulate that the redaction was done by plaintiff's

95

1  counsel; correct?
2        MR. GOLD:  Yes.
3        MR. PHELPS:  Q.  If you could turn to the last
4  page of what we've marked as Exhibit 21; it's got
5  "Bautista 103" on it.
6    A.  Yes.
7    Q.  Do you see that there's an entry there for a
8  card purchase with PIN for 7/12/13 and it's listed as
9  Corner Store 3757 in Barstow in the amount of $35.86.  Do
10  you see that?
11   A.  Yes.
12   Q.  That was a purchase you made with your debit
13  card with your PIN number at a Valero station in Barstow
14  back in 1973 -- 2013?
15       MR. GOLD:  I'll object first.  I'll object to
16  that question.
17       MR. PHELPS:  Q.  This shows in July of 2013 you
18  made a card purchase at a Valero station in Barstow;
19  correct?
20   A.  How would I know?  It doesn't say "Valero."
21   Q.  Let me represent to you that Corner Store is one
22  of the business names under which Valero in the past had
23  done business.
24       Does that refresh your recollection at all?
25   A.  No, I do not know.

96

1    Q.  Well, let me ask you to take a look at No. 22,
2  and it's going to be a similar type of question.
3        Exhibit 22 is a copy of another one of your bank
4  statements; right?
5    A.  Yes.
6    Q.  If you look at the second page of Exhibit 22,
7  there's a reference at the top for a card purchase on 7/29
8  in Barstow for $52.31.  Do you see that?
9    A.  Yes.
10   Q.  Does that refresh your recollection of going to
11  a Valero station in Barstow, California in July of 2013
12  and making a card purchase in that amount?
13   A.  No, because --
14   Q.  Again, because it says "Corner Store"?
15   A.  It says "Corner Store."
16   Q.  And that's not a term that has meaning to you;
17  correct?
18   A.  That's right.
19   Q.  Do you have any recollection, independent of the
20  documents, of going to a Valero station in Barstow in 2013
21  and buying gas?
22   A.  Oh, I don't remember.
23       MR. PHELPS:  Let's go off the record for a
24  second.
25       (Off the record at 11:30 a.m.)

97

1        (Resumed at 11:34 a.m.)
2        (Exhibit 23 marked for identification.)
3        MR. PHELPS:  At Counsel's suggestion -- I
4  appreciate the suggestion -- what I've done is I've taken
5  a number of what I was going to mark as separate documents
6  -- they're all bank statements -- and see if we can just
7  go through them and confirm transactions that are listed
8  there.
9    Q.  So you have Exhibit 23 in front of you.
10   A.  Yes.
11   Q.  On the page that starts with the production
12  number 98 on the bottom -- do you see that?
13   A.  Yes.
14   Q.  And this is a copy of one of your bank
15  statements and it shows the -- shows a purchase on
16  October 14, 2015 -- I'm sorry; it shows a debit purchase
17  on October 12 that's listed at October 14, 2015 date for
18  $31.67; right?
19   A.  Yes.
20   Q.  So is this something you printed off online?
21   A.  I ordered it, actually.
22   Q.  And when did you do that?
23   A.  When I printed this paper?
24   Q.  Yes, Ma'am.
25   A.  What?  Two months ago.

98

1    Q.  Let's go to the next page, same exhibit; it
2  should have "96" in the lower right-hand corner.  Do you
3  have that?
4    A.  Yes.
5    Q.  And this would be, then, the bank record for the
6  transaction at the station in Redwood City that we talked
7  about; correct?
8    A.  Yes.
9    Q.  And then, let's go to the next page; it's got
10  "Bautista 97" on it.  Are you there?
11    MR. GOLD:  What's missing from our copy?
12    MR. PHELPS:  I knew I was going to screw it up.
13  Page 97, I'm going to give you this copy.  You can insert
14  it.
15    Q.  Does that indicate a purchase at the Daly City
16  location for $35 in or about August of 2015?
17    A.  Yes.
18    Q.  The next page in your exhibit has what number?
19    A.  98.
20    Q.  98 is a bank record for your purchase at the
21  Daly City location, October 12th; correct?
22    A.  Yes.
23    Q.  Did we already do that?  I think we might have
24  already done that.
25    Next page you've got is what, 36?

99

1    A.  Yes.
2    Q.  And this is a copy of your bank statement for
3  the period September 23, 2015 through October 22nd, 2015,
4  and it shows on the second page Card Purchase With PIN
5  10/22 in the amount of $22.61; right?
6    A.  Yes.
7    Q.  And that's at the Daly City station; right?
8    A.  Yes.
9    Q.  Next page in your group is what?
10    A.  108.
11    Q.  And 108 is your bank statement or a portion of
12  your bank statement for the period November 24, 2015,
13  through December 21st, 2015; correct?
14    A.  Yes.
15    Q.  And it shows on the second page with the
16  production number "Bautista 109" a card purchase on
17  December 2nd at Valero #7207 Daly City; correct?
18    A.  Yes.
19    Q.  Next is -- do you have "Bautista 112"?
20    A.  Yes.
21    Q.  That's your bank statement for December 22nd,
22  2015 through January 25th, 2016; correct?
23    A.  Yes.
24    Q.  And on the page -- the third page there with the
25  "Bautista 114" number shows a card purchase on 1/19,

100

1  January 19, 2016, for $33.30; right?
2    A.  Yes.
3    Q.  That's after the complaint was filed; right?
4    MR. PHELPS:  Can we stipulate to that, Counsel,
5  on the date, January 2016?
6    MR. GOLD:  Where is the date of 2016?
7    MR. PHELPS:  If you look at the top of the page,
8  it shows that this is a statement for December 22, 2015,
9  through January 25th, 2016.
10    MR. GOLD:  Okay, yeah, we can do that.
11    MR. PHELPS:  Q.  That was a purchase that you
12  made at Valero?
13    A.  Yes.
14    Q.  After the complaint was filed?
15    A.  Yes.
16    Q.  Why did you go back to Valero after you sued
17  them?
18    MR. GOLD:  I'll just object to the extent that
19  that question may have been asked and answered earlier.
20  But you can go ahead.
21    MR. PHELPS:  Sure.
22    Q.  Why did you go back?
23    A.  I don't know.
24    Q.  When did you first reach the conclusion
25  personally -- you, Faith Bautista -- that Valero was not

101

1  properly pricing?
2    A.  It's when I started talking to Attorney Ralph.
3    Q.  When was that, do you recall?  I'm sorry; we
4  went through some of that, but I'm trying to pin it down
5  as best as you can remember.
6    A.  We started talking like December -- November,
7  December 2015.
8    Q.  Back on our exhibit here.  What you got next?
9    A.  116.
10    Q.  116, okay.  116 is the bank record for March 22,
11  2016 through April 21, 2016; right?
12    A.  Yes.
13    Q.  And this shows on the page with the marking
14  "Bautista 117" that there was a card purchase on April 2nd
15  in the amount of $4.69.  Do you see that?
16    A.  Yes.
17    Q.  Do you recall what that was?
18    MR. GOLD:  I'll just object to the extent it
19  calls for communications with counsel and on that basis
20  I'll instruct her not to answer.  Unless she can answer
21  without revealing those communications.
22    THE WITNESS:  I don't recall.
23    MR. PHELPS:  Q.  Is that the last part of the
24  exhibit that you have?
25    A.  Yes.

102

1        MR. PHELPS:  Counsel, thank you for your
2  assistance in speeding us through that.
3        MR. GOLD:  Sure thing.
4        MR. PHELPS:  Q.  So we've looked at a number
5  of --
6        MR. GOLD:  Excuse me, Counsel.  Do you want to
7  put a paperclip on these just so these --
8        MR. PHELPS:  Yes.
9    Q.  To the best of your understanding, Ms. Bautista,
10  are these items that we've looked at here all of the times
11  that you've gone to a Valero station in the last five
12  years and used your card?
13    A.  Yes.
14    Q.  Clearly, though, those aren't the only places
15  that you've bought gas in the last five years; right?
16  You've bought gas at other places?
17    A.  Right.
18    Q.  For example -- withdraw that.
19        Were there times in the last five years that
20  you've gone to a Valero location and you've bought gas not
21  using any form of payment card, but instead used cash,
22  green dollars?
23    A.  I don't recall.
24    Q.  As a consumer advocate and educator, do you
25  believe that you're more sensitive to consumer issues than

103

1  the average consumer?
2    A.  Yes.
3    Q.  As an educator, you know that state and local
4  government agencies can sometimes have jurisdiction over
5  disputes between consumers and sellers; right?
6        MR. GOLD:  I'm sorry, just to the last question,
7  I'll object as far as the term "consumer issues."  It's
8  vague.  Sorry to interrupt.
9        MR. PHELPS:  That's fine.
10    Q.  Do you have my current question in mind?
11    A.  Huh-uh.
12    Q.  I can ask it again.
13        As a consumer advocate, you're aware that there
14  are government agencies, state agencies, local agencies,
15  that can sometimes have jurisdiction over disputes that
16  consumers have with retailers; right?
17        MR. GOLD:  I'll just object to the foundation.
18        THE WITNESS:  I'm unclear on that.
19        MR. PHELPS:  Q.  Is it my question that's
20  unclear?
21    A.  It's unclear, the jurisdictions.
22    Q.  You have testified before numerous regulatory
23  agencies; correct?
24    A.  Yes.
25    Q.  In Washington, D.C., you've testified?

104

1    A.  No.
2    Q.  You've testified live before state agencies in
3  California; correct?
4    A.  Yes.
5    Q.  So you understand that, at least at the state
6  level, there are some agencies that have some
7  responsibility for consumer issues; right?
8        MR. GOLD:  Object to that question as vague.
9        THE WITNESS:  All depends.
10        MR. PHELPS:  Q.  When you were speaking before
11  the agencies that you testified to, you were speaking as a
12  consumer advocate; right?
13    A.  Yes.
14    Q.  You were speaking to those agencies because you
15  felt that agency or those agencies had some sort of
16  ability to do something about consumer issues; right?
17        MR. GOLD:  Object to that question.
18        THE WITNESS:  Yes and no.
19        MR. PHELPS:  Q.  At any time when you began to
20  be suspicious that Valero was not properly pricing
21  gasoline, did you go to any state or local agency and seek
22  their assistance?
23    A.  I did not.
24    Q.  Why not?
25    A.  It's not the advocacy that the NAAC does.

105

1    Q.  Have you ever given advice to consumers about
2  what they should do when they have been overcharged by a
3  merchant?
4    A.  Yes.
5    Q.  What advice do you typically give?
6    A.  To send a letter.
7    Q.  Anything else?
8    A.  To talk to NAAC.
9    Q.  Let's talk about debit cards.
10        Do you feel that there are advantages to you
11  personally for using your debit card?
12    A.  Yes.
13    Q.  What are they?
14    A.  It's a cash -- it's an equivalent of cash.  It's
15  money management.
16    Q.  Other advantages to debit cards?
17    A.  It's really more money management.
18    Q.  What about the fact that you don't have to carry
19  around a lot of -- I'm going to call it "green cash," the
20  dead presidents, the paper.
21        The debit card gives you the ability as a
22  consumer to buy things without having to carry a lot of
23  the green cash with you; correct?
24    A.  Yes.
25    Q.  Is that ever a concern for you personally for

106

1  your safety, the amount of cash that you carry around?
2      A.  The question is if a concern of me having cash
3  with me?
4      Q.  Yes.
5      A.  Yes.
6      Q.  So one of the advantages of a debit card is that
7  you don't have to carry around as much green cash with
8  you; correct?
9      A.  Yes.
10     Q.  And in your experience as a consumer advocate
11 and consumer educator, have you heard other things that
12 consumers have said that they like about debit cards?
13     A.  None.
14     Q.  To your understanding, are credit cards free as
15 far as the merchants are concerned?  Now, I'm talking
16 about credit cards, not debit cards.
17     MR. GOLD:  I'll just object to the foundation.
18     MR. PHELPS:  Q.  Well, let me withdraw the
19 question.
20     When you were a business owner, did you take
21 credit cards?
22     A.  No.
23     Q.  Did you take debit cards?
24     A.  No.
25     Q.  So it was cash only; right?

107

1      A.  Check.
2      Q.  Checks, okay.  Cash and checks.
3      So if somebody came into your business when you
4  were running it and all they had with them was a debit
5  card -- they didn't have a credit card, they didn't have
6  green cash, they didn't have a checkbook -- they couldn't
7  do business with you; correct?
8      A.  Correct.
9      Q.  Do you have any understanding as to whether
10 merchants, retailers are charged fees when their customers
11 use credit cards?
12     A.  For credit cards, yes.
13     Q.  What about for debit cards, do you have any
14 understanding as to whether the merchants are charged a
15 fee if a customer uses a debit card?
16     A.  No.
17     Q.  Good answer to an ambiguous question.
18     No, that they're not charged or no, that you
19 don't know?
20     A.  No, that I do not know.
21     Q.  The card that you had was both a combination of
22 a credit card and a debit card; correct?
23     MR. GOLD:  I'm going to object to that question.
24     MR. PHELPS:  Q.  You can answer.
25     A.  No.

108

1      Q.  It had features where you could use it as a
2  debit card or you could choose to use it as a credit card;
3  correct?
4      A.  Yes.
5      Q.  As a consumer, how did you decide which times
6  you would use the credit feature and which times you would
7  use the debit feature?
8      A.  I do not use my debit card for credit.  A debit
9  card, to me, is my cash.
10     Q.  In addition to the card that is your combination
11 debit card and credit card, do you carry other credit
12 cards?
13     A.  Yes.
14     Q.  Do you carry any -- does the term "proprietary
15 credit card" have a meaning to you?
16     A.  No.
17     MR. GOLD:  Just one second.  I'm going to object
18 to your prior question to the extent it mischaracterizes
19 debit, slash, combo credit card, however you characterized
20 it.
21     MR. PHELPS:  Q.  You understand, for example,
22 that you can go to Chevron and you can get a Chevron
23 credit card; right?
24     A.  Yes.
25     Q.  Or you can go to Macy's and you can get a Macy's

109

1  credit card or Nordstrom and get a credit card like that?
2      A.  Yes.
3      Q.  Do you have any credit cards like that, store
4  cards specific to a particular merchant?
5      A.  Yes.
6      Q.  Are any of them gasoline related?
7      A.  No.
8      Q.  Does the fact that you have one of those store
9  cards make you more or less likely to go buy products or
10 service at that company?
11     A.  No.
12     Q.  It doesn't make a difference to you?
13     A.  No.
14     Q.  We talked earlier about your understanding of
15 "PIN debit."
16     Have you ever heard the term "signature debit
17 purchase"?
18     A.  No.
19     Q.  A few moment ago we were talking about plastic
20 and -- I guess it was paper and plastic, I guess.  Paper
21 with what I called the "green dollars" on it and plastic,
22 the card.
23     I'd like to focus on cash, the term "cash."  As
24 you sit here today, what does "cash" mean to you?
25     A.  "Cash" is when it's taken out from your bank

110

1   account and "cash" when -- "cash" is immediate payment.
2       Q.   It's an exchange of value, you're giving the
3   value of the dollars to the retailer and the retailer is
4   giving you the product and service back right then;
5   correct?
6       A.   Yes.
7       Q.   Are there times when you personally prefer to
8   pay with debit as opposed to green cash?
9       A.   Yes.
10      Q.   What are those circumstances?
11      A.   The gas.
12      Q.   Anything else?
13      A.   When I go a little bit of shopping.
14      Q.   So, in general, you personally, when you're
15   purchasing consumer goods and services, what percentage of
16   the time do you think you use your debit card?
17          MR. GOLD:  I'm just going to object to the
18   question as vague.
19          THE WITNESS:  I don't know.
20          MR. PHELPS:  Q.   Do you use it mostly?  Rarely?
21   A lot?
22          MR. GOLD:  Same objection.
23          THE WITNESS:  It all depends.
24          MR. PHELPS:  Q.   What does it depend on besides
25   all of the things that we've already talked about?

111

1       A.   When I'm just locally, I just use my debit card.
2       Q.   So, other than gas, the main time that you would
3   use your debit card is if you were doing local shopping?
4       A.   Yes.
5          MR. GOLD:  I'm going to object to the question
6   as it mischaracterizes the testimony.
7          MR. PHELPS:  Q.   When you use the debit card,
8   why don't you use the credit card instead?
9       A.   When I -- what's the question again?
10      Q.   When you're using the plastic payment card, why
11   do you use debit instead of the credit side?
12          MR. GOLD:  I'll object to the question as vague.
13          THE WITNESS:  Yeah, I ...
14          MR. PHELPS:  Q.   Okay.  Sometimes you use the
15   debit card, sometimes you use credit; correct?
16      A.   Yes.
17      Q.   Is there a clear difference in your mind for the
18   times that you use debit instead of credit?
19          MR. GOLD:  I'll object to the question.
20          THE WITNESS:  Sometimes.  I don't know.
21          MR. PHELPS:  Q.   Sometimes you do, sometimes you
22   don't?
23      A.   Yeah.
24          (Exhibit 24 marked for identification.)
25          MR. PHELPS:  Q.   Showing you what we've marked

112

1   as Exhibit 24, and I'll represent to you that this is a
2   photograph of one of the dispensers at the 6989 Mission
3   Street station in Daly City.
4          Does it look familiar to you, Ms. Bautista?
5       A.   It's been a while, so I guess.
6       Q.   If you take a look at Exhibit 15 -- I'm sorry,
7   Exhibit 7, the second page with the production Bautista
8   90, that's a closeup of this dispenser, isn't it, that
9   we've marked as Exhibit 24?
10      A.   Is it?
11          MR. GOLD:  I'll just object --
12          THE WITNESS:  Because I cannot see.
13          MR. PHELPS:  Q.   They're very similar, though;
14   correct?
15      A.   Yes.
16          (Exhibit 25 marked for identification.)
17          MR. PHELPS:  Q.   Showing you what we've marked
18   as Exhibit 25, Ms. Bautista -- actually, before you take a
19   look at that, do you still have No. 7 handy?
20      A.   Yes.
21      Q.   Turn to page 90, the second one that we were
22   just looking at.  Now, this is a picture you took?
23      A.   Yes.
24      Q.   This is at the 6989 Daly City station; right?
25      A.   Yes.

113

1       Q.   You see how there's a red button in the upper
2   left-hand corner on the dispenser where it says
3   "ATM/Debit"?
4       A.   Yes.
5       Q.   Let's take a look now at Exhibit 25.  It's a
6   closer shot of the same thing.
7          Do you see on Exhibit 25 the picture of the
8   dispenser how there's, again, a red button that says
9   "ATM/Debit"?
10      A.   Yes.
11      Q.   And then, to the immediate left of that, there
12   are a series of four buttons vertically that say
13   consecutively "Yes, No," and then there's "Help"; right?
14      A.   Yes.
15      Q.   So when you went to the Daly City station and
16   you purchased gas at that station and you used your card,
17   did you push the red "ATM/Debit" button?
18      A.   You know, I didn't even notice that it's there.
19      Q.   But it's there; right?
20      A.   I see it now, but at that time I didn't.
21      Q.   It's no less prominent than anything else?
22      A.   Right.
23      Q.   Same size, same typeface, and it's in red;
24   right?
25      A.   Yes.

114

1    Q.   But your recollection -- your testimony is that
2  you don't have a recollection one way or the other if you
3  ever saw it; right?
4    A.   Correct.
5         MR. GOLD:  Just for the record, I'll state that
6  this exhibit -- we can't be sure if this is the one she,
7  in fact, purchased from, and there appears to be some tape
8  covering one of the other instructions in the bottom.
9         MR. PHELPS:  That's fine, Counsel.  I think
10  we've established from her own picture that the ATM/Debit
11  button was on the dispenser.
12        MR. GOLD:  No, I'm referring to the instruction
13  on the bottom, when you asked her if it's more or less
14  prominent than anything else --
15        MR. PHELPS:  Oh, I see your point.  Understood.
16        (Exhibit 26 marked for identification.)
17        MR. PHELPS:  Q.  Ms. Bautista, we're showing you
18  what we've marked as Exhibit 26, and I'll represent to you
19  that this is a picture that was taken of the dispenser at
20  the 6989 Daly City station.
21        Do you see that there's a visual display there
22  on the dispenser; correct?
23    A.   Yes.
24    Q.   You see that there's an instruction that says:
25  "DEBIT CARD? YES/NO."  Do you see that?

115

1    A.   Yes.
2    Q.   When you purchased gas at the Daly City station,
3  did you see that?
4    A.   Yes.
5    Q.   Now, let's go to -- let's do this one.
6         (Exhibit 27 marked for identification.)
7         MR. PHELPS:  Q.  I'm showing you what we've
8  marked as Exhibit 27, Ms. Bautista, another photograph of
9  the dispenser.
10        Do you see it's -- there's a little bit of
11  sunshine there.  But can you see how it says "CASH PRICE?
12  YES/NO"?
13    A.   Yes.
14    Q.   Did you see that at the time that you purchased
15  gas at the Daly City station?
16    A.   I don't recall.
17    Q.   In your complaint in this case, you described
18  your card as a MasterCard-branded debit card.
19        Is there any significance, in your mind, to the
20  fact that the card was MasterCard branded?
21    A.   No.
22    Q.   You understood that the MasterCard affiliation
23  allows you to use your debit card anywhere a credit card
24  is accepted; right?
25        MR. GOLD:  Objection as foundation.

116

1         THE WITNESS:  Yeah, I don't know.
2         MR. PHELPS:  Q.  You understood that your card,
3  because it was affiliated with MasterCard, it allows you
4  at some locations to use your debit card without entering
5  a PIN number; right?
6         MR. GOLD:  Objection to foundation.
7         MR. PHELPS:  Q.  Do you know?
8    A.   I do not know.
9    Q.   Does it cost you anything to have a debit card,
10  you personally?
11    A.   No.
12    Q.   As far as you're concerned, there's no fee
13  that's charged that you have to incur?
14    A.   That's right.
15        MR. PHELPS:  Let's go off the record for just a
16  second.
17        (Off the record at 12:02 p.m.)
18        (Resumed at 12:03 p.m.)
19        MR. PHELPS:  Q.  In your understanding,
20  Ms. Bautista, could you have a bank account without having
21  a debit card?
22    A.   Yeah.
23    Q.   Do you know whether the fees would be lower if
24  you had a bank account but no debit card?
25        MR. GOLD:  Object to the question as vague,

117

1  ambiguous.
2         THE WITNESS:  Yeah, I'm not sure of the bank's
3  technical policy.
4         MR. GOLD:  Also foundation.  Sorry.
5         MR. PHELPS:  Q.  We talked a while ago about
6  when you were running your business and it was cash or
7  check only.
8         Can you think of other examples of businesses
9  that are cash or check only?
10    A.   Restaurants.
11    Q.   Can you think of any others?
12    A.   A lot.  A lot.
13    Q.   Dry cleaners?
14    A.   Yes.
15        MR. GOLD:  I'm going to object just for
16  foundation, calls for speculation.
17        MR. PHELPS:  Q.  If you go to an ATM -- I'm
18  sorry, let me rephrase that.
19        You can use your card that we've been talking
20  about in an ATM; correct?
21    A.   Correct.
22    Q.   If you go to an ATM but it's not from your bank
23  and you get cash, you get charged a fee; correct?
24    A.   Not necessarily.
25    Q.   Sometimes you do?

118

1   A.  Sometimes you do, sometimes you don't.
2   Q.  So, in some circumstances, when you use your
3  debit card to get green money, you have to pay for that
4  privilege; correct?
5   A.  Not necessarily.
6   Q.  But, in some circumstances, you do; right?
7   A.  Not in my case.
8   Q.  And that's because you don't go to ATMs outside
9  of your network?
10   A.  No, I still go.
11   Q.  When you got your bank accounts set up, you got
12  disclosures and agreements from the banks; right?
13   A.  Yes.
14   Q.  Did you read them?
15   A.  No.
16   Q.  You didn't read them at all?
17   A.  Nobody reads them.
18   Q.  Well, maybe this part will be quicker than I
19  thought.
20   (Exhibit 28 marked for identification.)
21   MR. PHELPS:  Q.  Showing you what we've marked
22  as Exhibit 28, Ms. Bautista -- and this was a document
23  that was produced by your counsel and it has the
24  production numbers Bautista 38 through 66 -- do you
25  recognize this document?

119

1   A.  Yes.
2   Q.  It's titled Client Manual Consumer Accounts,
3  Effective July 23, 2015.
4   This was basically relating to your account with
5  Citibank; correct?
6   A.  Yes.
7   Q.  Just a couple of quick questions on this.
8   Did you read through this at any time?
9   A.  No.
10   Q.  I'd like you to -- with that in mind, I would
11  like you to turn to page 59.  It's got the Bautista
12  production number 59.
13   A.  Okay.
14   Q.  And it's under the heading "Point-Of-Sale (POS)
15  Transactions."  Do you see that?
16   A.  Yes.
17   Q.  You have an understanding of the term
18  "point-of-sale"; correct?
19   A.  Yes.
20   Q.  Down at the last paragraph on that page, the
21  penultimate sentence reads, "We reserve the right to block
22  or deny certain merchant categories when you attempt to
23  make purchases with your Citibank Banking Card.  These
24  merchants include, but are not limited to, internet
25  gambling sites."  Do you see that?

120

1   A.  Yes.
2   Q.  So one of the things that's different about
3  using your card as opposed to using greenbacks, green
4  cash, is that Citibank has said that they will reserve the
5  right to not let you use the card for certain types of
6  purchases; right?
7   A.  Yes.
8   (Exhibit 29 marked for identification.)
9   MR. PHELPS:  Q.  Ms. Bautista, Exhibit 29 is
10  another document that was produced to us by your counsel
11  bearing the production numbers Bautista 3 through 35, and
12  this appears to be a Deposit Account Agreement for Chase.
13   This was another one of your bank disclosures;
14  right?
15   A.  Yes.
16   Q.  Did you read this one?
17   A.  You know, you glance at it, not really read it.
18   Q.  When you glanced at it, did you look for
19  anything in particular?
20   A.  When you open a bank account, the teller explain
21  to you what type of accounts you have, so ...
22   Q.  Turning to the page that's got the number
23  "Bautista 26" on it, please.
24   Do you see at the bottom of the page there's a
25  heading that says, "Important Information And Agreements

121

1  About Your ATM Or Debit Card"?
2   A.  Yes.
3   Q.  And then, the second one that's listed is called
4  "Holds."
5   You're familiar with the concept of hold being
6  put on funds when you use a debit or a credit card;
7  correct?
8   A.  Yes.
9   Q.  That's different?  You know, putting a hold on
10  your credit is different from using green cash; right?
11   MR. GOLD:  I'll object; foundation.
12   MR. PHELPS:  Q.  The fact that the bank can put
13  a hold on some of your money is different from, say, going
14  to the store and using paper money; that's different,
15  right?
16   MR. GOLD:  I'm going to object to the questions.
17   THE WITNESS:  I don't know.
18   MR. PHELPS:  Q.  Let me re-ask it.
19   You understand the concept of the "hold";
20  correct?
21   A.  Yes.
22   Q.  And that is something that occurs when you
23  purchase something with a credit card or a debit card;
24  correct?
25   MR. GOLD:  I'm sorry; just to the previous

122

1  question, I'm going to object to foundation.  Continue.
2      MR. PHELPS:  Q.  So the hold is something that
3  occurs when you buy something with your debit or credit
4  card; correct?
5      A.  I don't know how they do that.
6      Q.  Let's go to the next page.
7          Under No. 4 it says, "We may cancel your Card at
8  any time without notice"; right?
9      A.  Yes.
10     Q.  The bank doesn't have the ability to cancel your
11 green money; does it?
12     MR. GOLD:  I'm going to object to foundation.
13     THE WITNESS:  Yeah.  Yes.
14     MR. PHELPS:  Q.  Then No. 5, "Our Right to
15 Refuse Transactions.  We can refuse to authorize any
16 transaction when your Card has been reported lost or
17 stolen or when we reasonably believe there is potentially
18 fraudulent, suspicious or illegal activity on your
19 account."  Do you see that?
20     A.  Yes.
21     Q.  That's something that doesn't happen when you
22 use green cash; right?
23     MR. GOLD:  I'm going to object to the form of
24 the question.
25     THE WITNESS:  I guess.

123

1          (Exhibits 30 and 31 marked for identification.)
2      MR. PHELPS:  Q.  Ms. Bautista, I'm showing you
3  what we've marked as Exhibit 30 to your deposition.  Do
4  you have that in front of you?
5      A.  Yes.
6      Q.  Do you recognize this as a photograph of the
7  Daly City service station that we've been talking about?
8      A.  Yes.
9      Q.  You see on the street signs there you can see
10 that it's Mission Street and the cross street is Bismark?
11     A.  Yes.
12     Q.  And Exhibit 31, you recognize that as a copy of
13 the main price sign there at the station at the corner of
14 Mission and Bismark; right?
15     A.  Yes.
16     Q.  Do you know who owns the signs at that station?
17     MR. GOLD:  Objection; foundation.
18     THE WITNESS:  Yeah, I don't know.
19     MR. PHELPS:  Q.  Do you have any understanding
20 of who decides what the signs should look like?
21     MR. GOLD:  Object to foundation.
22     THE WITNESS:  We would not know that.
23     MR. PHELPS:  Q.  Do you have any understanding
24 as to whether the signs are in compliance with state or
25 local laws?

124

1      MR. GOLD:  Objection; foundation.
2      THE WITNESS:  Yeah, I would not know that.
3      MR. PHELPS:  Q.  To your understanding -- I'm
4  sorry.
5          In your experience, are the Valero signs
6  different from signs used by other brands?
7      MR. GOLD:  Object to the form of the question.
8      THE WITNESS:  I don't know.
9      MR. PHELPS:  Q.  In your experience, is Valero
10 the only one who's advertising split prices the wrong way?
11     MR. GOLD:  Object to the form of the question.
12     THE WITNESS:  I don't know.
13     MR. PHELPS:  Q.  If state law does not require
14 that Valero stations separately disclose a price charged
15 to debit customers, should Valero be the only company in
16 California required to make that disclosure?
17     MR. GOLD:  I'm going to object to the form of
18 the question.  Calls for a legal conclusion.
19     THE WITNESS:  Yeah, I defer that to my lawyer.
20     MR. PHELPS:  Q.  Are you able to answer that
21 question?
22     A.  No.
23     Q.  As a consumer, Ms. Bautista -- let's take a look
24 at Exhibit 30, which is the sort of longer shot of the
25 station looking up Mission Street.

125

1          As a consumer, you look at the sign in making
2  your decision whether to buy gas?
3      A.  Yes.
4      Q.  What do you look at on the sign?  Is there
5  anything in particular?  Do you read the whole thing?  Do
6  you look at something specific?
7      A.  Yes, I look at the "cash" and the "credit," look
8  at the price.
9      Q.  Do you look at all of the prices or just for one
10 grade?
11     A.  I look at the prices and what?
12     Q.  Do you look at all of the prices -- let me ask a
13 preliminary question.
14         You see that, turning to Exhibit 31, the price
15 sign there, how there's a price for Unleaded, a price for
16 Unleaded Plus and a price for Unleaded Super, Cash and
17 Credit; right?
18     A.  Yes.
19     Q.  My question to you is, as a consumer, when you
20 are deciding whether you are going to go in and buy gas at
21 this station, do you look at all of the prices or just one
22 of them?
23     A.  I look at all the prices.
24     Q.  How much time do you think you spend reading the
25 sign as you're driving before you make the decision to go

126

1  into a particular station?
2      A.  I really look at the sign.
3      Q.  I understand that.  And my question, Ma'am, was
4  how much time do you think you spend looking at it?
5      MR. GOLD:  I'm just going to object to the
6  question, form of the question.
7      THE WITNESS:  Yeah, I would not know minute,
8  seconds, like that, no.  So it's hard to answer.
9      MR. PHELPS:  Q.  Five seconds?
10     MR. GOLD:  Object to the question.
11     MR. PHELPS:  Q.  Do you know what the speed
12  limit is on Mission there?
13     A.  I'm not sure; 35, 40.
14     Q.  35, 40 miles an hour, is that what people
15  usually drive?
16     A.  Uh-huh (affirmative).
17     MR. GOLD:  Object to the form of the question.
18     MR. PHELPS:  Q.  Your answer is "yes"?
19     A.  Yes.
20     Q.  And so, as you're driving up Mission Street at
21  35 miles an hour or so, how far away do you think you can
22  see the sign?
23     MR. GOLD:  I'm going to object to the form of
24  the question; it's incomplete hypothetical.
25     THE WITNESS:  Yeah, that one I could not.

127

1      MR. PHELPS:  Q.  Let's look at Exhibit 30, which
2  is the long-shot of the station.
3      How close do you think you physically have to be
4  to that station before you can read the signs?
5      MR. GOLD:  I'll object to the form of the
6  question.
7      THE WITNESS:  I don't know.  10 feet, 12 feet.
8  I'm not sure.
9      MR. PHELPS:  Q.  So if you take a look at
10  Exhibit 31, do you have that in front of you?
11     A.  Yes.
12     Q.  And it says that there's a price for Cash;
13  correct?
14     A.  Yes.
15     Q.  And it says there's a price for Credit; correct?
16     A.  Yes.
17     Q.  What does it say about the price you're going to
18  get if you use a debit card?
19     A.  Cash.
20     Q.  Isn't it, in fact, the case, Ms. Bautista, that
21  it says nothing, that it doesn't say "debit" at all?
22     A.  No, it has to be cash, it's my -- my debit is
23  cash.
24     Q.  Why is your debit cash?
25     A.  Because it's being removed from my bank account

128

1  immediately and this is what debit is all about; it's
2  equivalent as cash.
3      MR. PHELPS:  Counsel, the complaint, that's what
4  I'm looking for.  Thank you very much.
5      Q.  If you could go back to Exhibit 2, Ms. Bautista,
6  which is the Second Amended Complaint in this case, I'd
7  like you to turn to page eight.  There's a photograph of
8  the service station.
9      That's the Daly City station; correct?
10     A.  Yes.
11     Q.  Is that a picture you took?
12     A.  Yes.
13     Q.  Do you recall when you took it?
14     A.  I think you asked me a while ago, too.
15     Q.  I'm not sure this is the same picture.  If you
16  have a recollection.
17     A.  Yeah, I don't.
18     Q.  If you can turn to page 12.  That's a picture of
19  one of the dispensers at the Daly City location; correct?
20     A.  Yes.
21     Q.  Did you take this picture?
22     A.  Yes.
23     Q.  Do you see how there's the keypad in the upper
24  left corner and you can see the red button?
25     A.  No.

129

1      Q.  Do you see the red button up in the corner there
2  (indicating)?
3      A.  Right there, okay.
4      Q.  Do you see it?
5      A.  Yeah.
6      Q.  In the time that you were purchasing gas at the
7  Mission Street Daly City station, did you ever have to
8  leave the pump, walk away from the dispenser, to see the
9  street sign for what the prices are?
10     MR. GOLD:  I'm just going to object to the form
11  of the question.
12     THE WITNESS:  No.
13     MR. PHELPS:  Q.  I'm sorry; your answer is "no"?
14     A.  No.
15     Q.  I'd like you to turn to page -- please turn to
16  page 19 of the complaint.  In paragraph 51, it is alleged
17  "At various times throughout the Class Period, Plaintiff
18  purchased gasoline from a number of Valero-branded dealers
19  throughout California where Valero advertised Split
20  Pricing."  Do you see that?
21     A.  Yes.
22     Q.  We have the Mission Street station, we have the
23  Redwood City station.
24     Can you identify for us any other specific
25  Valero stations that you shopped at that had Split Pricing

130

1 besides those two?
2 A. I do not know.
3 Q. Is it that you don't remember or that your
4 answer is it was only those two?
5 A. Yeah, I mean, I don't remember and I don't know.
6 Q. It says in paragraph 55 "Plaintiff either did
7 not notice the 'price per gallon' displayed on the fuel
8 dispenser or she did not recognize the price to be
9 Valero's credit price." Do you see that?
10 A. Yes.
11 Q. And now, this is referring to transactions that
12 you personally did at the Daly City station. Which one
13 was it? Did you not notice the price per gallon display
14 or you didn't recognize the price to be Valero's credit
15 price?
16 A. I did not recognize the price of Valero's credit
17 price.
18 Q. In paragraph 56 on the next page --
19 A. Page what?
20 Q. The next page, there's paragraph 56 that says,
21 "Plaintiff would not have purchased gasoline from
22 Valero-branded dealers with a debit card but for Valero's
23 knowing and intentional scheme." Do you see that?
24 A. Yes.
25 Q. If you had known at the time that you made your

131

1 purchases at the Daly City station that you were not
2 getting the cash price, what would you have done?
3 A. I would complain.
4 Q. Did you?
5 A. No.
6 Q. Would you have gone somewhere else without
7 buying anything at the Valero station if you knew?
8 A. See, the fact is, I did not really notice then,
9 that's why, so ...
10 Q. Well, the allegation here, though, says you
11 would not have purchased gasoline from Valero-branded
12 dealers with a debit card had you known what Valero is
13 doing.
14 A. Yes, that's right.
15 Q. My question is, when you went to the Daly City
16 station here, if you had found out when you were there,
17 what would you have done?
18 A. I would not get gas.
19 Q. You would have left without buying?
20 A. Uh-huh (affirmative).
21 Q. The answer is "yes"?
22 A. Yes.
23 Q. Where would you have gone?
24 A. To maybe Texaco.
25 Q. At the time that you did the transaction where

132

1 we have the receipt here in the complaint, the 10/26/2015
2 transaction for $31.96, do you know if you had $31 in cash
3 on you at that time that you could have used?
4 A. No, I do not know.
5 MR. GOLD: Counsel, sorry to interrupt. I just
6 want to make sure you have a clear answer to the previous
7 question you asked -- I don't know if she did or not --
8 about paragraph 55; I'm not sure -- we're referring to the
9 price per gallon displayed. I'm not sure if you want --
10 if she understood what exactly you were referring to, or
11 if you want to use the exhibit to point out?
12 MR. PHELPS: No, I'm satisfied. Thank you; I
13 appreciate that.
14 Q. Ms. Bautista, you believe you've been damaged by
15 Valero; correct?
16 A. Yes.
17 Q. In what ways have you been damaged?
18 A. They deceive you. They give you a credit price
19 for the cash price.
20 Q. You, personally, in the times that you've gone
21 to Valero stations over the last five years, how much
22 total do you believe you were overcharged?
23 A. I would not know.
24 Q. Was it more than $20?
25 A. Oh, yes.

133

1 Q. So, on a per-gallon basis, how much do you think
2 you were overcharged?
3 A. Well, you're asking me math questions.
4 Q. Yes, Ma'am, I sure am.
5 A. I don't know.
6 Q. Ms. Bautista, I'm just trying to find out how
7 much you think your damages are.
8 How much do you believe Valero has damaged you
9 by this overcharge?
10 A. So personally --
11 Q. Yes.
12 A. -- not thousands, right. But even though, let's
13 say, I got damage of a thousand dollars, how many of me
14 got damaged of a thousand?
15 Q. I understand that, Ms. Bautista, and that's why
16 we have class actions.
17 But you are sitting here as the representative
18 plaintiff in the case, and if the plaintiffs prevail on
19 this claim, you get your damages, you don't get damages
20 for other people. Do you understand that?
21 A. I understand that.
22 Q. And so, if you were to say personally, Faith
23 Bautista was overcharged by Valero how much?
24 MR. GOLD: I'll just object that the question
25 calls for speculation.

134

1     MR. PHELPS:  I understand.
2     Q.  How much do you believe you were overcharged?
3     A.  I don't know.
4     Q.  Less than a thousand dollars?
5     A.  Probably.
6     Q.  Less than 500?
7     A.  It's not just -- it's not just the money.
8     Q.  Okay.  Let's take it one step at a time.
9     MR. GOLD:  Were you finished with your answer?
10    THE WITNESS:  Well, it's not just the money that
11 got damaged here.  It's deceiving.  And had I known that,
12 I could have gone somewhere else, so my time -- you have
13 to add the time.
14    MR. PHELPS:  Q.  So, in addition to the
15 out-of-pocket money, you have the lost value of time;
16 correct?
17    A.  Yes.
18    Q.  Anything else?  All of the damages that you
19 believe you suffered because of what you're complaining
20 against Valero here.
21    A.  That's all I could say right now.
22    Q.  And as you sit here today, you're unable to give
23 me a precise figure; correct?
24    A.  Correct.
25    Q.  If we went back through the transaction records

135

1 that we marked as exhibits and figured out how many
2 gallons of gas you had bought, would we be able to do a
3 calculation there of how much you were overcharged?
4     MR. GOLD:  I'm going to object to the question
5 that it lacks foundation, calls for speculation.
6     THE WITNESS:  I'm going to defer that to my
7 counsel.
8     MR. PHELPS:  Q.  You're unable to answer the
9 question?
10    A.  Yes.
11    Q.  But in the sense of you as the individual
12 plaintiff -- I'm sorry, the representative plaintiff, you
13 believe you were damaged; correct?
14    A.  Yes.
15    Q.  You believe you were damaged in at least two
16 ways, one was money damages from being overcharged for
17 gas; correct?
18    A.  Yes.
19    Q.  And in your mind, that overcharge would be the
20 difference between the cash price that was advertised and
21 the credit price that you claim you were charged; correct?
22    A.  Correct.
23    Q.  And so, if that was four cents a gallon, just
24 for the sake of argument -- I mean, we looked at
25 Exhibit 31 here; there's a four-cent spread between the

136

1 cash and the credit.
2     How many gallons do you typically buy?
3     MR. GOLD:  Object to the question.
4     THE WITNESS:  I don't know.
5     MR. PHELPS:  Q.  So you buy about $30 worth, it
6 seems like.  So maybe 10 gallons?
7     MR. GOLD:  I'm going to object to the question.
8     THE WITNESS:  Maybe.
9     MR. PHELPS:  Q.  So if you were overcharged four
10 cents a gallon and in the transaction you -- let's be
11 generous and say you bought 20 gallons; eighty cents?
12    MR. GOLD:  Object to the question.
13    THE WITNESS:  Yes.
14    MR. PHELPS:  Q.  With that in mind, do you have
15 a sense of the magnitude of the money damages that you
16 think you've suffered?
17    MR. GOLD:  Object to the question.  Asked and
18 answered, calls for speculation.
19    THE WITNESS:  Yeah, I'm gonna defer that.
20    MR. PHELPS:  Q.  In addition to the monetary --
21 I want to make sure we're clear on this.
22    In addition to the out-of-pocket, the monetary
23 damages, you also said that there was a time value, or a
24 value for your time.  Is there a way that you can put a
25 dollar figure on that?  Let me withdraw that and ask a

137

1 different question.
2     How does Valero compensate Faith Bautista for
3 that value of time?
4     MR. GOLD:  I'll object to the question as it
5 calls for a legal conclusion.
6     THE WITNESS:  Yeah, I would not know that.  You
7 guys figure it out.
8     MR. PHELPS:  Q.  Is it something you can put a
9 dollar amount on personally how much it was worth to you?
10    A.  No.  This is not me, right, it is everyone.  How
11 many people goes to Valero every single day?
12    Q.  Ms. Bautista, I'm completely understanding what
13 you're saying that four cents a gallon may not be a lot of
14 money in isolation, but if you multiply it by the number
15 of people that are involved, then you start talking about
16 big numbers here.
17    But we're here for your deposition, and I'm
18 trying to determine what you claim your damages are.
19 Other people may have other damages.  They may have other
20 claims, but I want to know what it is that you think
21 damaged you.  We've got the money and this value for your
22 time.
23    Is there anything else?
24    A.  Yes, the deceiving.
25    Q.  You feel bad because you felt you were lied to?

138

1    A.  Yes.
2    Q.  Is that something that you think that Valero
3  should compensate you for, for that bad feeling?
4    A.  Yes.
5    Q.  And how do we do that?  How do we determine how
6  much the bad feeling that Faith Bautista felt is worth?
7         MR. GOLD:  Object to the question.
8         THE WITNESS:  I'm going to defer that to the
9  lawyer.
10        MR. PHELPS:  Q.  You don't have something in
11  mind that would compensate you for that; correct?
12    A.  No, I don't.
13    Q.  Ms. Bautista, do you consider yourself an expert
14  on consumer behavior?
15        MR. GOLD:  I'm going to object to the question.
16  Vague term.
17        THE WITNESS:  (Witness shakes head.)
18        MR. PHELPS:  Q.  No?
19    A.  No.
20    Q.  Do you have more experience or training in
21  consumer behavior than the typical person?
22        MR. GOLD:  Object to the form of the question
23  and lacks foundation.
24        THE WITNESS:  Yeah, I cannot say that.
25        MR. PHELPS:  Q.  Have you taken any classes

139

1  either when you were working on your bachelor's degree or
2  at any other time on the subject of consumer behavior?
3    A.  Yes.
4    Q.  What types of classes did you take on that
5  subject?
6    A.  People go by the ads.
7    Q.  The advertisements?
8    A.  Advertisements, signs like this.  You know,
9  people are usually not -- especially the people that I
10  represent, English is a second language, immigrants.  So
11  they don't read fine prints, they don't pay attention to
12  that red button that you showed me there.  They don't
13  really know what that means.
14    Q.  Do you believe that's typical of consumers in
15  California?
16    A.  Yes, for -- I'm talking about the immigrants,
17  the low-income families.
18    Q.  What about if we expand it to Californians in
19  general?  You understand this case is not just on behalf
20  of immigrants and low-income people?
21    A.  I understand.
22    Q.  If you had a wealthy person from Beverly Hills
23  who went to a Valero station, would you consider that the
24  same way?
25        MR. GOLD:  Object to the question.

140

1         THE WITNESS:  You know, it's all relative.
2  Sometimes it's not money, it's how they were treated.
3         MR. PHELPS:  Q.  So people have different
4  reasons for liking or disliking a particular merchant;
5  right?
6         MR. GOLD:  Object; foundation.
7         THE WITNESS:  I guess.
8         MR. PHELPS:  Q.  The training that you have on
9  consumer behavior, the classes, was that in the context of
10  getting your bachelor's degree?
11    A.  No.
12    Q.  Where was that that you had that training?
13    A.  It's just experience.
14    Q.  Life?  It's your life experience?
15    A.  Right.
16    Q.  Do you --
17         Maybe counsel can help me on this.  Is she going
18  to be designated as an expert in any way?
19         MR. GOLD:  An expert, no.
20         MR. PHELPS:  Q.  Have you ever testified as an
21  expert on consumer behavior?
22    A.  No.
23    Q.  Have you ever spoken in any of your testimony,
24  your public testimony, about the subject of consumer
25  behavior?

141

1    A.  Not really.
2    Q.  In some way, have you?
3    A.  I guess for like the rate increase, like people
4  have no choice of any rate increases.
5    Q.  So this would be, for example, testimony that
6  you gave before the CPUC?
7    A.  Correct.
8    Q.  And you've spoken that rates may have been too
9  high and that that was harming consumers; correct?
10    A.  That's right.
11         MR. PHELPS:  Ms. Bautista, I don't have any
12  further questions.  Your counsel may.  But I think we're
13  done.
14         The one thing I have to tell you is that, before
15  anybody leaves, we have to make sure that the reporter has
16  all of the original exhibits, because if somebody
17  accidently walks off with them or makes a mess of them
18  like I have, then we're all in trouble.
19         MR. GOLD:  I do have some questions.  I would
20  just like to take a quick break.
21         (Off the record at 12:36 p.m.)
22         (Resumed at 12:49 p.m.)
23
24              EXAMINATION BY MR. GOLD
25         MR. GOLD:  Q.  Ms. Bautista, I just have a

142

1 couple of questions for you.
2      As alleged in the complaint, we alleged that you
3 used the MasterCard-branded debit card.  And we talked
4 about that a little bit earlier.
5      Your MasterCard-branded debit card, do you
6 consider that to be a debit card or a credit card?
7      A.  Debit card.
8      Q.  Why do you consider it to be a debit card?
9      A.  Because it's taking money out from my checking
10 account immediately.
11      Q.  Have you ever used your MasterCard-branded debit
12 card to buy something on credit -- excuse me.
13      Have you ever used your MasterCard-branded debit
14 card to buy something on credit?
15      A.  No.
16      Q.  Why not?
17      A.  Because it's credit, and my debit card is my
18 cash.
19      Q.  Ms. Bautista, you testified that you believe a
20 debit card should be treated as cash.  Why is that?
21      MR. PHELPS:  Asked and answered.
22      MR. GOLD:  Q.  You can answer.
23      A.  It's because -- that's like I always say, debit
24 card is cash to me because it's -- I'm not charging.  It's
25 going to be taken out from my account immediately.

143

1      Q.  So once you use your debit card, is it your
2 testimony that the cash in your bank account is
3 immediately deducted?
4      A.  Correct.
5      MR. PHELPS:  Lacks foundation.
6      MR. GOLD:  Q.  So you testified earlier about
7 some of the factors that you consider when selecting a gas
8 station to purchase gas from, and I believe two of the
9 factors you consider are the lowest price and convenience;
10 is that correct?
11      A.  Yes.
12      Q.  What is the most important factor for you when
13 choosing a gas station?
14      A.  Lowest price.
15      Q.  Ms. Bautista, earlier you testified that when
16 you use a debit card at the ATM, it's possible that you
17 can be charged a fee to use an ATM machine that is outside
18 of your network; is that correct?
19      A.  Yes.
20      Q.  How would you know if you are being charged a
21 fee to use an ATM?
22      A.  Because it says there.
23      Q.  It says what?
24      A.  It says on the -- on the -- so your question is
25 how do I know if I'm being charged?

144

1      Q.  My question, I'll repeat it.
2      When you use a debit card at an ATM machine that
3 is not affiliated with your bank and it charges you a fee
4 to use the machine, how would you know that you were being
5 charged a fee?
6      A.  I would not know.
7      Q.  You would not know that you're being charged a
8 fee to use the debit -- to use an ATM machine?
9      A.  I guess I'm not -- trying to understand.
10      MR. PHELPS:  Objection; leading.
11      MR. GOLD:  I'm just trying to get it clear.
12      MR. PHELPS:  I understand.
13      MR. GOLD:  Q.  If you use a debit card at an ATM
14 machine and it charges you a fee, how would you know that
15 you were being charged a fee?
16      A.  Because it says on the -- do they put it there
17 on the -- on the -- what they call this, the pump?
18      Q.  We're talking about the ATM machine.  ATM, so
19 you're using your debit card --
20      A.  Oh, the ATM machine, okay, not the gas.  Sorry.
21      Q.  ATM machine to withdraw cash.
22      A.  No, I do not get charged for that.
23      Q.  We'll move on.
24      Ms. Bautista, you testified earlier that your
25 assistant purchased gas for you at a Valero-branded

145

1 station after this lawsuit commenced; is that correct?
2      A.  Correct.
3      Q.  Has your assistant ever purchased -- other than
4 that time, has your assistant purchased gas for you?
5      A.  Yes.
6      Q.  You testified earlier about what Valero can do
7 to cure the deception that is alleged in this case.
8      You testified that they could change the sign to
9 indicate that the debit -- the credit price will apply to
10 a debit card; is that correct?
11      A.  Yes.
12      Q.  Are there any other ways that Valero can cure
13 the deception in this case?
14      A.  They need to pay damages to the people and they
15 need to do the right thing.
16      Q.  "To do the right thing."  What can Valero do?
17 You testified that they can have a proper sign.
18      Is there anything else that they can do?
19      A.  Reimburse those people and then pay for the
20 damages.
21      Q.  Ms. Bautista, when you use your debit card to
22 purchase gasoline or any consumer good, do you have any
23 knowledge about how the money is deducted from your
24 account and transferred to the merchant?
25      A.  I do not know.

146

1    Q.  Ms. Bautista, I'm going to direct your attention
2 to some of the exhibits we looked at earlier.  We'll look
3 at Exhibit 24, which is the photograph of what counsel
4 represented to be a fuel dispenser at the Daly City
5 station on Mission Street, and Exhibit 2, which is the
6 Second Amended Complaint.
7        So earlier you testified, looking at paragraph
8 55 -- in paragraph 55 you allege that "Plaintiff either
9 did not notice the 'price per gallon' displayed on the
10 fuel dispenser or she did not recognize the price to be
11 Valero's credit price."
12       Earlier, in response to counsel's question, you
13 testified that you did not recognize the price to be
14 Valero's.  Was your testimony accurate?
15       Let me direct your attention.  This paragraph,
16 do you understand this paragraph to be referring to these
17 windows on the fuel dispensers?
18    A.  Right.
19       MR. PHELPS:  I'm going to object to this whole
20 line of questioning as being not only leading but
21 incredibly leading, but continue.
22       MR. GOLD:  Q.  Was your testimony accurate with
23 respect to --
24    A.  Yes.
25    Q.  Your testimony was accurate?

147

1    A.  Yes, it's accurate.
2    Q.  So when it says "either/or," so either you did
3 not recognize -- I'm sorry.
4        Either you did not notice the price per gallon
5 displayed or you did not recognize?
6    A.  That's right.
7       MR. PHELPS:  Leading.
8       MR. GOLD:  Q.  Is it either/or or is it one or
9 the other?
10    A.  Both.
11    Q.  It's both?
12    A.  Yes.
13    Q.  You testified earlier that it was the second
14 one?
15    A.  That's correct, right.  You're right, I
16 testified this one, but this is -- I did not notice the
17 price per gallon, and then ...
18    Q.  So is it your testimony now that your earlier
19 testimony was not accurate?
20    A.  Correct.
21    Q.  Just to clarify the record, you are saying it's
22 -- I think the record is clear.
23    A.  Yes.
24    Q.  I don't want to confuse it any more.
25       When a person uses a debit card to purchase gas

148

1 at a Valero-branded station that offers split pricing,
2 what price should they be charged, the cash price or the
3 credit price?
4       MR. PHELPS:  Lacks foundation, calls for
5 speculation.
6       MR. GOLD:  Q.  Let me rephrase the question.
7       Ms. Bautista, in your opinion, when you use a
8 debit card to purchase gasoline at a Valero-branded
9 station that offers split pricing, should you be charged
10 the cash price or the debit -- or the credit price?
11    A.  Cash.
12    Q.  Cash price, okay.
13       Ms. Bautista, how much time have you spent on
14 this case up until now?
15    A.  A lot.  You know, from the talking to the
16 lawyers, email, you know, phone calls, reading, meeting in
17 person, driving, and L.A. is terrible traffic.  My
18 supposedly half an hour became hour-and-a-half, so ...
19    Q.  And?
20    A.  And here, too, San Francisco.
21    Q.  You testified that you reviewed some stuff?
22    A.  Yes.
23    Q.  What did you review in this case?
24    A.  All of this.
25    Q.  "All of this," do you mean the court filings?

149

1    A.  The court filings.
2       MR. PHELPS:  To be clear, for the record, the
3 witness was indicating not the court filings but the
4 Second Amended Complaint, correct?
5       MR. GOLD:  Correct.
6    Q.  Ms. Bautista, besides the Second Amended
7 Complaint, what other documents did you review in this
8 case?
9    A.  The first one and the third one.  There's like
10 three.
11    Q.  There are three complaints.
12       So the Second Amended Complaint, do you
13 understand this to be the current complaint?
14    A.  Yes.
15    Q.  So prior to this, did you review the First
16 Amended Complaint?
17    A.  Yes.
18    Q.  Prior to the First Amended Complaint, did you
19 review the original complaint?
20    A.  Yes.
21    Q.  And you reviewed those complaints prior to
22 filing?
23    A.  Yes.
24    Q.  You authorized their filing?
25    A.  Yes.

150

1    Q.  Did you review any of the -- any of the briefing
2    which are other court documents that we file in the case,
3    any legal documents besides the complaints?
4    A.  There's no other --
5    Q.  Strike that.
6        You received discovery requests in this --
7    A.  Yes.
8    Q.  Did you spend time preparing answers to the
9    interrogatories?
10   A.  Yes.
11   Q.  Did you spend time collecting discovery?
12   A.  Yes.  A lot.
13   Q.  What are you prepared to do in this case going
14   forward?
15   A.  I'm prepared to what it takes, as a
16   representative of the class.
17   Q.  Are you ready to go to trial?
18   A.  Yes.
19   Q.  You mentioned -- strike that.
20       Do you know the status of this case?
21   A.  Yes.
22   Q.  What is the status?
23   A.  We're in the deposition now, and then you're
24   going to submit it to Judge Seeborg, and then he'll figure
25   out if this is going to be classified as a class action

151

1    lawsuit.
2    Q.  Are you receiving any compensation or other
3    benefits to be a class representative in this case?
4    A.  No.
5    Q.  Are you aware of any potential conflicts of
6    interest that would prevent you from faithfully executing
7    your duties to the class?
8    A.  No.
9    Q.  When you made the purchase at the gas station
10   alleged in the complaint, why did you not enter a PIN
11   number?
12   A.  Because it did not ask for it.  Sometimes they
13   ask for zip code or the PIN number.
14   Q.  Did you see anything at all at the Mission
15   Street station that indicated to you that your debit card
16   would be charged the credit price?
17   A.  No.
18       MR. GOLD:  I have no further questions.  Thank
19   you.
20
21       FURTHER EXAMINATION BY MR. PHELPS
22   MR. PHELPS:  Just very briefly, Ms. Bautista.
23   Q.  You indicated in response to counsel's question
24   that the most important factor for you in selecting where
25   you're going to buy gas was the lower price.  Do you

152

1    recall that testimony?
2    A.  Yes.
3    Q.  Do you know whether all consumers share that
4    view?
5        MR. GOLD:  Object.  Foundation.
6        THE WITNESS:  I do not know that.
7        MR. PHELPS:  Q.  If everybody were motivated to
8    go only to the lowest price, why would anyone go to the
9    stations that have higher prices?
10       MR. GOLD:  Object to foundation.
11       THE WITNESS:  I would not know.
12       MR. PHELPS:  Q.  Now, regarding your assistant
13   who purchased the gas for you, what is that person's name?
14   A.  Lolita.
15   Q.  Lolita; and her last name?
16   A.  Balda.
17   Q.  Could you spell that, please?
18   A.  B-a-l-d-a.  "B," as in boy.
19   Q.  Now, we went through your bank records and
20   credit card receipts to determine times that you bought
21   Valero gas.
22       Are the times that your assistant bought gas for
23   you included in that?
24   A.  Maybe, yes, because sometimes I give her my
25   debit card.

153

1    Q.  But sometimes she would pay herself --
2    A.  No.
3    Q.  -- and then you would reimburse her?
4    A.  No.  Sometimes, yes.
5    Q.  And when she paid and you reimbursed her, do you
6    know whether she used a debit card?
7    A.  I do not know.
8    Q.  The complaint that counsel walked you through,
9    Exhibit No. 2, I'd like you to turn to page 19, please;
10   it's the one that's got paragraph 55.  And then if we flip
11   to the next page, it has the receipt there; correct?
12   A.  Yes.
13   Q.  And my question is, for this transaction that's
14   reflected in the receipt that's part of paragraph 55, was
15   that an instance where you didn't notice the price per
16   gallon or didn't recognize it to be the credit price?
17   Which one was it that time?
18   A.  I do not know it's because, you know, I'm in a
19   hurry when I'm getting gas so I don't know the -- I don't
20   notice the price per gallon, so ...
21       MR. PHELPS:  I don't have anything further.
22   Thank you.
23       (The deposition was adjourned at 1:03 p.m.)
24            ---oOo---
25

154

DECLARATION

I, Faith Bautista, do hereby declare under penalty of perjury that I have read the foregoing transcript of my deposition; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein as corrected is true and correct.

EXECUTED this _____ day of _____, 2017, at _____, _____.

_____
Faith Bautista

155

DEPONENT'S CORRECTION SHEET

To add testimony, indicate "Add" and print the exact words you wish to add.  To delete testimony, indicate "Delete" and print the exact words you wish to delete.

Deposition of:  Faith Bautista
Deposition Date:  May 10, 2017.

I, Faith Bautista, have the following changes to my deposition transcript:

PAGE   LINE   CHANGE (Add/Delete)
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____

156

I, the undersigned, a Certified Shorthand Reporter in the State of California, hereby certify that the witness (if applicable) in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said proceeding was taken at the time and place therein stated; that the testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete, and true record of the said testimony; and that the witness (if applicable) was informed of his/her opportunity to read and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceedings and caption named, or in any way interested in the outcome of the cause named in said caption.

Dated this 12th day of May, 2017.

/s:/Ann R. Leitz

_____
ANN R. LEITZ, CSR NO. 9149

157

Barley & Associates
Certified Shorthand Reporters
2977 Ygnacio Valley Road, #123
Walnut Creek, California  94598
(925) 934-8884
Date: May 12, 2017

Faith Bautista
C/O Christopher Gold, Esq.
Robbins, Geller, Rudman & Dowd, LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
Case: Bautista vs. Valero Marketing and Supply
Deposition of: Faith Bautista
Date taken: May 10, 2017
Dear Ms. Bautista,
Please be advised the original transcript of your deposition is ready for your review.

You may either call my office to make arrangements with me to read and sign the original transcript, or you may contact your attorney or the attorney who arranged for you to be present at your deposition.  If they have ordered a copy of the transcript, you may review their copy and make corrections by indicating on a separate sheet of paper the page and line number and the word or words you wish to correct.  Please then sign your correction sheet at the bottom and return it to the above address.

As this is a civil action, you have 35 days from the date of this letter to read, correct, if necessary, and sign your transcript.  It will then be sealed and sent to the examining attorney pursuant to the applicable law.

ANN R. LEITZ, CSR #9149

cc:  All Counsel